# Exhibit 19

```
1    SUPREME COURT OF THE STATE OF NEW YORK

2    COUNTY OF RICHMOND:  CIVIL TERM:  PART TP 12G
     ------------------------------------------X
3    In the matter of the application of       :
     BERNARD BLACK,                            :
4                                              :

5    for the Appointment of a Guardian of the :

6    Person and Person and Property of         :

7    JOANNE BLACK                                    Index No.
                                                     80253/2014
8    An Alleged Incapacitated Person.          :
     ------------------------------------------X
9                             26 Central Avenue
                              Staten Island, New York
10                            March 21, 2016

11
     B E F O R E:       THE HONORABLE THOMAS P. ALIOTTA
12                         Justice of the Supreme Court

13
     A P P E A R A N C E S:
14
     PIPER HOFFMAN, ESQ. PLLC
15   Attorney for the Petitioner
             379 Fifth Street
16           Brooklyn, New York 11215
     BY:    PIPER HOFFMAN, ESQ.
17

18   GOLDFARB ABRANDT SALZMAN & KUTZIN, LLP
     Attorneys for AIP Joanne Black
19           350 Fifth Avenue
             New York, New York 10118
20   BY:    IRA SALZMAN, ESQ.

21

22   BAMUNDO ZWAL & SCHERMERHORN, LLP
     Court Evaluator
23           111 John Street
             New York, New York 10038
24   BY:    BART RUSSO, ESQ.

25   BRIAN A. RAPHAN, PC
     Attorneys for Cherie Wrigley
```

ORIGINAL

```
 1    7 Penn Plaza
           New York, New York 10001
 2    BY:   MELISSA COHENSON, ESQ.

 3

       PROCOPIO, CORY, HARGREAVES & SAVITCH
 4    Trustee
      525 B Street - Suite 2200
 5           San Diego, Ca 92101
      BY:   ANTHONY DAIN, ESQ.
 6

 7    KATHERINE LITVAK, ESQ.
      Pro Se
 8    c/o Northwestern University
      357 East Chicago Avenue
 9           Chicago, Illinois 60611
      BY:   KATHERINE LITVAK, ESQ.
10

11    SHARAN R. ABRAHAM, ESQ.
      Attorney for Petitioner
12           33 South Street
             Roslyn Heights, New York 11577
13    BY:   SHARAN R. ABRAHAM, ESQ.

14
                        TERI MALTESE and JOHN V. STEWART,
15                         Senior Court Reporters

16

17

18

19

20

21

22

23

24

25
```

PROCEEDINGS

1        THE COURT:  Maybe you can--

2        MR. SALZMAN: Counsel is correct.  Counsel is

3    correct, I apologize.  All right.  So this is the

4    round about way of saying no.

5        I guess my other application before

6    Miss Cohenson.  We have a number of witnesses here

7    who the clerk has asked be excused pending a ruling

8    of the Court.  We would ask that these witnesses be

9    allowed to remain in under 8114C which says the Court

10   shall not exclude a person or persons of the general

11   public from a proceeding under this article except

12   upon finding of good cause shown.  In determining

13   whether good cause has been shown, the Court shall

14   consider the interest of the public, the interest of

15   justice nature of the proceedings and the privacy of

16   the person alleged to be incapacitated.  Certain

17   privacy is not an issue.  My client wants these

18   people here.

19        In addition, one of these people is an expert

20   witness who should be allowed to be present in any

21   case to hear the testimony.  She can testify about

22   it.

23        THE COURT:  Who is the expert?

24        MR. SALZMAN:  Pamela Kerr, the forensic

25   accountant.

tm

PROCEEDINGS

1        MS. HOFFMAN:  Your Honor, I would like to be

2   heard in response to everything Mr. Salzman

3   addressed.

4        THE COURT:  Sure.

5        MS. HOFFMAN:  The acrimony in this case is at

6   an extremely high level.  It's very sad what happened

7   to this family.  Of course, I don't agree with Mr.

