# Exhibit C

DENVER PROBATE COURT
CITY AND COUNTY OF DENVER
STATE OF COLORADO
1437 Bannock Street, Room 230
Denver, Colorado 80202

**In the Interest of:**

**JOANNE BLACK,**

**Protected Person**

Jane G. Ebisch
The Ebisch Law Firm
12600 W. Colfax Ave.,  Suite C-400
Lakewood, CO 80215
Phone (303) 233-1232 Fax (303) 672-9998
Atty. #15029            Email jebisch@ebischlaw.com

^ COURT USE ONLY ^

Case No.: 2012 PR 1772

## PETITIONER'S MOTION TO RECUSE THE HONORABLE ELIZABETH LEITH FROM FURTHER PROBATE COURT PROCEEDINGS

Petitioner, Bernard Black submits this motion in his capacity as Joanne Black's

former conservator (Conservator Black), and in his separate legal capacity as a trustee

(Trustee BBlack) of the Supplemental Needs Trust for the Benefit of Joanne Black

(SNT)[1], by and through his counsel, Jane G. Ebisch of The Ebisch Law Firm, and hereby

requests this Court recuse itself from further proceedings in this matter pursuant to

C.R.C.P. 97 and C.J.C. 2.11(A)(1) and 2.11(A)(5).   As grounds therefor, Petitioner states

as follows:

---

[1] Petitioner Black denies that this Court has personal jurisdiction over him as SNT trustee, denies that this Court has subject matter jurisdiction over the SNT, or the actions of the trustees.  He appears in this matter, in his capacity as SNT trustee, for the limited purpose of preserving his rights, and thus reserves his right to contest the Court's jurisdiction. *Treadwell v. District Court*, 297 P.2d 891, 892 (Colo. 1956) (argument "to quash for lack of jurisdiction . . . is properly raised and stands in question until [it] is disposed of."); At Home Magazine v. 20th Jud. Dist., 572 P.2d 476, 478 (Colo. 1977) (rejecting notion that engaging in merits dispute waives properly raised jurisdictional objections).

1. C.R.C.P. 121, 1-15(8):  Duty to confer:  Below-signed counsel certifies that she has, in good faith, conferred with counsel for Joanne Black before filing this motion.  Opposing counsel has stated that she opposes the relief requested in this motion.

## I. THE HONORABLE JUDGE LEITH MUST BE DISQUALIFIED DUE TO BOTH THE APPEARANCE OF PARTIALITY, AND EVIDENCE OF BIAS AGAINST PETITIONER BLACK AND HIS FAMILY.

### A. There is Substantial Evidence Supporting the Appearance of Partiality, Personal Involvement, and Actual Bias by the Probate Court Judge against Petitioner Black and Members of His Family.

2. The evidence establishes that the Probate Court judge adjudicating the proceedings in this matter has prejudged the actions of Petitioner and members of his family, and therefore must recuse herself pursuant to C.R.C.P. 97 and C.J.C. Canon 3.

3. This matter originated in 2012 with regard to Petitioner's role as Conservator for the Estate of Joanne Black.  As the case has evolved, the Probate Court has entered numerous orders regarding Petitioner's role as Conservator and as trustee of SNT.

4. In some of these orders, the Court has referred in disparaging and prejudicial terms not only to Mr. Black, but to members of this family.   As this matter has developed over the last three years, the Probate Court has inappropriately denigrated Petitioner, Petitioner's wife and Petitioner's family members, the latter of which have never been parties to this matter and are not subject to the jurisdiction of this Court.   In its most recent Order of January 4, 2018, the Court

2

took action with regard to Petitioner's son, Samuel Black, even though Samuel has never appeared in Colorado in any capacity, and is not a party to this matter.

5. Additionally, the Court has inappropriately issued recommendations for actions to be taken in other states involving Trustee BBlack, and involving Bernard Black in his separate legal capacity as the Executor of the New York estate of Renata Black (Executor BBlack). *See* September 28, 2015 Order, p. 13, recommending that Petitioner not be appointed as a fiduciary for Joanne Black in any capacity, be removed as Executor of his mother's estate and be removed as a trustee of all trusts with Joanne Black as a beneficiary.

6. When its recommendations for legal actions in other states, involving persons not before it and matters not within its jurisdiction, were not followed, the Court inappropriately issued an Order directing counsel for Joanne Black and others to explain to the Court why they had not initiated the actions that the Court had recommended. *See* November 3, 2017 Order, p. 2.

7. The recent record is replete with evidence that the Court has become "embroiled in a running controversy" with Petitioner, to the extent that she has recommended that counsel file actions that would further punish him. C.J.C. 2.11 provides that a judge shall disqualify herself in any proceeding in which the judge's impartiality might reasonably be questioned, including but not limited to circumstances where the judge "has a personal bias or prejudice concerning a party . . . ." C.J.C. 2.11(A)(1). *See Wright v. District Court,* 731 P.2d 661, 664 (Colo. 1987)(where "a reasonable inference" exists that the judge has a "'bent of mind' that will prevent the judge from dealing fairly with the party seeking recusal, it is

3

incumbent on the trial judge to recuse [her]self"); *Goebel v. Benton*, 830 P.2d
995, 999 (Colo. 1991)(where the evidence showed the judge's "bent of mind," the
judge's refusal to recuse or disqualify himself is an abuse of discretion).

8.   The following illustrate some of the many instances in which actions and
statements by the Probate Court judge create, at a minimum, an appearance of
partiality, and also provide evidence of actual personal involvement and bias
against Petitioner and his family:

- On November 3, 2017, the same day that a motion was filed alleging theft
  of SNT assets by Trustee BBlack, without waiting for a reply, the Court
  issued an Order instructing that "it shall be advised regarding all actions
  that are pending regarding removal of Bernard Black as [SNT] trustee and
  *if none are pending, an explanation as to why no such actions have been
  initiated*." (Emphasis added).[2]
  This Order implicitly demanded that other parties bring legal actions in
  other states to remove BBlack as SNT trustee.

- In her ruling from the bench on January 4, 2018, the Probate Court judge
  upbraided Petitioner:  "He [Petitioner] is supposed to be someone
  (inaudible) and the rest of us look up to as having a presence in our
  country and teaching our students.  And this behavior is completely
  antithetical to that.  And I just can't express strongly enough how
  disappointed and deceived and disturbing that these actions are."  January
  4, 2018 Hearing Tr., p. 26: 13-18, attached as Exhibit "A."

---

[2]  No such actions had been initiated.

- On January 4, 2018, the Probate Court judge excoriated Petitioner and

  Petitioner's family members in her Order:

  ". . . [T]he actions of Bernard Black are shocking to the conscience of the
  Court, especially given Mr. Black's position as a professor of law at a
  respected law school in this country.  Similarly, the Court finds the
  actions of Mr. Black's wife, also a law professor, are shocking . . . ."

  The Probate Court judge repeated:

  "The Court finds it is unable to adequately express how shocking these
  actions taken by [Bernard Black] and his family are to the conscience of
  the Court."

  The Probate Court judge finally stated that the actions of Petitioner "and

  his family" were "reprehensible."

- The above statements related to allegations of conduct outside Colorado,

  and were made without an evidentiary basis, an explanation of what these

  actions were or why they were improper, or even appearance by the

  individuals reprimanded by the judge, either as parties or in any other

  capacity.[3]

- In its ruling from the bench, also incorporated in its January 4, 2018

  Order, the court ordered relief against Bernard Black that had not been

  requested by any party, that directed him to take action in an Illinois

  proceeding, and that Mr. Black had no opportunity to respond to.  *See,*

  *e.g.*, "I'll order that Mr. Black disclose either to this Court or to the

  Illinois court the source of the funds he's using to pay his attorneys with.

---

[3] Mr. Black's wife, Katherine Litvak Black, appeared in hearings before this Court as a
witness in 2015.  Her testimony at that time is completely unrelated to the actions outside
Illinois which underlay the Court's statements in January 2018.  No other members of
Mr. Black's family have appeared before the Court in any capacity.

So I guess I should do it to both courts."   January 4, 2018 Hearing Tr., p. 28: 7-10, attached as Exhibit "A."

- In its January 4, 2018 Order, the Court effectively directed that Joanne's counsel or other persons file trustee removal proceedings in Illinois, not only as to Mr. Black but as to Samuel Black.  This steps far beyond the court's role as a neutral arbiter of disputes brought before it.

9. The courts must "meticulously avoid any appearance of partiality, not merely to secure the confidence of the litigants immediately involved, but 'to retain public respect and secure willing and ready obedience to their judgments.'" *Estate of Elliott*, 993 P.2d 474, 481 (Colo. 2000) (substitution of another judge to adjudicate contempt proceedings in probate matter was appropriate on remand), *citing People v. District Court*, 192 Colo. 503, 507-08, 560 P.2d 828, 831-32 (1977) (omitting quotations).

10.  The record reflects earlier Orders which amply illustrate Judge Leith's partiality against Petitioner.  She gratuitously characterized Petitioner's actions in another state over which she had no jurisdiction as "absolutely appalling" and "not in keeping with his status as a law professor." *See* Order, dated February 25, 2016. The Court more recently quipped, "It is apparent that Mr. Black believes his defense is comprised of a good offense." *See* Order Re. Second Accounting and Request for Approval of Further Fees and Costs, dated October 23, 2017.

11. The evidence shows that the Probate Court judge communicated privately with the Honorable Thomas P. Aliotta of the New York Supreme Court regarding the related matter of the New York court's denial of petitions and cross-petitions for

6

guardianship of Respondent Joanne Black filed in a later New York action, which is where Respondent Joanne Black had moved in the meantime.   *See* Amended Decision and Order, dated June 7, 2016, p. 4, *In the Matter of the Application of Bernard Black and Cherie Wrigley*, Index No. 80253/14, attached as Exhibit "B."

12.   In the *Estate of Elliott*, a similar case to the within matter, the Colorado Supreme Court held that statements voiced by the probate judge early in a contempt hearing indicated that she was both personally involved in the case and had prejudged the Petitioner's guilt before considering evidence presented by both sides. *Id*., 993 P.2d at 482.  The Court held that the Probate Court judge had abused her discretion by not disqualifying herself.  Recusal similarly is mandated here.

13.  Petitioner believes that a determination as to Colorado jurisdiction over the SNT and its trustees should be made by a different court, without the appearance of partiality – and, Petitioner believes, the reality of bias – that would accompany any further decisions by this Court with respect to the Conservatorship or the SNT.

**B.   At a Hearing in August, 2015, the Court Improperly Relied On Her Prior Relationship with Key Witnesses to Assess Their Credibility.[4]**

14.  There is additional evidence that justifies disqualification in this case, from the

hearings held in 2015, leading to the Court's order of September 28, 2015.  In

those hearings, the Court inappropriately relied on her professional history with

key witnesses to vouch for their credibility and buttress her own view of the facts.

A judge "shall not investigate facts in a matter independently, and shall consider

only the evidence presented and any facts that may properly be judicially

noticed." Colorado Code of Judicial Conduct 2.9(C).

15.  A judge's predisposition regarding the credibility of witnesses "can only frustrate

the goal of providing [a litigant] with a meaningful hearing before an impartial

tribunal." *Estep v. Hardeman*, 705 P.2d 523, 526-27 (Colo. 1985) (finding that

judge's comment regarding the truthfulness of prospective witnesses constituted a

premature determination of credibility requiring disqualification of the judge).

"Prejudgments regarding the quality of evidence to be heard are not consistent

with the duty of the trial court to reach an unbiased decision after weighing all the

evidence." *Id*. at 527 (*citing Roberts v. Bailar*, 625 F.2d 125 (6th Cir.1980)

(finding judge had a duty to recuse himself under 28 U.S.C. § 455(a) "in order to

---

[4] The arguments presented in Sections I.(B.) and I.(C.) were presented by Petitioner Black to the Probate Court on December 22, 2015 in Bernard Black's Second Motion for Post Trial Relief, and the Reply in Support thereof.  They are presented here again herein both to demonstrate the Probate Court's apparent partiality.  Additionally, they provide background which explains the Court's reliance on Joanne's counsel and Guardian *Ad Litem*, based on her prior experience with them, which was recently again demonstrated in the Court's two most recent orders issued based on , unsworn motions by counsel and the guardian-ad-litem, instead of evidence.

preserve the indispensable semblance of fairness" because he said he knew

defendant to be an honorable man who would not discriminate).