8   Salzman's characterization of where the fault lies.

9        Ms. Black's characterization of who it is who

10   saved her is a result of manipulation at the very

11   least --

12        MR. DAIN:  Your Honor, I will object.  Now we

13   are having the same thing.  She's testifying use of

14   the word evil is somehow objectionable and now she's

15   saying that the parties who saved her are

16   manipulating her.  If she wants to make an opening

17   statement--

18        MS. HOFFMAN:  Mr. Salzman--

19        THE COURT:  I think it is within the range

20   that we've been using thus far.

21        MS. HOFFMAN:  The way that Ms. Wrigley opened

22   her relationship with Miss Black -- because she, in

23   fact, did not have a close relationship with Miss

24   Black before Renata Black died, Joanne's mother.  The

25   way she opened her relationship was by hiring Easaun

PROCEEDINGS

1    Pinto, finding Joanne in Colorado, putting her in a

2    car, putting her under 24 hour watch, even in

3    restraints and driving her all the way to New Jersey

4    against Joanne's will.  This is also against the will

5    of Bernard Black and his wife who wanted Joanne near

6    them in Illinois so they could arrange for her care.

7              MS. COHENSON:  Your Honor, objection.  This

8    is facts.  She's testifying to personal knowledge.

9              MS. HOFFMAN:  In an opening statement it's

10   entirely proper to--

11             THE COURT:  I don't think we're in an opening

12   statement.  I think Mr. Salzman was addressing

13   whether his client would consent to an independent

14   guardian, that is really what we are talking about

15   right now.  And he indicated that she would not.

16             MS. HOFFMAN:  He also, in the process,

17   painted quite a picture that I feel needs rebuttal.

18             THE COURT:  I think the opportunity, during

19   cross, dealing with these -- I've lost count how many

20   motions we have here, there is plenty of opportunity.

21             MS. HOFFMAN:  On the topic of the witnesses,

22   we believe that the witnesses should not be in the

23   courtroom.  That the expert witnesses are certainly

24   welcome in, but this is a sensitive case.  There is

25   sensitive information about my client as well as

PROCEEDINGS

1    about Mr. Black.

2              In addition to that, if the witnesses can

3    hear the prior testimony, we won't necessarily get

4    their own testimony, we won't -- we will get what

5    they have heard as well as what they already know.

6              MS. COHENSON:  May I comment on that, your

7    Honor?

8              THE COURT:  Yes.

9              MS. COHENSON:  What I want to say is this.

10   The Court needs to look for the best interest of Miss

11   Black.  Miss Black, as you saw in October, feels

12   protected and feels comfortable when certain people

13   that are here today are, once again, behind her,

14   standing behind her.

15             I would ask your Honor, in the best interest

16   of Miss Black, you allow them in this courtroom.

17             THE COURT:  When you say "them" who are you

18   referring to?

19             MS. COHENSON:  We have Miss Lois Orlin,

20   Licensed Care Social Worker who was here October 1st;

21   we have Easaun Pinto, also here in October; we have

22   expert testimony of Pamela Kerr and we also have Miss

23   Dorothy Dain.

24             MR. DAIN:  Could I just briefly speak?

25   Dorothy Dain is my wife.  She was here at the last

tm

1        MS. COHENSON:  Yes, your Honor.

2        THE COURT:  All right, in whatever order you

3    wish to speak.

4        MS. HOFFMAN:  Your Honor, may I suggest,

5    given the late hour, that we adjourn for the day?

6        MS. COHENSON:  Your Honor, I have an expert

7    witness here today all the way from Colorado.  I

8    would ask your Honor please extend some time to

9    allow us to provide her input.

10       THE COURT:  Would she be testifying on this

11   matter?

12       MS. COHENSON:  Yes.

13       THE COURT:  All right, we can get a witness

14   on. We may not have more than a half hour, if

15   that, so we have to expedite this.

16       MS. COHENSON:  Your Honor, we would like to

17   call forensic accountant CPL certified fraud

18   examiner Ms. Pamela Kerr to the stand.

19       THE COURT:  Sure.

20       MS. COHENSON:  Thank you.

21       COURT OFFICER:  Face the clerk and raise your

22   right hand.