16. In evaluating the testimony of the Guardian *Ad Litem*, Gayle Young and counsel

for Protected Person Joanne Black, Lisa DiPonio, the Court stated that she had

worked with Ms. DiPonio and Ms. Young "for a while now" and that they "don't

get this exercised about much and they're pretty exercised about this." August 5,

2015 Hearing Tr., at 142:15-23, attached as Exhibit "C."

17. The Court also relied upon her previous relationship with Ms. Young and Ms.

DiPonio to note that "their work is not in trust and estates it's in guardianships

and conservatorships and looking after the physical well- being of people, getting

them out of hoarding situations with bedbugs." *Id.* at 145:13-16. Based on these

observations, she concluded that, "I'm satisfied that [Ms. DiPonio and Ms.

Young] really didn't know [the effect of the disclaimers] and neither did I." *Id.* at

142:25-143:1.  The Court's reliance on her prior observations of Ms. Young and

Ms. DiPonio in other cases to evaluate their testimony and to resolve material

issues of fact was improper, and provides a further basis for recusal.

**C.    The Court Improperly Testified As a Material Witness.**

18. "A judge shall be disqualified in an action in which he . . . is or has been a

material witness." C.R.C.P. 97 (emphasis added); Colorado Code of Judicial

Conduct 2.11(A) (a judge "shall disqualify himself or herself in any proceeding in

which the judge's impartiality might reasonably be questioned, including [where]:

(1) The judge has . . . personal knowledge of facts that are in dispute in the

proceeding . . . [or] (2) The judge knows that the judge . . . is: . . . (d) likely to be a

9

material witness in the proceeding.") (emphasis added). "The judge presiding at the trial may not testify in that trial as a witness. No objection need be made in order to preserve the point." Colorado Rule of Evidence 605. "[I]t is contrary to public policy to permit a judge to be called as a witness to state the grounds upon which he or she decided a certain case." *People v. Beike*, 232 P.3d 146, 152 (Colo. App. 2009).

19. As previously set forth in Petitioner's Second Motion for Post Trial Relief, filed on December 22, 2015, the Court articulated her own personal memory and subjective understanding of the material events that led to the Court's entry of the March 5, 2013 Order which allowed Petitioner to disclaim Renata Black's "payable on death" instructions, including:

- On the third day of the Hearing, in the middle of Mr. Black's cross-examination, the Court revealed for the first time her own personal memory and subjective understanding of the material events that led to the Court's entry of the March 5, 2013 Order, which had allowed Mr. Black to disclaim Renata Black's "payable on death" instructions. August 5, 2015 Hearing Tr., attached hereto as Exhibit "C," at 126:19-128:8; 129:13-20. The Court made clear that her "own independent memory" was that she "absolutely did not have any understanding that a third of these assets was going to go to somebody else." *Id*. at 126:19-127:1.

- The Court articulated her "specific memory" that she intentionally refused to sign the January 29, 2013 proposed Order for conservatorship "because I didn't understand and nobody was explaining … it to me" and "because it wasn't in accord with what I understood what was going on." *Id.* at 127:10-128:8; 144:6-10;

- Even before Mr. Black had finished presenting his evidence, the Court then relied on her own "testimony" to conclude that Mr. Black violated his fiduciary duties because of her "definite memory" of the facts. *Id.* at 129:13-130:15;

- The Court also relied upon her recollections and subjective belief to confirm that "[a]t no time was it the Court's understanding that Mr. Black

10

intended to divide the disclaimed funds and divert one-third of the funds into the Issue Trust." Hearing Order of September 28, 2015 at 7;

- The Court's decision to testify as a material witness and rely on her own subjective understanding was a surprise to Petitioner and his counsel. August 5, 2015 Hearing Tr., Ex. "C," at 144:11-14; 144:19-21 (Mr. Poskus stating that he was unaware that the Court had a recollection of what transpired "until this moment"). Mr. Poskus immediately raised his concern about the Court's role as a witness because he could not cross-examine the Court regarding the reasonableness of her memory or understanding. August 5, 2015 Hearing Tr., Ex. "C," at 144:1-21 (recognizing that he "can't argue with [her] perception," and acknowledging that he was "disturbed" and must "choose [his] words carefully" because he would "have to deal with [her] in more cases that this one"). The Court herself agreed that her statements put Mr. Poskus "under a disadvantage." *Id.* at 144:6-10.

20. The interchange with counsel highlights why it is improper and prejudicial for the Court to testify as a material witness. Counsel clearly felt inhibited in directly challenging the Court's memory of years-old events. And, of course, counsel had neither any prior opportunity to depose the Court, nor the ability to cross-examine the Court about whether her memory was consistent with the record evidence.

21. Even if Mr. Black's objection to the Court testifying as to material facts was made too late with regard to the Court's damages order, as the appellate panel found, it remains relevant to whether, considering the Court's actions as a whole, recusal is warranted for future actions, as to which this motion is clearly timely.

## II.  SUFFICIENT EVIDENCE OF PREJUDICE, BIAS AND PERSONAL INVOLVEMENT MANDATES IMMEDIATE RECUSAL.

22. While the determination of whether a judge should be disqualified in a civil case is ordinarily within the discretion of the trial court, this discretion is limited. The trial judge must determine whether the motion for recusal alleges conduct "which, *if true*, show bias or prejudice or the appearance of bias or prejudice on the part of

11

the trial judge. . . ." *Goebel v. Benton, supra* at 998-999 (emphasis added).  Even

if the trial judge believes the meaning attributed to the Court's actions by the

party seeking recusal is erroneous, the judge must withdraw from the case if the

statements on their face show bias and prejudice, or could appear to do so to an

outside observer.  *Id.*

23. As the Colorado Supreme Court has explained in a series of cases, recusal is

required when facts tending to show partiality are alleged through an affidavit of

counsel, even if the Court believes that the meaning attributed to them is

erroneous.  See *Goebel v. Benton*, *supra,* 830 P.2d at 998-999 (quoting *Johnson v.*

*District Court*, 674 P.2d 952, 956 (Colo. 1984), internal citations omitted):

> Ordinarily, the question of whether a judge should be disqualified in a
> civil case is a matter within the discretion of the trial court. However,
> where an attorney for one of the litigants signs a verified affidavit alleging
> conduct and statements on the part of the trial judge which, if true, show
> bias or prejudice or the appearance of bias or prejudice on the part of the
> trial judge, it is an abuse of discretion if that judge does not withdraw from
> the case, even though he or she believes the statements are false or that the
> meaning attributed to them by the party seeking recusal is erroneous. In
> such a case, the judge should not pass upon the truth or falsity of the facts
> alleged in the affidavit, but only upon the adequacy of the motion as a
> matter of law. . . .  The motion and affidavits are legally adequate if they
> "state facts from which it may reasonably be inferred that the judge has a
> bias or prejudice that will prevent him from dealing fairly" with the party
> seeking recusal. *People v. Botham,* 629 P.2d 589, 595 (Colo. 1981).

24.  The test for recusal is met, even if the Court is convinced of her own

impartiality, so long as "the factual statements in the affidavits establish that the

judge's actions or comments have compromised the appearance of fairness and

impartiality such that the parties or the public are left with a substantial doubt as

to the ability of the judge to fairly and impartially resolve pending litigation."

*Goebel v. Benton*, *supra*, 830 P.2d at 1000.

25. As set forth in the Order of the Court of Appeals in *In the Interest of Joanne Black*, 16CA0625, on January 25, 2018 ("SNT Appellate Order"), the Probate Court failed to establish the basis for jurisdiction over the SNT, or over Trustee BBlack.  The SNT Appellate Order vacates a prior order of this Court.  Following issuance of a mandate from the Colorado Court of Appeals, this matter will be remanded to the Probate Court for further proceedings, including findings of jurisdictional facts.

26. This and other issues involved with the Court's orders involving the SNT are primarily technical in nature, including:  did the court have personal jurisdiction over Trustee BBlack; did it have jurisdiction over Trustee SBlack; does forum *non conveniens* analysis dictate that Illinois, which has both *in rem* jurisdiction over the SNT assets and clear personal jurisdiction over BBlack and SBlack, a more suitable forum for any litigation concerning the SNT; are the categories of spending authorize by the Court permitted under trust law and the SNT instrument.  These questions can readily be answered by another court which comes to these questions without the appearance of bias shown by the Probate Court judge.

27. On remand from the Court of Appeals upon issuance of the mandate in the *Interest of Joanne Black*, 16CA0625, Petitioner Black, should be entitled to litigate this matter, including his challenge to jurisdiction, before a judge without bias or prejudice, who is not personally involved in the case, and who will deal with him fairly.  The purpose of a disqualification requirement is to prevent a party from being forced to litigate a matter before a judge with a "bent of mind."

*Goebel v. Benton, supra* at 998.   There is ample, indeed overwhelming evidence of such a bent of mind in this case, based on the Court actions and statements.

28. Petitioner submits with this Motion the sworn Affidavits of Shannon Wells Stevenson, Esq. (Exhibit "D") and Bernard Poskus, Esq. (Exhibit "E"), as required by C.R.C.P. 97.  The Affidavit of Ms. Stevenson attests to the truthfulness of the allegations set forth in paragraphs 4-6, 8, and 10-11 of this Motion.  The allegations in paragraphs 16 and 17 are based on the Court's own statements, and do not require support by affidavit.  The Affidavit of Bernard Poskus, Esq. attests to the truthfulness of the allegations set forth in paragraph 19 of this Motion.

WHEREFORE, without waiving his right to challenge the jurisdiction of this Court with regard to the Supplemental Needs Trust for the Benefit of Joanne Black or any other trust matters, Petitioner requests the following relief:

a.      That this Court be disqualified to hear or try any further proceedings in this matter;

b.      That the Court notify the chief judge of Denver District Court  of her recusal and request that another judge in the district be assigned to hear and determine any further proceedings in this matter; and

c.      For suspension of all other proceedings until a determination is made on this motion, pursuant to C.R.C.P. 97 ("Upon the filing by a party of such a motion [for recusal] all other proceedings in the case shall be suspended until a ruling is made thereon").

Respectfully submitted on February 1, 2018.

*Signed Original on file at*
*The Ebisch Law Firm /s/ Jane G. Ebisch*

_____
Jane G. Ebisch, #15029

15

## CERTIFICATE OF SERVICE

I hereby certify that on February 1, 2018, I served true and correct copies of the foregoing PETITIONER'S MOTION TO RECUSE THE HONORABLE ELIZABETH LEITH FROM FURTHER PROBATE COURT PROCEEDINGS by E-service and first class mail as indicated below and addressed as follows:

VIA E-SERVICE
Joanne Black
c/o Lisa DiPonio, Esq.
DiPonio & DiPonio, LLC
79 S. Broadway, Suite 348
Littleton, Colorado 80122

VIA E-SERVICE
Probate Court
City and County of Denver
1437 Bannock Street, Room 230
Denver, CO 80202

VIA E-SERVICE
M. Carl Glatstein, Esq.
Glatstein & Obrien, LLP
2696 S Colorado Blvd, Ste 350
Denver, CO 80222

VIA E-SERVICE
Gayle Y. Young, Esq.
Guardian ad Litem
Young and Zen, LLC
P.O. Box 307
Littleton, CO 80160

VIA E-SERVICE
Terry Ehrlich
Arnold & Arnold, LLP
7691 Shaffer Parkway, Suite A
Littleton, Colorado 80127
terryehrlich@arnoldarnold.com

VIA E-SERVICE
Rebecca Klock Schroer
Matthew Steven Skotak
Holland & Hart LLP
555 17th Street, Suite 3200
Denver, Colorado 80202
rkschroer@hollandhart.com
msskotak@hollandhart.com

VIA U.S. MAIL
Anthony Dain, Esq.
13272 Capstone Drive
San Diego, CA 92130

VIA U.S. MAIL
Ira W. Salzman, Esq.
Goldfarb, Abrandt, Salzman & Kutzin, LLP
350 Fifth Avenue, Ste 4310
New York, NY 10118

VIA U.S. MAIL
Cherie Wrigley
1946 Roadrunner Ave
Thousand Oaks, CA 91320

VIA U.S. MAIL
Jeanette Goodwin
PO Box 200850
Denver, CO 80220
JeanetteGoodwin1223@msn.com

*Signed Original on file at*
*The Ebisch Law Firm /s/ JoAnn Greff*

_____

JoAnn Greff, Legal Assistant

16

PROBATE COURT, CITY AND COUNTY OF DENVER, COLORADO

----------------------------------------------------------

TRANSCRIBER'S TRANSCRIPT

----------------------------------------------------------

CASE NO. 2012 PR 1772

----------------------------------------------------------

IN THE MATTER OF:

JOANNE BLACK, Respondent

----------------------------------------------------------

       This matter came on for hearing before

THE HONORABLE ELIZABETH D. LEITH, Judge of the Denver

Probate Court, on Thursday, January 4, 2018.  The

following is a transcript of the audible portions of that

hearing as requested by the ordering party.