23   PAMELA KERR, having first been duly sworn by the

24   Clerk of the Court, testified upon her oath as

25   follows:

P. Kerr - direct - I. Salzman                282

1        THE CLERK:  Please take a seat.  For the

2   record, could I have your name and please spell

3   it?

4        THE WITNESS: Pamela Kerr, K-e-r-r.

5        THE CLERK:  Occupation?

6        THE WITNESS:  Owner of Kerr Forensic

7   Accounting.  I'm a certified public accountant, a

8   forensic certified public accountant and a

9   certified fraud examiner.

10        THE CLERK:  And your business address?

11        THE WITNESS:  650 South Cherry Street, suite

12   235, Denver, Colorado, 80246.

13        THE CLERK:  Thank you.

14        THE COURT:  Ms. Cohenson?

15        MR. SALZMAN:  With the Court's permission,

16   may I go first?

17        THE COURT:  Sure.

18   DIRECT EXAMINATION

19   BY MR. SALZMAN:

20   Q    Good afternoon Ms. Kerr?

21   A    Good afternoon.

22   Q    Ms. Kerr, how did you become involved in this

23   case?

24   A    I was approached by Gayle Young, Joanne Black's

25   guardian ad litem appointed by the Colorado Probate Court.

P. Kerr - direct - I. Salzman          283

1    Q     What were you asked to do?

2    A     I was asked to perform a forensic accounting of

3    the conservatorship account with Bernard Black as

4    conservator.

5    Q     Did you review other fiduciary entities, as well?

6    A     I did.  In addition to the conservator reports and

7    the accounts that were the underlying reports, I also

8    reviewed the estate account.  Excuse me, the estate of

9    Renatta Black.

10   Q     Did you review anything else?  Did you review any

11   of the trust accounts?

12   A     Yes, all of the trust accounts.

13   Q     How many trusts are there?

14   A     There is a supplemental needs trust, an investment

15   account and a checking account.  There is a 2013 trust

16   account.  There is an issue trust.  There is the estate

17   account.  In all, there are 25 various bank accounts.

18   Q     With regard to the estate of --

19         MR. SALZMAN:  Your Honor, there is a notice

20         to admit which was previously submitted to the

21         Court which has before it the will of Renatta

22         Black.  It includes both the issue trust and the

23         1997 trust for the benefit of Renatta Black.

24         We'll be referring to those items and my

25         understanding is they are all in evidence at this

SUPREME COURT * RICHMOND COUNTY * CIVIL * PART 12 GM

P. Kerr - direct - I. Salzman                284

1    point.

2         THE CLERK:  I'm sorry.  You wanted the notice

3    to admit?

4         MR. SALZMAN:  Right.  In addition, I would

5    ask the other two notices to admit I have filed

6    with the Court be deemed marked and that all of

7    the items in them be admitted in evidence at this

8    time, as I received no objections with regard to

9    any of them.

10        MR. BLACK: Yes.  You have.

11        MR. SALZMAN: Nothing in writing.

12        MS. HOFFMAN:  You received objections and

13   responses to both of those.

14        MR. SALZMAN:  I received no response as of

15   Saturday, which was the last day I would have had

16   to receive them.

17        MS. HOFFMAN:  We sent them by email Friday.

18        MR. SALZMAN:  I have never consented to email

19   service.

20        MS. COHENSON:  We were asked to consent to

21   email service and we said no.  They did not file

22   or serve on time.  This Court has given us

23   specific dates and we did not get their

24   objections.

25        MS. HOFFMAN:  We sent them by email and by

P. Kerr - direct - I. Salzman                285

1   Federal Express.  I have not received any

2   objection to service by email, your Honor.

3           MR. SALZMAN:  I have never consented to

4   service by email.

5           MS. HOFFMAN:  This Court has ordered

6   frequently service by email and regular mail is

7   adequate service.

8           MR. SALZMAN:  Your Honor, there is nothing in

9   the CPLR that requires me to accept service by

10   email.  At 7:30 on Friday night I received a

11   notice to admit from Ms. Hoffman, 2,300. We have a

12   photograph of it as we were so shocked.  It was

13   literally this high.

14           Under no circumstances would I ever consent

15   to email service and this is historical behavior

16   from them.  There are no circumstances under which

17   I would ever consent to email service from these

18   people.