APPEARANCES:   LISA DIPONIO, Esq., Reg. No. 27707, for
               Respondent

               GAYLE YOUNG, Esq., Reg. No. 17107, Guardian
               Ad Litem for Respondent

               SHANNON WELLS STEVENSON, Esq., Reg. No.
               35542, for Bernard Black

               PAUL SWANSON, Esq., Reg. No. 50923, for
               Bernard Black

EXHIBIT A

2

```
1                    P R O C E E D I N G S
2           THE COURT:  Okay.  Record is on.  The Court would
3    call in the interest of Joanne Black.  It's 12 PR 1772.  Can
4    I have appearances for the record?
5           MS. DIPONIO:  Good afternoon, Your Honor.  Lisa
6    Diponio, registration 27707, court-appointed counsel for
7    Joanne Black.
8           THE COURT:  Thank you.
9           MS. YOUNG:  Your Honor, Gayle Young, guardian ad
10   litem for Joanne Black, registration number 17107.
11          THE COURT:  Okay.
12          MS. WELLS STEVENSON:  Good afternoon, Your Honor.
13   I'm Shannon Stevenson and Paul Swanson for Mr. Black in his
14   capacity as trustee of the supplemental needs trust.
15          THE COURT:  Thank you.  All right.
16          MS. DIPONIO:  Your Honor, Mr. Dain is appearing by
17   telephone.
18          THE COURT:  Is he on the phone?
19          MS. DIPONIO:  Yes, he is on the phone.
20          THE COURT:  Okay.
21          MS. DIPONIO:  So I'll let him enter his appearance.
22          MR. DAIN:  I am, Your Honor.  And I'm in this case
23   merely as an interested party.  I'm available if the Court or
24   any of the counsel have any questions but, obviously, not as
25   an advocate.
```

1            THE COURT:  Okay.  And where's Mr. Black these

2  days?

3            MS. WELLS STEVENSON:  Your Honor, Mr. Black has

4  been teaching outside of the country for this entire year.

5            THE COURT:  So 2016?

6            MS. WELLS STEVENSON:  2017/18.

7            THE COURT:  '17.  Okay.  Is he expected to return?

8            MS. WELLS STEVENSON:  I believe that he returns

9  after the end of this school year, but I'm not positive on

10  that.  I'd have to check.

11            THE COURT:  Okay.  Anywhere in particular?

12            MS. WELLS STEVENSON:  He's teaching in Israel.

13            THE COURT:  All right.  And I believe, Ms. Diponio,

14  we're here on your motion.

15            MS. DIPONIO:  Your Honor, I believe we're here not

16  only on my forthwith motion that I filed back on December

17  5th, but also in response to the Court's order which was

18  entered on November 3rd in response to the motion for

19  injunction against Mr. Black for having withdrawn money from

20  Joanne Black's supplement--supplemental needs trust.  And

21  also the Court was questioning what steps are being taken to

22  remove Mr. Black as trustee.

23            So, Your Honor, if I may, this gets kind of

24  convoluted and complicated.  And I'd like to set forth all

25  the actions that Mr. Black has taken within the period of

4

1    time between when this Court approved the fees that Mr. Dain

2    had petitioned to pay from the SNT until after this Court's

3    order enjoining him from taking any more money and replacing

4    the money that he took.

5              THE COURT:  Okay.

6              MS. DIPONIO:  So, Your Honor, back in June of 2017,

7    this Court granted Mr. Dain second accounting for partial

8    fees and costs, and Mr. Black scheduled a hearing on the

9    reasonableness of those fees.

10             THE COURT:  Right.

11             MS. DIPONIO:  On October 3rd, Mr. Dain with input

12   from those who are helping Ms. Black, contacted a law firm in

13   Illinois called Gould & Ratner about pursuing an action to

14   remove Mr. Black and Samuel Black as trustees of the

15   supplemental needs trust and any other trusts that he's

16   involved in that contain Joanne's assets.

17             On October 4th we had a hearing before Your Honor

18   on the reasonableness of the fees at issue.  And if the Court

19   will recall, there were no objections to my fees as Ms.

20   Black's counsel.  There were some objections with respect to

21   Ms. Young's fees as guardian ad litem.  But those were

22   resolved at the time of the hearing.  There were also

23   questions about Ms. Kerr's fees and I believe Holland &

24   Hart's fees.

25             On October 12th, following that hearing, a court in

1    Illinois entered an agreed judgment against Joanne's SNT and

2    the 2013 trust in the amount of approximately 348,000.

3            THE COURT:  I'm sorry, what was the date?

4            MS. DIPONIO:  October 12th.

5            THE COURT:  And did you say it was agreed?

6            MS. DIPONIO:  It was an agreed judgment against the

7    SNT.  And the agreement was between Olga Dahl (phonetic) who

8    is--Kate Litvak who is the wife of Bernard Black.  She

9    purportedly loaned money to Mr. Black to pay attorneys' fees

10   or whatever it was.  So Mr. Black who defaulted on that loan

11   agreed to a judgment.  And the judgment he agreed to--and

12   mind you all this was happening without Mr. Dain being

13   notified as the trustee of these trusts.  She obtained a

14   judgment in the amount of approximately 348--349,000 in favor

15   of Olga Dahl against the trust.  So that judgment was issued

16   on October 12th.

17           On October 23rd this Court issued an order

18   approving all the fees that were contained in Mr. Dain's

19   request back in June.

20           On October 20th, Mr. Black withdrew--oh, let me

21   back up for a minute.  Mr. Dain, consistent with this Court's

22   orders, issued checks to the professionals to pay their fees.

23   On October 20th, Mr. Black withdrew 258,000 we think

24   he--well, we think, we know he did it online--from Chase bank

25   account, the SNT, again, unbeknownst to Mr. Dain.  And we're

1    trying to figure out how this happened because Chase had a

2    freeze on these accounts.  But he somehow was able to

3    withdraw 258,000 which ironically is just about the amount of

4    fees that were approved by this Court.  And despite all the

5    court orders, he deposited that into a bank account in

6    Illinois.  Part of that 258,000--9,500 of it, we don't know

7    what that was for.  If we do, somebody can notify the Court.

8    But he, again, transferred that money into his own personal

9    home equity loan account in a bank in Illinois.

10              On October 24th--

11              And, Tony, please correct me if I'm wrong.

12              --I think Mr. Dain was notified by Chase that this

13   money had been wired out of the SNT into Mr. Black's account

14   in Illinois.  Sometime--

15              MR. DAIN:  I'm sorry.  If I could just--

16              MS. DIPONIO:  Sure.

17              MR. DAIN:  --(inaudible).  The entire 258,000 was

18   transferred into his home equity line of credit.  He

19   subsequently transferred it into another account.

20              MS. DIPONIO:  Right.

21              MR. DAIN:  But approximately 9,500 he removed out

22   of both of those bank accounts.  So he--250,000 was all that

23   was remaining when--by the time I was notified by Chase.

24   But--

25              Sorry, Lisa.

1              MS. DIPONIO:  Oh, no.  Thank you.  So and, Tony,

2  you can correct me if I'm wrong.  On or about October 24th

3  you were notified by Chase that this withdrawal had happened.

4              MR. DAIN:  Correct.

5              MS. DIPONIO:  And then after Mr. Black caught wind

6  that we knew that this was happening, he turned around and

7  opened up--and Mr. Dain referred to this--another bank

8  account.  And again, we have no idea how he was able to do

9  this without Mr. Dain's approval as the co-trustee.  He

10  opened up supposedly another SNT account in a bank in

11  Illinois where he transferred a portion of that money.

12             I believe, Tony, that's the 9,500 that you were

13  referring to.

14             Because what Chase had done once they found out

15  this happened and with communication with Mr. Dain, Chase

16  filed a letter of indemnity to the bank in Illinois.  So

17  Chase got the $250,000 back into the SNT account with Chase.

18  Mr. Black didn't do that.  It was only after he found out

19  that Mr. Dain and the rest of us knew that he had withdrawn

20  this money that he turned around and replaced the $9,500.

21             THE COURT:  So he did replace the 9500?

22             MS. DIPONIO:  I believe he did.

23             Did he not, Tony?

24             MR. DAIN:  He did.  What happened is when Chase

25  notified me that he had taken the 259,000 specifically from

1  the checking account, Your Honor, you had asked me to put it

2  in to send the checks, I contacted that bank.  And I

3  explained to them the situation.  And they said, well, there

4  is only 250,000 left.  9,500 has already been removed.  But

5  if Chase would give them an indemnity letter, they would

6  freeze that.  And that's what Chase did.

7       And then subsequently they returned that money to

8  Chase who put it in a separate protected account where it's

9  being held.  But 9,500 had already been removed.  And my

10 understanding is after Mr. Black's Illinois counsel was

11 informed by Chase that--what had happened, they apparently

12 convinced Mr. Black to return the 9500.

13       THE COURT:  Okay.

14       MS. DIPONIO:  So, Your Honor, if I may continue.

15 On October 25th, the Illinois court, again, entered an

16 agreed-upon judgment between Mr. Black and his wife, Kate

17 Litvak, in the amount of roughly $415,000 for a loan Ms.

18 Litvak gave to Mr. Black and entered that judgment which was

19 agreed upon against the SNT and the 2013 trust too, I

20 believe.  After those judgments, this Court on November 3rd

21 issued the motion for injunction in response to the motion

22 that was filed.

23       On, let's see, it was November--I believe it was

24 about November 7th that the liens, the judgments that

25 Illinois court granted, Ms. Litvak and Ms. Dahl took those

1    liens and filed them against the Chase SNT account.  We

2    believe that the money, $250,000 that Chase returned, was

3    used to pay Mr. Black's attorneys' fees.  So the--

4              THE COURT:  Are you saying they released the money?

5              MS. DIPONIO:  Check--the bank in Illinois in

6    response to Chase's letter of indemnity sent back the

7    $250,000 to Chase.

8              THE COURT:  Right.

9              MS. DIPONIO:  But in the meantime the judgments

10   that Ms. Dahl and Ms. Litvak got, they attached that to the

11   Chase SNT account.

12             THE COURT:  Okay.

13             MS. DIPONIO:  And in response to that, Chase froze

14   those assets which were already frozen to begin with.  In the

15   meantime when this was all happening and after Mr. Dain had

16   paid all the professionals involved, all our checks were

17   returned for nonsufficient funds because Mr. Black had taken

18   the 258,000 out of the SNT.  So we all incurred a penalty

19   from our bank when those checks bounced.

20             Then on December 5th, I filed the motion in

21   conjunction with this Court's orders that Mr. Dain needs

22   authorization to withdraw money to pay counsels' fees.  In

23   requesting that, he be allowed to withdraw those funds to

24   retain counsel who had already been working on this for a

25   period of time to get those liens and judgments set aside, to

1    retain Gould & Ratner.  And Mr. Black's attorneys here filed

2    an objection to that request.  And one of the objections is

3    that I as Joanne's counsel could not raise that motion

4    because I don't represent the trust.