19           I was in my office yesterday all day.  I

20   received no Fed Ex yesterday.  There was no Fed Ex

21   in my office from Saturday delivery and there were

22   people in my office on Saturday, as well. We never

23   received a timely written response.

24           If the service was Fed Ex'd it would have to

25   be Fed Ex'd for delivery to my office no later

P. Kerr - direct - I. Salzman                    286

1   than yesterday under CPLR 408 and I received

2   nothing.

3         MS. HOFFMAN:  I sent the Fed Ex.  They would

4   not accept it for Saturday delivery to a business.

5   I sent it as quickly as it was possible to send

6   it.

7         MR. SALZMAN: That's not my problem.

8         MS. HOFFMAN:  Service by email and mail has

9   been the norm in this case.  There was absolutely

10  no notice to me it would not be acceptable for

11  this particular filing.

12        MR. SALZMAN:  Your Honor, every email I have

13  sent to counsel has been labeled as a courtesy

14  copy.  Everything that I have served in the last

15  two weeks has been Fed Ex'd in order to make sure

16  there was timely delivery.

17        THE COURT:  This was a notice to admit?  Is

18  that the issue here?

19        MR. SALZMAN:  Yes.

20        MS. HOFFMAN:  We started with our responses

21  to the notices to admit.

22        MR. SALZMAN:  They had this notice to admit

23  about a week and a half, at least.  And it's not

24  like it's rocket science.  The stuff in the second

25  notice to admit duplicates for the most part the

P. Kerr - direct - I. Salzman                287

3      1    first notice to admit.  There were reasons why I

       2    wanted to serve it again.  The other one contains

       3    documents from Colorado.  It's not like this is

       4    stuff they would not have known about.

       5         THE COURT:  Ms. Hoffman?

       6         MS. HOFFMAN:  Your Honor, actually the notice

       7    to admit came from my client, Bernard Black, as

       8    required by the CPLR and he was explaining to me

       9    the reasons it took so long to respond.  The first

      10    notice to admit, apparently all the documents were

      11    mislabeled.  All the exhibits did not actually

      12    refer to the specific requests to admit and it

      13    took a long time to respond to that and go through

      14    each of the documents.  I believe Mr. Black might

      15    be able to address this in more detail.

      16         MR. SALZMAN:  The first notice to admit is

      17    already in evidence.  What we're talking about is

      18    the second and third.

      19         MS. HOFFMAN:  The first notice to admit was

      20    not admitted.

      21         MR. SALZMAN:  No, the first notice to admit

      22    was filed prior to the October 1 hearing.  That's

      23    already before the Court.  What's labeled the

      24    second notice to admit and the third notice to

      25    admit --

P. Kerr - direct - I. Salzman                    288

1      MS. HOFFMAN:  There are three notices to

2  admit since the October hearing.

3      MR. SALZMAN:  Not filed by me.

4      MS. COHENSON:  There are three notices to

5  admit.  Two of which were Mr. Salzman's and one of

6  them was yours, the one sent by email at 7:30.

7      MS. HOFFMAN:  We received three notices to

8  admit.

9      THE COURT:  Are these Colorado court orders

10  and documents?

11     MR. SALZMAN:  One of them is the relevant

12  documents from the file in the Westchester

13  Surrogates Court.  What I'm interested in there is

14  the estate inventory Mr. Black filed and that, in

15  fact, was specifically discussed at the last Court

16  hearing.

17     MR. BLACK: May I speak, briefly?  The problem

18  with the notices to admit on the court documents

19  is the notice to admit said Document A and the

20  actual exhibit was Document B over and over and

21  over.

22     My recollection is for the particular case

23  for my inventory in the Surrogates Court it was on

24  two of the notices to admit, one time correctly

25  and the other time incorrectly.

SUPREME COURT * RICHMOND COUNTY * CIVIL * PART 12 GM

1       All of this is laid out in excruciating

2   detail in the response to the notice to admit

3   which Mr. Salzman wants to ignore.