5              Well, Your Honor, I'm representing Ms. Black who's

6    trying to get her assets to defend against her brother who

7    has stolen her money.  So I'm not representing the trust.

8    I'm representing my client to access those fees so she can

9    have counsel in Illinois attempt to set aside the judgments,

10   remove Mr. Black and his son, Samuel, in conjunction with

11   this Court's request that you be apprised of what is

12   happening in Illinois.

13             THE COURT:  Right.

14             MS. DIPONIO:  So as it stands right now, there's a

15   freeze on the SNT account at Chase.  It cannot be accessed

16   until these liens are taken care of and the judgment is set

17   aside.  None of the professionals on Ms. Black's side can get

18   paid until those funds are released by Chase.  In the

19   meantime, what we're all questioning is how Mr. Black is

20   paying his attorneys.  We have no idea.  Yet we have to jump

21   through all these hoops for Ms. Black to have counsel

22   retained.  And everybody who has been involved for I don't

23   know how many years now continue helping her without being

24   paid.

25             THE COURT:  Okay.

1          MS. DIPONIO:  So, Your Honor, I think Mr. Black is

2    not feeling the pinch of any of this.  He's an officer of the

3    court.  He has totally disregarded every one of this Court's

4    orders, and he faces no repercussions.  His counsel, which I

5    can't fathom how this can happen, but they continue to file

6    pleadings when we have the evidence of what he did,

7    contradicting this Court's orders.

8          THE COURT:  Uh-huh.

9          MS. DIPONIO:  So something has to be done.  I mean,

10   Mr. Black has to feel this.  He never shows up for hearings

11   by telephone, in person.  And he just continues to disregard

12   and file pleadings to stay your orders knowing full well all

13   his actions and then continues appellant actions while we're

14   awaiting the Court of Appeals to issue its order.  So, Your

15   Honor, I--at this point we're all at a loss.  We're looking

16   to the Court to do something to make Mr. Black feel the pinch

17   that we have all felt during the course of these proceedings.

18         THE COURT:  And the fees, are you saying total the

19   258 (inaudible)?

20         MS. DIPONIO:  He transferred 258,000.

21         THE COURT:  Right.  But I ordered (inaudible) the

22   attorney fees paid.

23         MS. DIPONIO:  Right.  When you ordered, you--I

24   don't have the exact amount that this Court approved back on

25   October 23rd.  I don't know if anybody has that amount.  But

1  I--

2          MR. DAIN:  Just to answer--if I could answer the

3  question.  I, Your Honor, I transferred the entire amount

4  that you ordered into the checking account.

5          THE COURT:  Yeah.

6          MR. DAIN:  That entire amount less maybe a dollar

7  or two to keep the account open was what was transferred out.

8  I think almost all of it has been returned.  But because of

9  Bernard's collusive actions with his wife and Ms. Dahl in

10 obtaining these fraudulent judgments, those amounts were all

11 frozen.  The Illinois court has a procedure called a

12 citation.  And by initiating that, Mr. Black, his wife, and

13 his wife's cousin have caused those amounts to be frozen.  So

14 Chase can't allocate those.  And I can't write new checks to

15 cover the checks that bounced.

16          I'm trying to work with Chase and with Illinois

17 counsel for the conservatorship to get those funds released.

18 But right now they're frozen until there is a February

19 hearing in which the conservatorship's Illinois counsel is

20 going to argue to the Court that the judgments are fraudulent

21 and should be vacated.

22          THE COURT:  And are you hiring counsel for the

23 trust in Chicago?

24          MR. DAIN:  The conservatorship has hired the

25 counsel because the conservatorship has an interest in the

1    fees.  And I may be joined in that, but that counsel has
2    prepared a complaint to be filed.  The part of the issue is
3    they need confirmation of a retainer.  So they are moving
4    forward, but they need approval of a retainer.
5           And I think they're understanding that at some
6    point as soon as they can get the judgments vacated, they can
7    get the amounts unfrozen, and the retainer can be paid.  At
8    that point I may be joined as a trustee.  Right now the
9    plaintiff will be the conservatorship as his interest has
10   clearly been impacted by what Mr. Black and his wife and her
11   cousin have done.
12          THE COURT:  But the beneficiary in this trust also
13   has standing.
14          MR. DAIN:  And that is being handled--
15          THE COURT:  And you have standing, Mr. Dain, as a
16   co-trustee.
17          MR. DAIN:  I do have standing.  I do have standing.
18   The--so at some point I will be joined.  But Joanne Black's
19   interest is being handled through the conservatorship.  So
20   Ms. Goodwin would be, I believe, the plaintiff on Joanne
21   Black's behalf.
22          THE COURT:  But I guess I'm not clear as to why as
23   a co-trustee you're not seeking to--
24          MR. DAIN:  Well--it's--
25          THE COURT:  --request release as well.

```
 1              MR. DAIN:  I will be, Your Honor, but to be honest,
 2    I'm concerned about adding a layer of cost onto this.  And so
 3    if I have to hire separate counsel as a trustee, then that
 4    comes out of the trust.  If I have to hire--and that's why as
 5    of yet I've not--I've stepped back as an advocate in
 6    Colorado.  Because to hire counsel in Colorado would
 7    ultimately be charged to the trust.  And I'm concerned about
 8    overloading the trust which impacts Joanne Black with too
 9    many fees.
10              So at some point I will be joined or I will
11    separately join.  But we're trying to as much as possible
12    keep the fees to a minimum.  And then once counsel has a
13    retainer and is engaged and we have the judgments vacated,
14    then, again, I may either separately join or be joined as
15    plaintiff with the same counsel.
16              THE COURT:  Right.  All right.
17              MS. DIPONIO:  And, Your Honor, just a couple
18    points.  In addition to these judgments which were issued in
19    favor of Ms. Litvak and Ms. Dahl which then put a lien on the
20    SNT, they have also done the same thing with respect to
21    garnishment of Mr. Black's wages.  So Illinois counsel has to
22    set aside those as well as being fraudulent.  And again, Your
23    Honor, I guess a couple points out of all of this, again, all
24    this stuff in Illinois that Mr. Black did, Mr. Dain is the
25    trustee.  It was all done without his notice or approval or
```

1    disapproval.

2              Mr. Black did not voluntarily return the $250,000.

3    That was Chase's doing.  And it was only after Mr. Black knew

4    that we caught wind that he had done this online, and Chase

5    let this fall through the cracks for some reason.  But he

6    then opened up another account in Illinois labeling it an SNT

7    account for Joanne again without Mr. Dain's signature or

8    approval as the trustee.

9              He deposited that money to the SNT so that his

10   attorneys here could claim, oh, no, no, no; he replaced the

11   money.  He put it back into the--or he moved it to a

12   different--to an SNT account.  And that's just obfuscating

13   his grand scheme of trying to take the money and cover his

14   behind in doing it.

15              THE COURT:  Okay.

16              MS. DIPONIO:  Thank you.

17              THE COURT:  All right.  Ms. Wells.

18              MS. WELLS STEVENSON:  Thank you, Your Honor.  I

19   have to figure out how to start here.  The hearing that we're

20   having today was noticed to address the issued outlined in

21   your November 3rd order.  And as we've represented several

22   times, Mr. Black has complied with everything that was

23   ordered in that order and has consented to any injunctions

24   that the Court put in that order.  I spoke with counsel

25   several times to ask, is there anything that you think he

1    hasn't done that's required by the order that you think he

2    needs to do.  And I did not get any response to that, that

3    there was anything left to be done.

4         And, you know, as I've expressed in our motion to

5    vacate the hearing, I was concerned that we would hear a

6    bunch of new things today, and I'm worried that that's what's

7    happened.  Obviously, we knew what was in the motion for

8    injunction.  We responded to it, consented to the relief, and

9    it complied with the Court's order in full.

10        Ms. Diponio has just given the Court a long litany

11   of facts.  And while I certainly don't think she'd ever

12   intend to misrepresent anything to the Court, her statements

13   aren't evidence.  And many of these facts I'm hearing for the

14   first time.  Many of this information was not included in any

15   of the pleadings that have been filed before this hearing.

16        THE COURT:  You're talking about the judgments?

17        MS. WELLS STEVENSON:  No, no.  The judgment--oh,

18   no.  Well, the loans I learned about is attached to one of

19   their filings.  But specifically this--the notion that Mr.

20   Black created an SNT account after he learned that Chase--all

21   of that I'm hearing for the first time.  I don't believe that

22   to be true.  And these other details about how these freezes

23   got put in by Chase, I just don't--these allegations have not

24   been made in any written form.  I'm hearing them for the

25   first time today.

1           And all we ask is that if counsel is asking for
2   some relief, you know, she said we want to make Mr. Black
3   feel, you know, feel pain.  I'm not sure that that is a
4   proper thing for the Court to do.  I'm not sure that it's
5   not.  The Court can impose sanctions in accordance with law,
6   or it can hold people in contempt.  But I know this Court
7   would not just be vengeful against Mr. Black and not comply
8   with his rights of due process.
9           And so I find this vague request to make Mr. Black
10  feel pain very troubling when it's not accompanied by any
11  precise request for relief pursuant to any rule of civil
12  procedure or rule of the court.  It's very difficult to
13  respond to.  And again, Mr. Black deserves the right to know
14  what's being requested against him and to make a response.
15          And again, many of these things--and again, I do
16  not believe that Ms. Diponio is intentionally misrepresenting
17  anything.  But many of these things are evidentiary issues.
18  And the only evidence that's in the record on what was
19  noticed for this hearing today is Mr. Black's affidavit
20  saying I returned the money.  I've taken all the steps the
21  Court asked me to do to do that.  But the money was
22  transferred into an SNT account, not into--I mean, it went
23  through his personal account but into an SNT account.  I
24  mean, it wasn't spent from there on anything for him
25  personally.

1         That's all the evidence that's in the record right

2    now.  And if there's going to be all this litany of factual

3    allegations, there needs to be actual evidence, an affidavit

4    from somebody or records from Chase or whomever to support

5    these things.  And we deserve to have a chance to respond to

6    that.

7         So again, with respect to what the Court--I haven't

8    heard anybody say that Mr. Black was not in compliance with

9    the Court's order.  We attached an e-mail from his lawyer to

10   Chase saying if there's--we're returning this money.  Tell us

11   what we need to do to return it.  So he was complying fully

12   with what the Court asked him to do.  You know, beyond that

13   it's difficult to respond to this vague request.  And our

14   simple request for the Court is if someone wants to seek

15   relief against him, it needs to be properly presented in a

16   petition to which we have a chance to respond.

17        THE COURT:  And you've responded to the

18   December 5th motion.

19        MS. WELLS STEVENSON:  Correct.  We have respond to

20   the separate December 5th motion, yes.  And we didn't ask for

21   a hearing on that, and I don't believe the other side did

22   either.  So as far as I'm concerned, that's right for the

23   Court to rule on with no hearing.

24        THE COURT:  Okay.

25        MS. WELLS STEVENSON:  We're happy to make argument

1   about it if the Court would like.  But we did not--we did not

2   request a hearing on that issue.

3          THE COURT:  All right.  Well, it seems I should

4   rule on it since you're all here.  Was there anything else

5   you want to say about it?

6          MS. WELLS STEVENSON:  About the December 5th

7   request for fees?

8              THE COURT:  Correct.

9          MS. WELLS STEVENSON:  And, Your Honor, I think our

10  primary concern there and I think what Ms. Diponio's

11  statements indicated is there is a proceeding ongoing in

12  Illinois right now regarding the validity of those loans and

13  the liens.  And I believe that that court would be the one

14  that would be the proper place to authorize these.  Everyone

15  has consented to jurisdiction over the SNT.  There are no

16  disputes about that.  As you know, we have--

17             THE COURT:  Is that true?

18         MS. WELLS STEVENSON:  Yes.  Everyone is

19  participating in that litigation.  No one is raising the

20  jurisdictional objection.

21             THE COURT:  So how are they doing it if there's no

22  attorney fees being paid?