4       One of the two copies was actually fine, if

5   memory serves.  I just want to be sure which one

6   we're talking about.  The notice says Exhibit A is

7   this document when Exhibit A is obviously another

8   document is an unbelievably bad paralegal job.

9       MR. SALZMAN:  That's a fair comment, which is

10  one of the reasons why I filed a second one.  Ms.

11  Hoffman alerted me to that.  I filed a second one

12  in order to try to resolve that.  It's the third

13  notice to admit that is the refiling of the estate

14  issues.

15      The inventory in the third notice to admit

16  is --

17      MR. BLACK:  Why don't you just see which of

18  the two copies of that inventory I admitted?

19      THE COURT:  One thing that occurs to me as

20  you consult and look at papers is what sort of

21  continuing jurisdiction is this Court going to

22  have or does it have over these matters of trusts

23  and things in the surrogate court in Westchester

24  and Colorado?

25      MR. SALZMAN:  Can I follow the Court's lead

P. Kerr - direct - I. Salzman                290

1    and say perhaps before we get into some of the

2    factual issues here that perhaps we address some

3    of these legal issues?  Because I think that would

4    be important in terms of providing some context in

5    terms of where we're going.

6         THE COURT:  I think that would be a good

7    idea.

8         MR. SALZMAN:  May I be heard first?

9         THE COURT:  Sure.

10        MR. SALZMAN:  The Court has before it the

11   following applications that relate to estate

12   issues.  There is Joanne Black's application for

13   an injunction freezing assets in the issue trust,

14   the estate and the 1997 trust.  There is Cherie

15   Wrigley's application for similar, though not

16   quite identical, relief.  There is Joanne Black's

17   application for a determination that the

18   disclaimer filed, allegedly exercised by Bernard

19   Black, is void and there is Joanne Black's

20   application for the removal of Bernard Black and

21   Samuel Black as trustees of the 1997 trust.  I

22   believe those are the four estate issues.

23        Am I correct, counsel?

24        MS. HOFFMAN:  I believe that's right.

25        MR. SALZMAN:  So the question becomes --

Proceedings                              299

6    1          MR. DAIN:  And last time, too, I guess.  I

     2      don't know what the total is to date but somehow

     3      he has to be paid.

     4          MR. RUSSO:  2:00 o'clock tomorrow?

     5      THE COURT:  Yes.  Thank you.

     6

     7

     8      (Adjourned to March 22, 2016  at 2:00 p.m..)

     9                          oOo

    10

    11

    12   Certified to be a true and
         accurate transcription of the
    13   minutes taken in the above-
         captioned matter.

    14

    15                          Therese Maltese
                                Official Court Reporter

    16

    17                          John V. Stewart
    18                          Official Court Reporter

    19

    20

    21

    22

    23

    24

    25

SUPREME COURT * RICHMOND COUNTY * CIVIL * PART 12 GM

1    Joanne Black's money to pay for that.  That is not

2    their choice.

3          This claim that I have removed Mr. Black from

4    the accounts.  I went into Chase Bank and said I need

5    to be added to the accounts.  By the way, the same

6    argument they're making now is curiously the argument

7    they had no problem with before which is I didn't

8    know anything about the accounts, I wasn't getting

9    account statements.  I had no idea where the money

10   went.  We had to wait for Miss Kerr to conduct a

11   forensic analysis to find out they had stolen the

12   money.  I got no account statement.

13         Now, suddenly, when it is Mr. Black, he

14   raises this issue.  But what happened is, I

15   submitted, at the request of the Chase Bank manager,

16   submit the death certificate of Renata Black, submit

17   the court order that adds you -- that you should be

18   added, submit the court order in which the court says

19   I unilaterally need to act.  They sent that to their

20   legal department.

21         What I was told by the Chase managers is when

22   the legal department saw that Bernard Black had

23   committed civil theft and had engaged in a violation

24   of court orders, and that Judge Leith recommended

25   that he have no fiduciary capacity whether by trust,

1        by executorship, by guardianship or even

2        conservatorship in any of their jurisdictions, Chase

3        legal, on its own, removed Mr. Black.  I don't have

4        that power, never did.