23         MS. WELLS STEVENSON:  I can't answer that, Your

24  Honor.  I don't know.  But I do know that things have

25  certainly happened in the, you know, briefing that's going on

1    in that proceeding.

2              MS. DIPONIO:  And--

3              MR. DAIN:  I can answer the Court's question if you

4    would like, Your Honor.

5              THE COURT:  All right.  Go ahead, Mr. Dain.

6              MR. DAIN:  The counsel, Gould & Ratner, who

7    initially had represented Ms. Black per Your Honor's order in

8    the prior lawsuit Mr. Black brought against her--or Mr. Black

9    and his son brought against her is same counsel that is

10   handling the matter for the conservatorship.  He has a

11   retainer or engagement agreement with Ms. Goodwin--

12             THE COURT:  Yes.

13             MR. DAIN:  --and myself.  And he expects to be paid

14   through authorization from this Court authorizing me to pay

15   him from the supplemental needs trust as soon as he can get

16   the Illinois freeze lifted.

17             I also want to correct something that Ms. Stevenson

18   said.  I have access to the accounts here in San Diego,

19   California.  This idea that the Chase accounts are Illinois

20   accounts is not true.  I opened up accounts here in San

21   Diego, California.  And again, the banks are national banks.

22   So this notion that jurisdiction is only in Illinois is not

23   true.  It could be here in California as well.

24             But Gould & Ratner is expecting to be paid its

25   retainer by authorization from this Court, not from the court

1    in Illinois.  Because that court is not set up, and the

2    procedure is not set up to authorize attorneys' fees from the

3    supplemental needs trust.  It's not a probate court, and it's

4    not managing the conservatorship.

5            THE COURT:  It's not a probate court?  What is it?

6    It's not a civil court, is it?

7            MR. DAIN:  It--the two state courts that are

8    handling the judgments are just courts of general

9    jurisdiction--

10            THE COURT:  Okay.

11            MR. DAIN:  --in Illinois.  And those proceedings

12    that Gould & Ratner have brought are to set aside or to

13    vacate fraudulent judgments.  So they're being brought in the

14    same court that entered the judgments.  So those are just

15    general--courts of general jurisdiction in the state of

16    Illinois that render judgments in favor of Bernard Black's

17    wife and her cousin against the supplemental needs trust.

18            THE COURT:  Civil courts basically.

19            MR. DAIN:  Civil courts, exactly, Your Honor.  And

20    the complaint that counsel is going to bring to remove

21    Mr.--well, Samuel and Bernard Black as trustees, I

22    don't--honestly don't have knowledge of what specifically the

23    jurisdiction of those courts are.  I'm not--I'm not an expert

24    on that in Illinois.  But and so I don't know.  I don't know

25    whether those courts would be set up similar to probate

1   courts or whether those courts are also just general civil

2   courts.

3           THE COURT:  Anything else, Ms. Wells?

4           MS. WELLS STEVENSON:  Your Honor, just in response

5   to that.  This information Mr. Dain provided wasn't mentioned

6   in the fee request.  And I would find it hard to believe that

7   a Court that is adjudicating these matters couldn't order

8   payment of attorney's fees.

9           THE COURT:  (Inaudible.)

10          MS. WELLS STEVENSON:  And then our second argument,

11  of course, with respect to the most recent fee request is

12  simply that the Court is not authorized to preauthorize fees

13  without reviewing the reasonableness or knowing what they

14  are.  And I (inaudible) for the rest of our response, so I'll

15  just stand on our written response.

16          THE COURT:  Okay.  Any (inaudible)?

17          MS. DIPONIO:  Your Honor, if I may address a couple

18  of the statements that Ms. Stevenson made.  First of all, her

19  statements regarding no knowledge of these--excuse me--events

20  that I mentioned today, as the Court noted, they did file a

21  response to my December 5th motion.  And in the response Ms.

22  Stevenson stated, quote, Mr. Black had moved the funds to a

23  different SNT account at a different bank.  So how she can

24  say today that she had no knowledge that he moved these to

25  another SNT is--I don't understand where that's coming from.

1           And additionally in my motion of December 5th, I
2    outlined the actions that Ms. Litvak and Mr. Samuel Black,
3    Bernard Black, Olga Dahl had concocted to get these liens
4    which now effectively has frozen the SNT accounts.
5           THE COURT:  Uh-huh.  Okay.
6           MS. DIPONIO:  Thank you.
7           MS. WELLS STEVENSON:  Your Honor, can I just
8    clarify that?
9           THE COURT:  Sure.
10          MS. WELLS STEVENSON:  I didn't say that I didn't
11   know that Mr. Black--but certainly by the time we filed some
12   of these things--had moved the funds from one SNT account
13   into another.  What I was responding to was Ms. Diponio's
14   statements that he didn't create that account until after he
15   had first moved the money.  And that I've never heard before.
16   I've never seen any evidence of that.  I just wanted to
17   clarify that that's one of the facts that I had not heard.
18          I believe when she was talking she said he
19   caught--Chase caught wind of what he did, and then he created
20   a new SNT account.  I've never heard that allegation anywhere
21   in any of their papers that they've filed.  I certainly knew
22   that he moved the money from one SNT account to another.
23          THE COURT:  Okay.  Well, this family has a
24   demonstrated record of shifting money around in an abnormally
25   large number of accounts for no apparent reason.  And that

1  was the evidence in the trial that we had.  These actions I

2  have to say are just shocking to the conscience of the Court.

3  Mr. Black is a law professor at a large (inaudible) law

4  school in this country.  And this sort of behavior is

5  absolutely shocking to the conscience of the Court.  I just

6  can hardly fathom it.  And Ms. Litvak is also, I believe, a

7  professor, according to her testimony, at the same

8  university.  And her actions are shocking to the conscience

9  of the Court.  It's outrageous.

10          The Court finds at this point that Bernard Black

11  has really disregarded all of these Court's (inaudible) in

12  fact and in spirit.  He understands what's going on.  And why

13  he's trying to deprive his sister through these legal

14  machinations of her money, I just don't understand why he

15  would do this in this fashion.  This is really beyond simply

16  appealing an order that he doesn't agree with.  Now, I just

17  really don't understand why he is acting this way.  It's

18  just--

19          And of course, the only reason he is able to be so

20  fast among his movements is because he's an attorney.  His

21  wife is an attorney.  He knows what to do and who to hire and

22  how to do it.  But it does seem that he's deliberately

23  dissipating all of the funds that his mother left in this

24  fashion which is equally shocking.  And the agreed to

25  judgment against the special needs trust by a trustee appears

1   to be a fragrant breach of his duty, of fiduciary duty as his

2   duty of loyalty, basically all of the loyalty duties that a

3   trustee would have.

4           I understand that Mr. Black through counsel today

5   brings the Court's injunctions that were previously entered.

6   If this (inaudible) I did some review through (inaudible)

7   trusts, and (inaudible) it's (inaudible) to show that actions

8   by a trustee and to not a breach of trust or otherwise

9   prejudiced against (inaudible) introduced through general

10  performance.

11          There doesn't seem to be a huge amount of case law

12  on this.  We have one Colorado case which is Dobbs v. McCart

13  (phonetic).  That's 837 P.2d 104 (phonetic).  It's a 1992

14  Colorado Court of Appeals case.  The facts aren't similar at

15  all, but it does speak about the trial court taking the

16  regular steps in interfering with the trustee's discretion.

17  I don't know what else to do.  This is just outrageous.  And

18  I don't know how I can come up with terms to condemn these

19  actions that are strong enough.

20          So I'm granting Ms. Diponio's motion that she filed

21  on December 5th, the forthwith motion to authorize funds for

22  payment of Chicago counsel and whatever else is needed,

23  really, to try to resolve this.  I am suspending Samuel Black

24  and Bernard Black as trustees.  The only active trustee on

25  this (inaudible) is Anthony Dain.  I'm ordering that neither

1    Samuel or Bernard Black should not take any actions with

2    respect to this trust and any other trust funds, the probate

3    estate, any other claims that are ultimately (inaudible) to

4    or to benefit Joanne Black.  There are (inaudible) December

5    pending limit proceedings, and I've been advised today

6    (inaudible) commence.  And whatever court that ends up with,

7    that court can deal with all other issues.

8            As far as I'm concerned, Bernard and Samuel Black

9    should not have anything to do with any money or any property

10   that's meant for Joanne Black, any way, shape, or form.  I

11   don't know how else to say it.  And this is just

12   unbelievable.

13           He is supposed to be someone (inaudible) and the

14   rest of us look up to as having a presence in our country and

15   teaching our students.  And this behavior is completely

16   antithetical to that.  And I just can't express strongly

17   enough how disappointed and deceived and disturbing that

18   these actions are.

19           So that will be the order.  And hopefully, we will

20   get some resolution soon.  I know we're all ready to

21   (inaudible) our court of appeals to issue its ruling from

22   that oral argue in July.  And so it's been a long time.

23           MS. WELLS STEVENSON:  Your Honor, we have a quick

24   response to the--our response requesting sanctions, attorney

25   fees.  What is the Court's position as to that?  Because--

```
 1            THE COURT:  Well, I think I've ordered it before.
 2    I mean, I've ordered and that would have continued
 3    (inaudible).  Everything that's been incurred for this, all
 4    of this, needs to be surcharged back to Mr. Black from his
 5    personal funds.  And I mentioned it before; it's just like a
 6    runaway train that he's created to dissipate all of Joanne's
 7    money.  And to what end, I have no idea.
 8            MS. DIPONIO:  Your Honor, if I may.  And I don't
 9    know if the Court has any jurisdiction over this, but I had
10    mentioned the point that we have no idea how he's paying his
11    attorneys' fees.  He obviously tried to go the SNT route the
12    first time which the Court denied.  Then he came up with
13    these judgments in favor of his wife and his wife's cousin in
14    an effort to get that money to pay his attorneys' fees.  I
15    don't know if it's possible if we could have Mr. Black submit
16    to counsel where his money is coming from to pay his
17    attorneys' fees.  I have to--but he claims consistently, his
18    judgment here, he has no assets.
19            THE COURT:  Well, he transferred his jointly owned
20    property in and out of his wife's (inaudible).  It would be
21    simple enough to pierce.
22            MS. DIPONIO:  Right.  Right.  Right.  I--everything
23    is frozen.  I don't know how he's paying for this.  And in
24    the meantime all the other professionals who are working for
25    Joanne aren't getting paid.  So I don't know if the Court can
```

1   do anything about piercing the veil of how he is paying his

2   attorneys' fees.

3          THE COURT:  Well, I know trust law is pretty clear

4   that a breach in trustee is not entitled to reimbursement of

5   his attorneys' fees, defense, or prosecution, or what have

6   you in terms of the trust.  So he's not entitled to recoup

7   them under these circumstances.  I'll order that Mr. Black

8   disclose either to this Court or to the Illinois court the

9   source of the funds he's using to pay his attorneys with.  So

10  I guess I should do it to both courts.

11         MS. DIPONIO:  Thank you.

12         THE COURT:  And, Mr. Dain, what's going on with the

13  probate case?

14         MR. DAIN:  The probate case had a--there was a

15  mediation in which Mr. Black returned from his temporary

16  sabbatical teaching in Israel; was not successful.  We've

17  been in contact with the guardian ad litem in the probate

18  case for the two minors.  And she had made an attempt to

19  resolve the matter, again, unsuccessfully.  She gave it a

20  good effort.

21         But that case is ongoing and will probably go to

22  trial because it has, as Ms. Kerr had determined it has, the

23  same issues where Mr. Black had taken money that was

24  obligated to Joanne Black, and he distributed it to either

25  himself, his children, or the issue trust.  And so there will

1   be--there undoubtedly will be a surcharge in that case as

2   well.

3          THE COURT:  And is that a removal petition?

4          MR. DAIN:  There were initially a removal petition,

5   but the only removal petition that remains is for him as

6   executor because the New York Court or I guess it was

7   determined that the--there are no trust assets in New York.

8   There are no trustees in New York.  So the Court wasn't going

9   to address the removal of the trustee.