5              If I walked into Chase and said remove

6        Mr. Black from an account, you know the response.  I

7        don't have any authority to tell them to do that.

8        Chase legal, on its own, did that.  And they did that

9        probably to protect themselves because they didn't

10       want someone with that finding on those accounts.  I

11       did not ask them to -- and frankly, if they put him

12       back on the account I don't care, as long as

13       Mr. Black doesn't use that to interfere.

14             THE COURT:  Anybody advise the Surrogate in

15       Westchester of these Colorado court orders?

16             MR. DAIN:  Your Honor, I have to say I

17       certainly have and I will be appearing there in the

18       same capacity as pro se.  I don't know who has--

19             MR. SALZMAN:  We have not been served with

20       any of these, I guess, accounting proceedings in

21       Westchester.  Am I going to be served?

22             MS. HOFFMAN:  It was filed yesterday in the

23       court, so yes.

24             MR. SALZMAN:  As a citation issue.

25             MR. BLACK: I do not know what Joanne had on

1          affairs, but it is our intention to upkeep our

2          integrity as professionals.

3                    MS. KERR: May I speak?

4                    THE COURT: Yes.

5                    MS. KERR: I contacted Northwestern directly--

6                    THE COURT: Are you an attorney?  We will

7          swear you in.

8                    MS. KERR: Am I allowed to speak?

9                    THE COURT: Yes, just take the oath please.

10                   (Ms. Kerr takes the stand.)

11                   COURT CLERK: Do you solemnly swear or affirm

12         that the testimony you are about to give in this

13         matter will be the truth, the whole truth and nothing

14         but the truth so help you God or so you affirm?

15                   MS. KERR:  I do.

16                   COURT CLERK: Miss Kerr, take a seat.  For the

17         record, can I have your name and spell it.

18                   MS. KERR:  Pamela Kerr, K E R R .

19                   COURT CLERK: And spelling of your first name.

20                   MS. KERR: P A M E L A.

21                   COURT CLERK:  Occupation?

22                   MS. KERR: Owner of Kerr Forensic Accounting,

23         PC, 650 South Cherry Street, suite 235, Denver,

24         Colorado 8O246.

25                   THE COURT:  Miss Kerr, the document that I

1     put into evidence the other day when I addressed the

2     group at the beginning, contained a letter on your

3     letterhead with your signature; did you write that

4     letter?

5           MS. KERR:  I wrote that letter.  I did not

6     send that letter to Northwestern.

7           THE COURT:  Do you know how it came into the

8     possession of Miss Wrigley?

9           MS. KERR:  It's my understanding that my

10    letter was titled "Letter to Northwestern" and

11    Miss Wrigley was under the assumption that that was

12    her letter to Northwestern.

13          THE COURT:  My question is, how did it come

14    into her possession?

15          MS. KERR:  I gave it to her.  I forwarded a

16    copy to Miss Wrigley because I wanted her to

17    understand why I was contacting Northwestern.

18          THE COURT:  Now, you wanted to address some

19    other points?

20          MS. KERR:  Yes, sir.  I contacted

21    Northwestern because I said I had received a letter

22    on Northwestern letterhead that stated that I was

23    hired to investigate somebody and I was not hired for

24    that particular reason and I told them exactly that.

25          I said, part of the -- I was hired to

```
 1          investigate the activities of the conservator,

 2          Bernard Black, and as part of that investigation, the

 3          activities of the son Pinto were included.

 4               I was not hired to do what Miss Litvak told

 5          this Court I was hired to do and I contacted

 6          Northwestern to say this is on your letterhead, it's

 7          my opinion that you appear to be supporting Miss

 8          Litvak's position and I need you to tell the Court

 9          you are not supporting that position.

10               I did not mail the letter, I left a message.

11          Rita Winters called me back and we spoke briefly

12          about the situation.  Approximately two weeks later,

13          another individual, I forget her last name, I think

14          Isaacson maybe, called and said, "Are you going to

15          mail the letter?" I said, "no, I talked to my

16          attorney.  He said, don't mail the letter, don't

17          worry about it, it's okay." So I did not mail the

18          letter.

19               Miss Litvak put in her document that she

20          filed with this Court that I mailed a letter to

21          Northwestern which is a 100 percent false statement.

22               As she stated today, that she appears to know

23          about my travel plans.  I can give you my train

24          ticket.  Leaving Friday morning to go to Boston. I

25          have no intention of leaving town before Miss Litvak
```

P. Kerr - Cross - Litvak

1        can discuss anything she wishes to discuss with me.