10         THE COURT:  Right.

11         MR. DAIN:  So for jurisdiction the only place to

12  remove the trustees was either here in San Diego because I

13  have access to the accounts here in San Diego, or in

14  Illinois.  And just to make sure there was no issue as to

15  personal jurisdiction we chose Illinois.

16         THE COURT:  Right.  So the removal action in New

17  York is him as executor for the probate estate.

18         MR. DAIN:  That's correct.

19         THE COURT:  All right.  And is there a proposal for

20  a successor there?

21         MR. DAIN:  I think under the terms of the will and

22  depending as Your Honor may recall, there were--actually,

23  there's a will he probated.

24         THE COURT:  Right.

25         MR. DAIN:  And there's a will he didn't.

1            THE COURT:  And there was probably more than one.

2            MR. DAIN:  But given the circumstances, it would be

3    likely that it would be a state-appointed executor.

4            THE COURT:  I know they have public administrators

5    in New York.

6            MR. DAIN:  And that's probably--you articulated it

7    better.  That's probably the term.

8            THE COURT:  Okay.  All right.  All right.  Well,

9    that will be this Court's orders.  Is there anything else?

10           MR. DAIN:  Just a request since I'm the one that

11   would be doing this.  As soon as the--would it be the Court's

12   order that as soon as the freezes are released by the

13   Illinois court based on these judgments, that I don't need

14   any further authorization from this Court then to issue

15   checks?

16           THE COURT:  Correct.

17           MR. DAIN:  Or issue payments?

18           THE COURT:  Correct.

19           MR. DAIN:  Okay.  Thank you.

20           MS. DIPONIO:  Your Honor, does that include all

21   payments?  Or just--

22           THE COURT:  All payments.

23           MS. YOUNG:  Okay.  And, Your Honor, I have one

24   request that in the future that Mr. Black, if we have any

25   further hearings be present in person.

1          THE COURT:  Okay.  Any opposition to that?

2          MS. WELLS STEVENSON:  Your Honor, I apologize.  I

3    just want to make a record.  I, you know, obviously didn't

4    realize that Mr. Black and Samuel Black being removed as

5    trustees was something--had not been asked for prior to the

6    hearing.

7          THE COURT:  Well, I'm suspending them.  Removal

8    proceedings are pending in Illinois.

9          MS. WELLS STEVENSON:  Suspending them, I'm sorry.

10   I did not realize that was going to be your request.  We

11   would just make a record of objecting to the Court's

12   jurisdiction on that particular ruling.

13         THE COURT:  Very good.  Thank you.  All right.  And

14   I'll grant the request in any further proceedings.  In this

15   courtroom Mr. Black should appear.  All right.  Very good.

16   All right.  Anything else?

17         MS. DIPONIO:  Thank you.

18         MR. DAIN:  Thank you, Your Honor.

19         (Whereupon, the proceedings were concluded.)

20

21

22

23

24

25

```
------------------------------------------------------------
CERTIFICATE
------------------------------------------------------------
```

STATE OF COLORADO  )

                   :

COUNTY OF DENVER   )


       I, Patti Petersen, Transcriptionist for the

Denver Probate Court, in the State of Colorado, do hereby

certify that the above and foregoing is a transcript of

the recorded proceedings, based upon the quality of

the recording and my ability to understand it, taken at the

date and time set forth on Page One hereof.

       DATED at Denver, Colorado, this 16th day of

January, 2018.


                 /s/Patti Petersen
                 _____
                 Patti Petersen
                 Official Transcriber
                 Federal Reporting Service
                 17454 E. Asbury Place
                 Aurora, CO  80013

At an IAS Part 12G of the
Supreme Court of the State of
New York, held in and for
Richmond County at 26 Central
Avenue, Staten Island, New York
on the ⁊ day  of June, 2016.

**PRESENT:**

**THOMAS P. ALIOTTA,**
**J.S.C.**

---

In the Matter of the Application of                                        **AMENDED**
**Bernard Black,** Petitioner and                                 **DECISION AND ORDER**
**Cherie Wrigley** Cross-Petitioner,
For the Appointment of a Guardian of                          Index No. 80253/14
the Person and Property of

**JOANNE BLACK,**
an Alleged Incapacitated Person.

---

The Petitioner, brother of Joanne Black, an alleged incapacitated person

[hereinafter "AIP"] commenced this proceeding pursuant to Mental Hygiene Law Article

81, to appoint a guardian of her person and property.  The petition alleged that the AIP

was incapacitated due to a long history of chronic schizophrenia, and that a guardian

was needed to provide for the management of her financial affairs and personal needs.

At the time of the filing, the AIP was a resident of South Beach Psychiatric Center in

Richmond County.  Petitioner, Bernard Black had already been appointed as

Conservator for the AIP by the Denver, Colorado Probate Court under case

#12PR1722.  He was also Executor of the Estate of their late mother, Renata Black,

appointed by the Surrogates Court of Westchester County, New York on May 1, 2012,

under File #2012/1209.  Petitioner claimed to be best suited to serve as guardian of the

AIP by virtue of his being an attorney, her brother, her Conservator and the Executor of

their mother's estate.  This Petition was subsequently amended to request that an

Page 1 of  10

EXHIBIT B

independent guardian be appointed, but was later withdrawn.

On or about November 25, 2014, this Court issued an Order vacating the appointment of Mental Hygiene Legal Services as Counsel for the AIP upon consent of Nora Renzulli, Esq., of MHLS, at which point private Counsel, Ira Salzman, Esq., was substituted as her attorney. By that point in time, Joanne Black, the AIP, had been discharged from South Beach Psychiatric Center and placed in Transitional Housing in Brooklyn, New York.

On or about October 31, 2014, a Cross-Petition was filed by Cherie Wrigley, a resident of the State of California and cousin of the AIP, claiming that she was best suited to serve as guardian based on her long standing, close and loving relationship with the AIP. In addition, she claimed that she had been supporting the AIP since the death of her mother, Renata Black in 2012, both emotionally and financially. In addition, she claimed to have arranged for a team of people to assist the AIP and provide day-to-day support, which enabled Joanne Black to live independently in an apartment.

A hearing for the appointment of a Guardian for the AIP was held on October 1, 2015, at which Cherie Wrigley, the Cross-Petitioner moved to be appointed as Guardian of the person and property of Joanne Black. Based on the hearing testimony given by Ms. Wrigley, Esaun Pinto, Lois Orlin, CSW and a statement made on the record by Anthony J. Dain, Esq., an attorney admitted to practice in California and the brother of Cherie Wrigley, and no one having appeared in opposition thereto, and Joanne Black having nominated Cherie Wrigley to be her Guardian, a decision was rendered from the bench by this Court on October 1, 2015, granting the Cross-Petition.

Page 2 of 10

While the AIP has apparently suffered from a mental illness for what appears to be most of her adult life, when she appeared before this Court to give testimony on October 1, 2015, she presented as intelligent, articulate and composed.  She professed to be determined to maintain her health, both mental and physical; has adopted a healthy lifestyle; and is working towards being as independent as possible.  In addition, she freely nominated her cousin, Cherie Wrigley, the cross-petitioner, to be her Guardian pursuant to MHL §81.17, and consented that the guardianship be for a period of two (2) years.

The case at bar is clearly the product of a conflict between the AIP, the nominated Guardian, Cherie Wrigley, Anthony Dain and the family of Joanne Black (in the person of her brother Bernard Black), due to an uncontroverted, long standing intra-familial animosity that exists among them.  It is also clear that this animosity pre-dates the death of Renata Black, the appointment of a Conservator in Colorado and/or the commencement of the within Guardianship proceeding.

This Court is not concerned with the warring factions of this family; rather its sole concern is the well being, care, and maintenance of Joanne Black, the AIP, and that her assets receive the appropriate protection.  It is her best interests that are the subject of these proceedings, as opposed to those of any sibling or other family member.

In so far as it appears, a proposed Order and Judgment resolving this matter was filed with the Court, but was not properly settled on notice as directed.  Thus, interested parties and presumptive distributees were never placed on notice of its terms.  This fact was brought to the Court's attention by Bernard Black's former attorney in a letter dated November 12, 2015.  Rather than properly re-settling the Order, the

Page 3 of 10

parties embarked upon a letter writing campaign that merely served to delay the appointment of a guardian, and to further fuel the fires of discontent among and between the warring factions.

As a result, this Court issued an Order dated December 23, 2015, directing that an Order and Judgment be re-settled on notice to all interested parties. However, it appears that service was untimely and that one of the Trustees was never served. To the extent relevant, all of the parties and their attorneys have been informed that this Court has communicated privately with Judge Elizabeth D. Leith, who presided over the Conservatorship proceeding in Denver, Colorado. In addition, this Court is in receipt of a letter from Marcia Issacson, the Chief Compliance Officer of Northwestern University Law School, (the employer of both Bernard Black and his wife, Katherine Litvak who are Law Professors at that institution). The letter has been placed in the record herein.

In the opinion of this Court, the events which followed the hearing held on October 1, 2015, are disturbing at best. Ms. Wrigley by her own admission contacted Northwestern University School of Law on January 8, 2016, to file a complaint against Katherine Litvak, on a University hotline. She forwarded therewith copy of the transcript of the Court's hearing held on October 1, 2015, a sealed document. Apparently, she had filed a similar complaint some nine months earlier against Ms. Litvak's husband, Bernard Black.

In Richmond County, guardianship files and proceedings are sealed in order to ensure that the alleged incapacitated persons who appear before the court are afforded maximum confidentiality. Here however, Ms. Wrigley's actions tend to show that she would not adequately protect the confidentiality of her Ward, if appointed. Her

judgment clouded by acrimony, Ms. Wrigley allowed her feud with Bernard Black to take
precedence over the best interests of Joanne Black. Accordingly, pursuant to MHL
§81.19 (b) this Court finds Cherie Wrigley unfit to be appointed Guardian for Joanne
Black.

Moreover, while the proceedings for the appointment of a guardian were still
pending, the Petitioner, Bernard Black moved to renew his petition claiming that the
appointment of a guardian for his sister was necessary, but that the court should
appoint an independent guardian, ie: someone not related to the Black family. That
motion was granted, and a new hearing was held on March 21 and March 22, 2016.
The Petitioner, Bernard Black appeared and testified at said hearing, as did Joanne
Black, the AIP and Bartholomew T. Russo, the court evaluator. Katherine Litvak, Esq.
(the sister-in-law of the AIP) appeared pro se, as did Anthony Dain, Esq. (a cousin of
the AIP).

During this hearing, the AIP, Joanne Black presented once again as poised,
intelligent, articulate and determined. In addition, according to the testimony of the
court evaluator, she was doing even better than she had been five (5) months earlier, in
October, 2015.

In exercising its authority to appoint a personal needs guardian or a property
management guardian, the Court must make a two-pronged determination (see Mental
Hygiene Law §81.02[a]; see also Matter of Samuel S. [Helen S.], 96 AD3d 954, 957;
Matter of Daniel TT., 39 AD3d 94, 96-97; Matter of Maher, 207 AD2d 133, 139-140).
Thus before appointing a personal needs guardian, the court must first determine that
"the appointment is necessary to provide for the personal needs of that person,

including food, clothing, shelter, health care, or safety" (Mental Hygiene Law §81.02[a][1]). Similarly, prior to the appointment of a property management guardian, the court must first determine that "the appointment is necessary...to manage the property and financial affairs of that person"*(id)*. In either case, before appointing a personal needs or property management guardian, the court must determine "that the person agrees to the appointment, or that the person is incapacitated" (Mental Hygiene Law §81.02[a][2]). For the reasons previously stated this Court rejects the nomination of Cherie Wrigley, the Cross-Petitioner.

With respect to the second prong regarding the appointment of a guardian of the person, "the determination of incapacity shall consist of a determination that a person is likely to suffer harm because" (1) "the person is unable to provide for [his or her] personal needs," and (2) "the person cannot adequately understand and appreciate the nature and consequences of such inability" (Mental Hygiene Law §81.02[b][1], [2]).