2                    THE COURT:  Miss Kerr, would you think that

3        if somebody learned that at their place of employment

4        a letter was on file, on your letterhead, with your

5        signature, would you think it is a reasonable

6        assumption that you sent it to them?

7                    MS. KERR:  I think it's inappropriate for

8        Northwestern to have told Miss Litvak that I sent

9        them a letter.  That's the only way Miss Litvak could

10       have been informed that a letter was sent by me to

11       Northwestern.

12                   THE COURT:  Okay.

13                   MS. LITVAK: Can I briefly cross, your Honor?

14                   THE COURT:  Briefly.

15       CROSS EXAMINATION

16       BY MS. LITVAK:

17       Q.    Okay. Let me give you the letter that she wrote

18       to Northwestern.

19       A.    I believe the Judge has the letter went to

20       Northwestern.

21       Q.    Miss Kerr, so here is the pieces of your letter

22       to Northwestern.  I was shocked to receive this letter.

23                   MR. SALZMAN: The issue not the content of the

24       letter, the issue is.

25                   MS. LITVAK: What?

```
 1          MR. SALZMAN: I don't think anyone is arguing

 2   with the content of the letter.  I think the issue here

 3   is whether or not it was sent and the facts and

 4   circumstances.  Miss Kerr said she did not send the

 5   letter so the content is irrelevant.

 6          MS. LITVAK: Contact is irrelevant?  It is her

 7   state of mind.  She's claiming that -- so the letter

 8   contains actual falsehoods about me and what the Judge

 9   needs to know--

10          THE COURT:  We are not going to litigate

11          this.  As I said, I don't anticipate this group is

12          going to be before me in the future.  I am concerned

13          that this conduct, if, in fact, it is offensive, is

14          not repeated.  And if I have assurances from

15          professionals and attorneys that there will be no

16          further contact with your law school other than

17          perhaps to try to collect a judgment, that's going to

18          be satisfactory to me.

19              I mean, I understand that you feel even

20          violated and you're upset about what has happened.

21          Quite frankly, I think that, you know, most

22          professionals would recognize that seeing a

23          letterhead, a Judge doesn't assume that imperotor of

24          Northwestern Law School is lent to the contents of

25          these letters.
```

```
 1            I mean, we've been around the block a few
 2       time and we see correspondence and people use
 3       letterhead and they shouldn't use letterhead to
 4       contact the Court and the like.  But I think that in
 5       this case a lot of it was over the top, was
 6       unnecessary and I can understand Miss Litvik being
 7       upset about it, but we are not going to litigate all
 8       that.  We are just going litigate -- and I want to be
 9       satisfied it is over and not any further--
10            MR. DAIN:  I am not going to --
11            MS. LITVAK: Can I speak to why is he always
12       before me?  I need to ask you about the requested
13       remedy for this.  The requested remedy -- I
14       understand they are now all promising not to contact
15       Northwestern, but we never know what else they're
16       going to do.  So, they don't tell us they were going
17       to contact Northwestern.  The next thing they do is
18       contact someone else, some professional which we are
19       members.  They could contact Bernie's children's
20       school, Bernie's children's employers, etcetera,
21       etcetera.
22            If you would make a broader request for them.
23       I understand maybe you don't want to actually issue a
24       restraining order, but I would ask you to ask them or
25       require them that no contact of any sort, to any
```

1          organization or institution that has control over our

2          lives, employment or our activity.  Because if they

3          cannot hit Northwestern, they will hit my husband's

4          children's school or my husband's children's

5          employer.  They are not stopping.  So, I would like

6          to ask for a broader restriction of the contact, if I

7          may.

8               And second, I would like to ask Miss Wrigley

9          to withdraw her ethics complaint if she believes and

10         for that very narrow, single purpose maybe we will --

11         you would allow her to make a contact.