Similarly, a determination of incapacity in a proceeding for the appointment of a guardian of the property, must be based upon evidence that the person in question is "likely to suffer harm" because (1) he or she is "unable to provide for ... property management," and (2) "the person cannot adequately understand and appreciate the nature and consequences of such inability" (Mental Hygiene Law §81.02[b]). Moreover, in reaching this determination, the court is required to give primary consideration to the person's "functional level and functional limitations" (Mental Hygiene Law §81.02[c]), including an assessment of the person's ability to manage the activities of daily living related to property management, such as money management and banking, his or her understanding and appreciation of the nature and consequences of any inability to

Page 6 of 10

manage these activities; his or her preferences, wishes, and values regarding the management of these affairs; and the nature and extent of the person's property and finances in the context of his or her ability to manage them (*see Matter of Maher*, 207 AD2d at 140: Mental Hygiene Law §§81.02[c], 81.03[h]). The court must also assess, in pertinent part, "the extent of the demands placed on the person.... by nature and the extent of that person's property and financial affairs"; any mental disability and the prognosis regarding same; "any medications with which the person is being treated and their effect on the person's behavior, cognition and judgment"; and "other relevant facts and circumstances" that may be present in a particular case (Mental Hygiene Law §81.02[c][4][d]).

Finally, the determination that a person is incapacitated for the purposes of appointing any guardian must be based on clear and convincing evidence (*see* Mental Hygiene Law §§81.02[b], 81.12[a]). "The burden of proof shall be on the petitioner" (Mental Hygiene Law §81.12[a]; see *Matter of Samuel S. [Helen S.]*, 96 AD3d at 957; *Matter of Maher*, 207 AD2d at 140).

Here, Petitioner has failed to demonstrate by clear and convincing evidence that Joanne Black is incapacitated within the meaning of the foregoing statutes (*see* Mental Hygiene Law §81.02[b]; *see Matter of Edward G.N.*, 17 AD3d 600, 601; *Matter of David C.*, 294 AD2d 433, 434), since the testimony adduced at the hearing failed to show that she was unable to provide for her personal or financial needs and that she was unable to adequately understand and appreciate the nature and consequences of any such inability (*see* Matter of Ardelia R., 28 AD3d 485, 486; *cf. Matter of Joseph S.*, 23 AD3d 804, 805-806; *Matter of Joseph V.*, 307 AD2d 469, 470-471). In any event, for the

reasons stated herein above, this Court also rejects the nomination of cross-petitioner, Cherie Wrigley to serve as guardian of the AIP.

## Decision

Accordingly, the motion (Mot #008) and cross motion (Mot #005) to appoint a Guardian of the person and property of Joanne Black is denied in its entirety. What remains before this Court are a series of open motions which upon consultation with the Westchester County Surrogate Court and upon further consideration and deliberation this Court's Decision and Order dated May 19, 2016, is vacated and amended as follows. It is therefore

**ORDERED,** that Mot #002, to temporarily restrain Bernard Black from selling the real property known as and by street number 26 McKeel Avenue, Tarrytown, NY 10591, is denied without prejudice and the moving party is directed to seek the same or similar relief in a Court of appropriate jurisdiction; and it is further

**ORDERED,** that Mot #003 to direct Bernard Black to return funds and turn over all documentation in connection with the payable-on-death accounts and all bank statements and documents filed in the Colorado Court proceeding is denied without prejudice and the moving party is directed to seek the same or similar relief in a Court of appropriate jurisdiction; and it is further

**ORDERED,** that Mot #006 to freeze the estate and Trust assets of Renata Black, and to restrain Bernard Black from accessing same is denied without prejudice and the moving party is directed to seek the same or similar relief in a Court of appropriate jurisdiction; and it is further

**ORDERED,** that Mot #007 to temporarily restrain and enjoin Cherie Wrigley, her

Page 8 of 10

attorney and the parties referred to as the "Wrigley group" from contacting the family of
Bernard Black and Katherine Litvak and Northwestern University Law School (their
employer), is denied and the temporary restraining order is discontinued based upon
the assurance of all parties and their attorneys, on the record, that they would cease
and desist any further contact with Northwestern University Law School, except as it
relates to the collection on any judgment emanating from the State of Colorado; and it
is further

**ORDERED,** that Mot #010 to freeze all estate and Trust assets of Renata Black,
and to restrain Bernard Black from accessing same is denied without prejudice and the
moving party is directed to seek the same or similar relief in a Court of appropriate
jurisdiction; and it is further

**ORDERED,** that Mot #011 to enjoin and restrain Anthony Dain, Esq., from acting
as Trustee and handling the assets of the Trust(s) established for the benefit of Joanne
Black is denied without prejudice and the moving party is directed to seek the same or
similar relief in a Court of appropriate jurisdiction; and it is further

**ORDERED,** that Mot #013 to remove Bernard Black and Samuel Black as
Trustees of the Trusts established for the benefit of Joanne Black is likewise denied
without prejudice and the moving party is directed to seek the same or similar relief in a
Court of appropriate jurisdiction; and it is further

**ORDERED,** that any open issue(s) regarding the disclaimer or renunciation of
Joanne Black's interests in the payable-on-death accounts left to her by her late
mother, Renata Black, are denied without prejudice and the moving party is directed to
seek the same or similar relief in a Court of appropriate jurisdiction; and it is further

**ORDERED,** that the Trustee of the Joanne Black Supplemental Needs Trust, shall pay to Bartholomew T. Russo, Esq., the sum of $ 25,000.00 as and for the services rendered as Court Evaluator in this proceeding and in accordance with the affirmation of services filed herein; and it is further

**ORDERED,** that such payment be made from the assets of Joanne Black and said fee shall be subject to recovery of sixty (60%) per cent of said fee from Bernard Black; and it is further

**ORDERED,** that any appointee herein shall comply with Judiciary Law §35-a and Part 36 of the Rules of the Chief Judge of the State of New York and that no fee shall be paid to such appointee until such appointee has filed O.C.A. form UCS 875 and UCS 872 with the court; and it is further

**ORDERED,** that a copy of this Amended Order with Notice of Entry shall be served upon all interested parties, including the Clerk of the Surrogates Court, Westchester County File #2012/1209 and Howard Dubs, Esq., the guardian ad litem, within twenty (20) days of entry of this Order.

This constitutes the amended decision and order of this Court.

**ENTER:**

HON. THOMAS P. ALIOTTA, J.S.C.

1

PROBATE COURT, CITY AND COUNTY OF DENVER, COLORADO

-------------------------------------------------------------

TRANSCRIBER'S TRANSCRIPT

-------------------------------------------------------------

CASE NO. 12 PR 1772

-------------------------------------------------------------

IN THE INTEREST OF:

JOANNE BLACK, Respondent.

-------------------------------------------------------------

        This matter came on for hearing before THE
HONORABLE ELIZABETH D. LEITH, Judge of the Denver Probate
Court, on Wednesday, August 5, 2015.  The following is a
transcript of the audible portions of that hearing as
requested by the ordering party.


APPEARANCES:     Bernard A. Poskus, Esq., and Patrick R.
                  Thiessen, Esq., for Bernard Black

                  LISA DiPONIO, Esq., for Joanne Black,
                  Respondent

                  GAYLE YOUNG, Esq., Guardian Ad Litem for
                  Joanne Black, Respondent

                  IRA SALZMAN, Esq., Attorney for Joanne Black,
                  Respondent

                  ANTHONY DAIN, Esq., Trustee/cousin

                  CHERIE WRIGLEY, Cousin


EXHIBIT C

2

<u>INDEX</u>

| WITNESSES: | <u>DIRECT</u> | <u>CROSS</u> | <u>REDIRECT</u> | <u>RECROSS</u> |
|---|---|---|---|---|
| <u>For the Petitioner</u>: | | | | |
| Bernard Black | 18 | 63 | 156,221 | 158,235 |
| Katherine Litvak | 247 | 274 | 282 | 283 |
| <u>For the Respondent</u>: | | | | |
| Cherie Wrigley | 160 | 177 | 187 | |
| Anthony Dain | 192 | 201 | 215 | 220 |

<u>EXHIBITS</u>

| For the Petitioner: | <u>Received</u> |
|---|---|
| 78 | 24 |
| 44 | 28 |
| 45 | 29, 30 |
| 46 | 30 |
| 47 | 30 |
| 48 | 30 |
| 43 | 32 |
| 80 | 108 |
| 109 | 158 |
| 49 | 183 |
| 106 | 204 |
| 68 | 208 |

1   already testified that that's not their understanding of the
2   way this was going to work.
3          MR. POSKUS:  Well, I--I agree that that's what they
4   testified to and I have to tell you that I don't--then I
5   guess I have to question what did they mean in their--in
6   their April--or January 29th e-mail in which they say that
7   one order you didn't sign is fine with me.  What did they
8   mean when they said it's fine with me that the disclaimer be
9   exercised to allow respondent's share to pass under Article
10  4th of the last will and testament; that's what they were
11  saying in writing at the time; that's a contemporaneous
12  statement.
13         We're now talking two and a half years later when
14  apparently--I don't know why they're testifying the way they
15  are, but I think it's pretty solid that they had actual
16  knowledge because we--the record is also very clear that they
17  had this will in their possession and they knew what the will
18  did.
19         THE COURT:  I mean, you know, part of the problem
20  okay is I have my own independent memory of all this.
21         MR. POSKUS:  And I guess--I'm dying to ask you what
22  is it?
23         THE COURT:  And I have to tell you it's really in
24  accord with what everyone else is saying.  I absolutely did
25  not have any understanding that a third of these assets were

1    going to go to somebody else.

2              MR. POSKUS:  Uh-huh.

3              THE COURT:  It was my understanding that the

4    disclaimer would go, the money would go into the estate and

5    then all go back out into her trust.

6              MR. POSKUS:  And then 100 percent would go to--

7              THE COURT:  Right.

8              MR. POSKUS:  And I appreciate your candidly sharing

9    that with me, Your Honor

10             THE COURT:  And I think you also need to understand

11   that the--when that second amended order came in that

12   specifically said only two-thirds--

13             MR. POSKUS:  Right.

14             THE COURT:  --that there was a lag between the

15   January and March because I didn't understand why that would

16   be and that's not what was explained and that's not what I

17   understood, so I hung on to it.

18             MR. POSKUS:  Uh-huh.

19             THE COURT:  And then the other order came along

20   about the beginning of March and it said basically what I

21   understood it to be so I signed it.  And I didn't

22   deliberately--did not sign that second order, it was not an

23   oversight and it was not lost in the shuffle of paperwork

24   here at the court, it was because I didn't understand and

25   nobody was explaining to it--explaining it to me.

1          So--you know, and I appreciate Mr. Black's

2    testimony about his problems that he was having in terms of

3    what happened with his mom and this business about why he

4    didn't understand why she would do that and it was a last

5    minute change relatively.  I--I do appreciate all of that

6    information but the bear fact of the matter in terms of the

7    disclaimer is that it was not disclosed fully or

8    forthrightly.

9          MR. POSKUS:  Well, and so here's my response to

10   that, Your Honor, and I--like I said I appreciate you telling

11   me, I've been wondering through the whole two days that we've

12   been in Court what was she thinking.  I mean it's the natural

13   thing to think about, so let me respond to your statement by

14   saying this, so in your mind you didn't--you didn't think

15   this.

16          So I guess my point to you then is looking at it--

17   and I have--I have to say we--we've all said if we could have

18   done it differently we would loved to have done it; it's kind

19   of like spilled milk, but here's the thing, when you look at

20   what Carl Glatstein and Bernie Black were looking at back in

21   2012 I don't find it unreasonable that given the fact that

22   they had submitted the will and the trust to the court file

23   and given that these--that both Ms. Young and Ms. DiPonio

24   said they agreed with it--and then you'll recall the

25   testimony was the reason why they submitted the third order

1    was they didn't--in all honesty, Your Honor, they did not

2    receive a directive from you saying I don't like the way this

3    order reads, nothing happened.

4         And then they were told by Vanguard we don't want

5    that stuff in there.  And I can tell you from dealing with

6    these companies they do that all the time.  They're afraid if

7    you stick stuff in there about what happens after the one act

8    that they're charged to perform then if it does--if the money

9    doesn't go to the two-thirds to the Supplemental Needs Trust

10   they're afraid they'll get sued, so they want that stuff

11   taken out.