12              MS. KERR:  May I speak?  Your Honor, I

13         believe that my integrity was absolutely on the line.

14         Miss Litvak contacted you as the Court and informed

15         you of an absolute false statement.  I was not hired

16         to investigate anybody other than Bernard Black's

17         actions.

18              MS. LITVAK: If she makes the actually false

19         statement about her -- the order that required her to

20         investigate Pinto, then I will have to cross-examine

21         her on that.  There was an order and there was a

22         transcript which I cited in the letter to you.

23              She absolutely was required to investigate

24         Pinto and she did investigate Pinto.  She found that

25         Pinto grossly overcharged Joanne and she found that

```
1       he overspent, overcharge by at least $40,000 of

2       undocumented expenses.  This is what I would like to

3       present to you if you want to hear this, but I

4       understand then you shouldn't be hearing her grossly

5       false statements about this either.

6               THE COURT: Miss Kerr, did you run any this by

7       Juglet Leith before you started composing the letter?

8               MS. KERR:  No, sir.

9               THE COURT:  I think that might be a good idea

10      in the future.  All right, I don't think you need any

11      further questioning of Miss Kerr.

12              MR. DAIN: Your Honor, I wasn't going to

13      question, I was going to read so the Court can

14      understand.  The contact was with this company called

15      Mazik Global which says:  It's to ensure that you can

16      communicate your concerns associated with unethical

17      or illegal activities safely and honestly with an

18      organization's management for the board of directors

19      while maintaining anonymity and confidentiality.

20              That's what Miss Wrigley -- she contacted

21      Mazik Global Ethics Point.  Apparently, Mazik Global

22      Ethics Point contacted Northwestern and Northwestern

23      went from there.  So the initial contact by

24      Miss Wrigley wasn't even with someone at

25      Northwestern.  Miss Kerr or Miss Cohenson can answer
```

```
 1          for themselves.

 2                  Our only concern with this is -- and I know

 3          your Honor says people have experience when you send

 4          something on Northwestern letterhead doesn't mean it

 5          is Northwestern, but it contained allegations of

 6          crimes, that's what so upsetting on this side.  We

 7          catch what is a crime and now we are being accused of

 8          extortion, intimidation, perjury.  That's what so

 9          upset the people about this.

10                  You can see how this goes from now we will

11          contact his children like somehow we are the villains

12          in this case.  You have been told by everybody here

13          that we have no intention other than collection from

14          contacting Northwestern.

15                  Miss Wrigley's contact initially was not with

16          Northwestern, it was with Mazik Ethics Point.  Be

17          that as it may, we won't do that.  If we start

18          getting beyond that point, then we are losing sight

19          of who is the important person here which is

20          Miss Black.  We need to be able to pursue the actions

21          we need to pursue.

22                  I have no intention -- I didn't contact

23          Northwestern or -- at this point, but I'm obligated

24          to help collect that judgment.  That judgment will be

25          simply directed at Northwestern as maybe to collect
```

```
 1          on it but you've been given that assurance.  To start
 2          saying now we want to go beyond and say don't contact
 3          Mr. Black's children.  I don't even know where they
 4          go to school, where that comes from.  That wasn't the
 5          point.  We just want you to understand the point was
 6          Northwestern letterhead was used to accuse us of
 7          crimes, that's why the contact was made.  Not to
 8          somehow send a letter to Mr. Black's children's
 9          school.  That's just absurd.

10              THE COURT:  Thank you, Miss Kerr.
11              (Miss Kerr stepping down.)
12              MS. LITVAK: I would like to reinstate my
13          request to restrict them from contacting any
14          organization or association or institution that has
15          control over our lives.  I don't want to even hear
16          that the next thing Miss Wrigley is going to do is
17          contact Bernie's children at school and make their
18          lives miserable.  She has done it before, that is the
19          problem.
20              They're saying, you know, there was a letter
21          that they got someone else.  She has done it before,
22          this is not the first time.  Please -- and so first
23          please, restrict them from interfering with our
24          lives.  They keep saying only Northwestern.  You can
25          see what's going, they will hit somewhere else.
```