12        THE COURT:  Uh-huh.

13        MR. POSKUS:  And so that's why they changed the

14   order.  In their minds it was reasonable for them to have

15   assumed that everybody knew given what they said.  I mean--

16        THE COURT:  It wasn't enough.

17        MR. POSKUS:  Well, if that's going to be your

18   ruling there's not much I--

19        THE COURT:  It has to be.  I have--I have a

20   definite memory of this and I just explained that to you.

21        MR. POSKUS:  No, and I agree you explained it to

22   me.

23        THE COURT:  So--

24        MR. POSKUS:  I'm just saying that under--at least I

25   think--I mean to--you would certainly agree with me and maybe

142

1   he was expressly authorized.

2          MR. POSKUS:  I'm sorry which statute are you

3   referring to?

4          MR. DAIN:  15-14-423 does not--does not permit Mr.

5   Black to prosper at the benefit of Ms. Black if he has a

6   conflict.

7          MR. POSKUS:  Where does it say that--where does it

8   say there has to be a hearing.

9          MR. DAIN:  I--you--a conflict--you have to have a

10  hearing on a conflict, it doesn't need to say it in that

11  statute.

12         MR. POSKUS:  But the statute doesn't say that.

13         THE COURT:  All right.  But the point here is--

14         MR. POSKUS:  Yeah.

15         THE COURT:  --the disclosures weren't made; it

16  wasn't clear; it just didn't happen.  And, you know, the

17  rationale for that or the reasons for that or whoever thought

18  what, perhaps but I--you know, we've all worked together for

19  a while now--

20         MR. POSKUS:  Right.

21         THE COURT:  --and Ms. DiPonio and Ms. Young don't

22  get exercised about much and they're pretty exercised about

23  this.

24         MR. POSKUS:  Uh-huh.

25         THE COURT:  So I'm satisfied that they really

1   didn't know it and neither did I.  So I cannot--I have to

2   find and I do that the disclosure was completely inadequate;

3   it wasn't up-front, it wasn't clear; didn't explain it, and

4   really he obtained an order for disclaimer without disclosing

5   the underlying reasons and what was going to happen with it;

6   he just didn't.

7             MR. POSKUS:  Well, if that's going to be your

8   ruling--

9             THE COURT:  It has to be.  And none of this

10  documentary evidence that you've got in the notebook supports

11  that.  There is no explicit explanation of it in any way,

12  shape, or form.  It just doesn't exist because it isn't

13  there; it didn't happen.

14            Unless there's something else that you want to pull

15  out and show, but it's just not here.  I don't have in the

16  notebook; I don't have it in any of these exhibits, it's not

17  in the transcript of the December hearing.  It's not in the

18  written form of the orders that I signed.

19            MR. POSKUS:  Uh-huh.

20            THE COURT:  So I don't have anything to--to

21  indicate to me otherwise that I misunderstood something or

22  that I missed something that was said.  And basically, you

23  know, what you're faced with is you've got the GAL, the court

24  appointed counsel and the Court under a misapprehension.

25            MR. POSKUS:  Uh-huh.

```
 1          THE COURT:  And there was no effort made to explain
 2    it away or to do anything.
 3          MR. POSKUS:  Well, Your Honor, you're free to--I
 4    have to deal with you in more cases than this one so I'm
 5    going to--
 6          THE COURT:  I know--and I know you are under a
 7    disadvantage, Mr. Poskus, and I get that, but I mean--like I
 8    say I have my memory of it; I have the specific memory of not
 9    signing that other order because it wasn't in accord with
10    what I understood what was going on.
11          MR. POSKUS:  And I appreciate that, Your Honor, and
12    I can't argue with what your perception of it was.  I--I have
13    to say--I want to choose my words carefully--I'm disturbed--
14    yeah--
15          THE COURT:  You know, maybe I missed the whole
16    point, maybe--
17          MR. POSKUS:  No, I--
18          THE COURT:  --but--
19          MR. POSKUS:  --see, Your Honor, your--your memory
20    of what happened is something that I didn't know until this
21    moment.
22          THE COURT:  Right.
23          MR. POSKUS:  But you need to know this, I did
24    depose Ms. Young--
25          THE COURT:  Uh-huh.
```

1          MR. POSKUS:  --and then of course we had Ms.
2     DiPonio's testimony.  And I understand your point about you
3     don't see them get angry about much but they're angry about
4     this.
5          And quite frankly this is the first I've ever dealt
6     with them.  I've never had them in a case of mine before.
7     But--
8          THE COURT:  Well, that's because they're always on
9     the guardianship cases.
10         MR. POSKUS:  I do--
11         THE COURT:  And the conservator--by and large--
12         MR. POSKUS:  Yeah.
13         THE COURT:  --their work is not in trust and
14    estates it's in guardianships and conservatorships and
15    looking after the physical well being of people, getting them
16    out of hoarding situations with bedbugs and--and--
17         MR. POSKUS:  Uh-huh.
18         THE COURT:  --and, you know, that sort of thing.
19         MR. POSKUS:  Yeah, I know and I--
20         THE COURT:  It's not this sort of stuff that we
21    deal with mostly when they're in front of me.
22         MR. POSKUS:  And I--and I get that, I get that.
23    But what I'm disturbed about is their refusal to concede at
24    any point that they might have known because even as an
25    attorney inexperienced in the area of say disclaimers, if

309

------------------------------------------------------------
CERTIFICATE

------------------------------------------------------------

STATE OF COLORADO   )

                       :

COUNTY OF DENVER    )


        I, Suzanne H. Ben Majed, Transcriptionist for the
Denver Probate Court, in the State of Colorado, do hereby
certify that the above and foregoing is a transcript of
the recorded proceedings, based upon the quality of
the recording and my ability to understand it, taken at the
date and time set forth on Page One hereof.

        DATED at Denver, Colorado, this 4th day of
September, 2015.


                              /s/Suzanne H. Ben Majed
                              _____
                              Suzanne H. Ben Majed
                              Official Transcriber
                              Federal Reporting Service
                              17454 E. Asbury Place
                              Aurora, CO  80013

DENVER PROBATE COURT
CITY AND COUNTY OF DENVER
STATE OF COLORADO
1437 Bannock Street, Room 230
Denver, Colorado 80202

**In the Interest of:**

**JOANNE BLACK,**

**Protected Person.**

Jane G. Ebisch
The Ebisch Law Firm
12600 W. Colfax Ave., Suite C-400
Lakewood, CO 80215
Phone (303) 233-1232 Fax (303) 672-9998
Atty. #15029          Email jebisch@ebischlaw.com

^ COURT USE ONLY ^

Case No.: 2012 PR 1772

**AFFIDAVIT OF SHANNON WELLS STEVENSON, ESQ. IN SUPPORT OF PETITIONER'S MOTION TO RECUSE THE HONORABLE ELIZABETH LEITH FROM FURTHER PROBATE COURT PROCEEDINGS**

I, Shannon Wells Stevenson, am over the age of 18, fully competent to make this affidavit, and state the following based on my personal knowledge:

1. I am counsel for the Petitioner, Bernard Black.

2. I was engaged to represent Bernard Black in the Denver Probate Court during the time period December 22, 2015 through January 23, 2018.

3. The allegations set forth in paragraphs 4-6, 8 and 10-11 of the Petitioner's Motion to Recuse the Honorable Elizabeth Leith from Further Probate Court Proceedings are true and correct, to the best of my knowledge.

Further the affiant sayeth naught.

EXHIBIT D

Dated this 1st day of February, 2018.

_____
Shannon Wells Stevenson, Esq.

STATE OF COLORADO          }
COUNTY OF DENVER           }

Subscribed and sworn to before me on this _1st_ day of ___February___, 2018 by Shannon Wells Stevenson.

```
KATHLEEN M. DAILY
NOTARY PUBLIC
STATE OF COLORADO
NOTARY ID 20054018602
MY COMMISSION EXPIRES MAY 9, 2021
```

_____
Notary Public

My commission expires on: _May 9, 2021_

| | |
|---|---|
| DENVER PROBATE COURT<br>CITY AND COUNTY OF DENVER, STATE OF COLORADO<br>1437 Bannock Street,  Room 230<br>Denver, Colorado  80202 | |
| **In the Interest of:**<br><br><br>**JOANNE BLACK,**<br><br><br>**Protected Person** | ***COURT USE ONLY*** |
| Patrick R. Thiessen, Esq., Reg. No. : 40185<br>Bernard A. Poskus, Reg. No. :11975<br>POSKUS, CATON & KLEIN, P.C.<br>Attorneys for Bernard S. Black<br>303 East 17th Avenue,  Suite 900<br>Denver, Colorado  80203<br>Phone: 303-832-1600<br>Facsimile:  303-832-1676<br>thiessen@poskuscatonklein.com<br>poskus@poskuscatonklein.com | Case Number:<br><br>2012 PR 1772 |

**AFFIDAVIT OF BERNARD POSKUS IN SUPPORT OF MR. BLACK'S SECOND MOTION FOR POST TRIAL RELIEF UNDER C.R.C.P. 59**

I, Bernard Poskus, being duly sworn, depose and state as follows:

1.      I am counsel for Bernard Black in this matter.  I have personal knowledge of the matters set forth herein.  I could and would testify competently thereto if called as a witness in any proceeding.  I state as follows:

2.      I attended the hearings for the matters before the Court on June 16-17, 2015, August 5, 2015 and September 8, 2015 (the "Hearing").

3.      On August 5, 2015, the Court revealed her own personal memory and subjective understanding of the material events that led to the Court's entry of the March 5, 2013 Order, which allowed Mr. Black to disclaim Renata Black's "payable on death" instructions.  The Court's reliance on its own subjective understanding was a surprise to me and Mr. Black.  Prior to the Hearing, the Court had not expressed its recollection relating to Mr. Black's prior disclosures to the Court.  Moreover, Mr. Dain had taken the position that the Court's subjective understanding was not relevant to the issues at hand.

**EXHIBIT E**

4.      Initially, I intended to depose Mr. Dain.  In his Objection to the Motion to Continue, however, he represented that he did not believe his testimony was relevant.  Once the Hearing began, Mr. Dain confirmed that he did not intend to call Ms. Wrigley or himself.  Thus, I was surprised when the Court unilaterally called Ms. Wrigley and Mr. Dain to the stand.

5.      On August 20, 2015, less than three weeks before the scheduled September 8, 2015 hearing day, my mother passed away.  In order to assist my family with arrangements and travel to Illinois for my mother's burial, I was absent from work through August 28, 2015.  I then unexpectedly suffered a serious knee injury on August 29, 2015.  The injury caused me excruciating pain, required a visit to the emergency room and multiple visits to an orthopedic surgeon, and prohibited me from preparing for Mr. Black's hearing.  As soon as it became clear that I could not act as Mr. Black's counsel at the September 8, 2015 hearing, I informed Mr. Black and filed the Second Motion for Continuance.

6.      During the period leading up to the September 8 hearing, I had to make multiple visits to the doctor, and suffered debilitating pain to the point that I could not adequately assist in preparation for the September 8, 2015 hearing.  Although I was able to physically attend the September 8, 2015 hearing, I was in so much pain that I was unable to participate as Mr. Black's counsel.  Accordingly my associate, Patrick Thiessen, had to act as Mr. Black's counsel. Although Mr. Thiessen had previously acted as "second chair" counsel at these proceedings, and in other matters, he had never served as lead counsel in a contested matter until the September 8th hearing.  Thus, the Court's improper denial of the Second Motion for Continuance deprived Mr. Black of the counsel of his choice, and I made such objection on the record.

I, Bernard Poskus, declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

_____

Bernard Poskus

Subscribed and affirmed before me by Bernard Poskus this 11th day of December, 2015.

_____

Notary Public

My commission expires: _11- 18- 11_

[SEAL] MARY MARESH
NOTARY PUBLIC
STATE OF COLORADO
NOTARY ID 20024037308
MY COMMISSION EXPIRES NOVEMBER 18, 2018