**Mancilla & Fantone** LLP

**ANDREW MANCILLA**
NY, NJ, SDNY, EDNY, DNJ, 2ND CIRCUIT

260 MADISON AVE, 22ND FLR
NEW YORK, NY 10016
T 646.225.6686  F 646.655.0269
andrew@law-mf.com

May 14, 2020

**Via ECF**
Hon. Steven L. Tiscione
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

Re:     **Black et al. v. Dain et. al. (16-cv-01238)(CBA)(ST)**

Dear Judge Tiscione:

Defendants submit this Reply in Support of Defendants' Motion for Reconsideration, Docket Entry 239. We have attached at Exhibit A a copy of the transcript of the August 6, 2019 hearing before Your Honor reflecting Plaintiffs' assurances to identify specific communications for Defendants to provide to the Court to review *in camera* to determine the applicability of the common interest privilege. However, Plaintiffs never identified any communications, which (we remind the Court) was the primary flaw in Plaintiffs' initial motion to compel.[1] The Court acknowledged this dilemma at the August 6, 2019 conference stating "[s]ometimes it's hard for me to make these decisions without seeing [the communications]. As much as I hate reviewing all of this stuff in camera all the time, I often find that these privilege questions are difficult to address without actually looking at stuff." Ex. A at 83:25- 84:4.

Thus, as noted, the Court cannot perform a competent analysis without reviewing the specific communications that Plaintiffs are challenging. In choosing to forgo identifying specific communications the Plaintiffs effectively abandoned their challenge and should not now be rewarded after failing to comply with the Court's direction.

Additionally, factors demonstrating the existence of a common interest agreement between the subject individuals prior to 2018 include the Defendants' deposition testimony, commencement of litigation involving the parties (and related individuals) dating back to 2014,

---

[1] In Defendant Salzman's opposition to Plaintiffs' motion to compel, counsel argued: "Preliminarily, we note that Plaintiffs' entire application is improper, as Plaintiffs have not properly identified the specific line items within the Defendants' privilege and/or redaction logs that they are challenging." DE 220 at 1. Similarly, in Defendants Cohenson and Raphan's opposition to Plaintiffs' motion to compel, counsel argued: "However, plaintiffs' motion does not even attempt to specify certain documents plaintiffs believe are not subject to the common interest privilege. At the least, plaintiffs should have to specify the documents they are challenging by a category such as document type, date of creation, subject matter, or recipient, but they fail to do so. This makes it quite difficult for the defendants to provide specific responses, as the privilege covers many documents, and varied types of documents at that." DE 217 at 1.

Hon. Steven L. Tiscione
May 14, 2020
Page 2 of 9

as well as the parties' circulation of drafts of the 2018 written common interest agreement as early as 2016.

Finally, were the Court to reach a conclusion regarding the privileged nature of any communications, the Court must necessarily conduct a conflict of laws analysis to determine which privilege law applies.

**I.      Defendants Previously Advised The Court at the August 6, 2019 hearing of Judge Kennelly's Finding Of Common Interest**

Plaintiffs blatantly misrepresent that Defendants introduced Judge Kennelly's November 15, 2018 Order "for the first time in their motion for reconsideration." Pls' Opp. at 2.  At the August 6, 2019 appearance before Your Honor the following colloquy took place:

THE COURT: Clearly, the judge recognized there was a common interest for all of the same players that are here. I'll tell you what. Why don't you produce to me for in camera inspection the documents, at least the ones that have already been produced. So both sides already have them, even though they're not technically supposed to be used in this case.

MR. FANTONE: (Ui).

THE COURT: Yeah.

MR. FANTONE: I think there's -- we have no problem doing that. I just want to forewarn the Court, I think there's probably close to a thousand pages or more.

THE COURT: Okay. Well, I'm not saying I'm going to necessarily read every single page.

MR. FANTONE: Yeah.

THE COURT: But at least I want to have some context for some of this.

MR. FANTONE: We can do that.

MR. MANCILLA: Can we limit it to responsive documents? I'm not sure that -- these are documents produced in response to (ui).

THE COURT: Different case, yeah. The only reason I said that might be a starting place is because both sides have those documents, so it might be easier to talk about them once I review them. If we're talking about other documents that the other side doesn't have --

MR. FANTONE: It might be better if the plaintiffs identify which documents, so your Honor can read a select few of those documents -- otherwise -- this is speaking perhaps as your law clerk, not to review all of these documents.

MR. SCHAALMAN: **We'd be glad to do that. I think that's a reasonable suggestion.** We'll submit --

THE COURT: Look, you both have those sets of documents.

MR. SCHAALMAN: We do.

Hon. Steven L. Tiscione
May 14, 2020
Page 3 of 9

> THE COURT: Why don't you confer and just agree on a set to provide to me that gives like an overview of the types of documents we're talking about.
>
> MR. SCHAALMAN: **That's fine**.
>
> THE COURT: So that I have some context for the -- because, look, this is a highly fact-specific inquiry.
>
> MR. SCHAALMAN: **Sure**.
>
> THE COURT: Sometimes it's hard for me to make these decisions without seeing them. As much as I hate reviewing all of this stuff in camera all the time, I often find that these privilege questions are difficult to address without actually looking at stuff.
>
> MR. FANTONE: All right, we can work it out. Just by way of example, in the conversation we had earlier, the requests in the Illinois case were much broader than what plaintiffs -- at least on behalf of Wrigley.
>
> THE COURT: Okay.
>
> MR. FANTONE: Pinto wasn't even a part of that case.
>
> MR. SCHAALMAN: **We'll see if we can agree to a subset that applies to** (ui).
>
> MR. FANTONE: Okay.
>
> THE COURT: Look, either agree to subset or submit the whole darned thing.
>
> MR. SCHAALMAN: Right.
>
> THE COURT: But I'll very disappointed in you if you make me read the whole thousand pages. Let's put it that way.
>
> MR. SCHAALMAN: Understood.

Ex. A at 82:4-84:22 (emphasis added).

Plaintiffs' assured the Court that they would meet and confer with Defendants to identify which documents from the Illinois action were responsive to their first set of discovery requests and subject to their motion to compel for *in camera* review.  Despite such assurances, Plaintiffs chose not to pursue that course of action.  Plaintiffs' counsel never even contacted defense counsel to meet and confer in this regard.  While the record reflects that the Court intended to schedule a subsequent appearance after its *in camera* review for the purpose of resolving Plaintiffs' motion to compel (Ex. A at 85:2-5), no appearance was set in light of Plaintiffs' choice to abandon the issue.

Absent specific identification of communications Plaintiffs were challenging and an *in camera* review of such communications, any finding regarding the common interest privilege, especially in light of Judge Kennelly's November 15, 2018 Order, is premature.[2]  Further, because Plaintiffs chose not to pursue this issue subsequent to the August 6, 2019 hearing, let

---

[2] As noted in our moving papers, Defendants Salzman and Cohenson have also objected to the production of the documents at issue on the basis of the work product privilege.  As such, any documents that Plaintiffs seek would also need to be reviewed *in camera* for work product.

Hon. Steven L. Tiscione
May 14, 2020
Page 4 of 9

alone act with diligence in obtaining such relief, Plaintiffs request for relief should be denied.
*See Padilla v. Maersk Line, Ltd.*, 721 F.3d 77, 83 (2d Cir. 2013) ("[A] delay attributable solely to
a [party's] failure to act with diligence cannot be characterized as 'excusable neglect.'"); *Colvin
v. Keen*, No. 13-CV-3595 (SJF)(ARL), 2015 U.S. Dist. LEXIS 54045, at *22 (E.D.N.Y. Apr. 24,
2015)(denying Plaintiff's motion for an extension of discovery because "Plaintiff's failure to
obtain the discovery she now seeks prior to the expiration of the final discovery deadline in this
case was clearly within her control, and she has not provided any persuasive reason for her
repeated failure to comply with the discovery orders and deadlines set by the Court or to
promptly seek relief from the Court when necessary, *e.g.,* to timely file motions to compel, for
extensions of time, etc.").

## II.     Plaintiffs Misrepresent the Scope of Their Motion to Compel

Plaintiffs improperly assert that their motion to compel pertains to Plaintiffs' "narrowed"
second set of document requests.  Plaintiffs are mistaken.  First, Plaintiffs' motion to compel (DE
213) was limited to requests for "Defendants' undisclosed documents responsive to Plaintiffs'
**First Document Demands**." *Id.* at 1 (emphasis added).  Plaintiffs reiterated this limited scope in
their reply papers (DE 225) at FN 1, which stated "**Plaintiffs' motion to compel concerned
only Plaintiffs' first document requests.**"  Thus, the Plaintiffs did not seek to compel any
documents responsive to their second set of discovery demands and the Court should accordingly
disregard Plaintiffs' opportunistic attempt to expand the scope of their actual motion to compel
during the Court's reconsideration.

Plaintiffs misrepresent that they narrowed their second set of discovery requests.
Although Plaintiffs attached an email sent to Defendants dated June 4, 2019 (Pls' Opp. Ex. 14
(DE 243-24)) containing their purported "narrowed" document requests, Plaintiffs intentionally
omitted Defendants' response and objections sent only days later on June 7, 2019 (Ex. B), and
Plaintiffs further response on June 10, 2019 promising to follow-up by June 12th (Ex. C).  Since
June 10, 2019, Plaintiffs never followed up with Defendants regarding their asserted objections,
nor did they otherwise seek relief from the Court.  Plaintiffs entirely abandoned their second set
of discovery demands and chose to focus their subsequent motion to compel only on Plaintiffs'
first set of discovery demands.  Plaintiffs' counsel's failure to include their June 10th email –
which acknowledges that the Defendants were meeting and conferring in good faith and reflects
that it was Plaintiffs who abandoned their obligations – is intentionally misleading to the Court.

Further., since Defendants Dain, Wrigley, Pinto, and CPI Investigations, Inc. are not
withholding any privileged documents subject to Plaintiffs' motion to compel, the only
communications at issue are those identified by Defendants Salzman, Cohenson, and Raphan in
their respective privilege logs.

Plaintiffs' inexcusable misrepresentations to this Court concerning Defendants' good
faith efforts to resolve their discovery dispute should operate to preclude Plaintiffs expansion of
the scope of their motion to compel.

Hon. Steven L. Tiscione
May 14, 2020
Page 5 of 9

### III. Defendants' Limited Request Is For The Court To Reconsider Its Broad Ruling That No Common Interest Agreement Existed Prior to 2018

The Court should reconsider its ruling because: (i) Defendants' created drafts of the 2018 written common interest agreement dating back to 2016; (ii) the instant lawsuit was filed in March of 2016 alleging, *inter alia*, breach of fiduciary duty against Dain and aiding and abetting breach of fiduciary duty against all of the other named Defendants, which are the individuals that participated in the disputed communications; and (iii) Judge Kennelly already concluded a common interest existed among these same parties.

That the Defendants ultimately executed the written common interest agreement in 2018 is of little legal importance because common interest agreements are commonly formed without a written agreement. *See*, e.g., *City of Almaty v. Ablyazov*, No. 15-CV-05345 (AJN) (KHP), 2019 U.S. Dist. LEXIS 111607, at *21 (S.D.N.Y. July 3, 2019) ("parties must show that an **oral** or written agreement between them embodies "a cooperative and common enterprise towards an identical *legal* strategy" and that their communications were made in furtherance of that strategy.")(emphasis added).  Additionally, here the Defendants actually circulated written drafts of the agreement as early as June 13, 2016.  As proffered by Mr. Dain at the August 6, 2019 hearing:

> MR. DAIN: Your Honor, there were multiple drafts over the years. It took that long to finally reduce it to writing because there were multiple litigations that kept getting filed, and we had some issues with -- some of the parties were parties in multiple states, and the insurance carriers for instance weren't comfortable with adding a litigation that was handled by maybe another carrier in another state. So we had iterations of that going on and, again, those would have still been covered by an oral common interest agreement.

Ex. A at 65:3-13.

The first draft of the common interest agreement was circulated by defendants on June 13, 2016, and can be made available to the Court to be submitted *in camera*.  Additionally, the Defendants can make available to Your Honor for *in camera* review an email in June 2017 attaching a separate common interest agreement among parties that were also litigating in Colorado and elsewhere against the Black family.  It bears the signatures of named parties in the instant action, including Gayle Young, Anthony Dain, and Lisa DiPonio.  This June 2017 common interest agreement provides undisputed evidence that at least some of the Defendants entered a written common interest agreement prior to 2018,[3] but the Defendants understanding of their common interest based on oral agreements dates back to as early as 2014.  Reconsideration is necessary because there is substantial evidence that not one, but many, written common interest agreements were executed, at different points in time, among the numerous individuals working to protect Joanne's interests.

---

[3] If a nuanced inquiry is required as to when all the particular parties to a specific communication agreed on the essential terms of a written common interest agreement draft, counsel will provide the Court with the various iterations of the drafts as well as all relevant comments/amendments provided by those particular parties for review *in camera*.

Hon. Steven L. Tiscione
May 14, 2020
Page 6 of 9

For example, there may be certain communication that Plaintiff identifies that involve a Defendant and non-party participants who had a separate common interest agreement concerning the Colorado litigation.  However, Plaintiffs have utterly failed to identify any specific communications, thereby rendering any finding concerning the existence of a common interest agreement unnecessary and premature.

At the very least, the Defendants had a common *legal* interest in defending the instant breach of fiduciary duty and aiding and abetting breach of fiduciary duty claims filed by Plaintiffs in March 2016.  Any communications among the Defendants in furtherance of their "common defense" against those conspiracy claims fall squarely within even New York's definition of the common interest privilege. *City of Almaty v. Ablyazov*, No. 15-CV-05345 (AJN) (KHP), 2019 U.S. Dist. LEXIS 111607, at *22 (S.D.N.Y. July 3, 2019).  However, as mentioned above, Plaintiffs failure to identify any specific communication makes it impossible for the parties to engage in a fact-specific inquiry regarding the application of the privilege. *See Edebali v. Bankers Standard Ins. Co.*, No. CV 14-7095 (JS) (AKT), 2017 U.S. Dist. LEXIS 110665, at *13-14 (E.D.N.Y. July 17, 2017) (whether a document is privileged is a "fact-specific determination, most often requiring in camera review.") (internal citations omitted).

Finally, Judge Kennelly's finding that the named Defendants in this action had a common interest also militates in favor of reconsidering Your Honor's broad ruling to the contrary.

**IV.     Defendants' Sworn Testimony Supports The Existence Of A Common Interest Agreement Prior To 2018**

Plaintiffs mischaracterize and omit Defendants' deposition testimony in an attempt to demonstrate that no such common interest agreement existed among the Defendants. Cohenson's testimony that she was "not sure" whether there was a common interest/joint defense agreement in place "for all of 2016" does not mean one did not exist in 2016, nor does it mean that an oral agreement did not exist in 2016.  It is unclear whether Cohenson was referring to a written agreement or any agreement and counsel did not ask any clarifying questions. Pls' MTC Ex. 6 (DE 213-6) at 65:20-23.  In fact, Cohenson's testimony actually supports the existence of a common interest agreement prior to 2018, as it implies that one existed at some point during 2016, and it is consistent with the fact that Mr. Dain sent her and Mr. Salzman the first draft of the written common interest agreement on June 13, 2016.

Plaintiffs' counsel also mischaracterizes the following colloquy by asserting Cohenson's response demonstrated she did not know what the common interest exception to waiver was:

> MR. SCHAALMAN: Ms. Cohenson, what is the common interest you shared with Ms. Kerr regarding the email dated February 18, 2016 addressed to you?
>
> MS. COHENSON: May I ask what you mean by "common interest"?
>
> MR. SCHAALMAN: You can. But it's the privilege that's being asserted on your behalf.

Hon. Steven L. Tiscione
May 14, 2020
Page 7 of 9

Pls' Opp. Ex. 4 (DE 243-4) at 51:6-12.  Clearly, Ms. Cohenson never said that she does not know what the common interest exception to waiver was, rather, she simply shifted the burden to the examiner to clarify his question.  Plaintiffs' counsel never clarified.

Pamela Kerr's testimony that Gayle Young never discussed confidentially with Ms. Kerr has nothing to do with whether Ms. Kerr considered her emails with others confidential. Plaintiffs' counsel never asked Ms. Kerr if she considered her communications with those who were helping Joanne confidential.  Pls' MTC Ex. 9 (DE 213-9) at 86:16-87:5.

Similarly, Ms. Wrigley's testimony actually supports the existence of a common interest agreement prior to 2018:

> MR. SCHAALMAN: Well, were you aware of any agreements to keep matters -- keep these documents confidential among that group at least?
>
> MS. WRIGLEY: Yes.  **From the very beginning,** I knew that there was some kind of a thing that we had signed, or that they had signed that said we were -- our e-mails were confidential, or that the group -- as we talked as a group -- were all kind of considered legal counsel together.  But --
>
> MR. SCHAALMAN: And who was in the group, as you've just testified?
>
> MS. WRIGLEY: Um, I think we called them collectively "Joanne's team."
>
> MR. SCHAALMAN: Okay. And who was on Joanne's team?
>
> MS. WRIGLEY: It was a large group, both in Colorado and New York. And it pretty much included everybody that was involved with Joanne.

Pls' Ex. 8 (DE 213-8) at 101:5-21 (emphasis added).

Messrs. Dain and Salzman's testimony also supports the existence of a common interest agreement prior to 2018.  Mr. Salzman testified that he understood that all of his communications with Pamela Kerr, Anthony Dain, Lisa DiPonio, Melissa Cohenson, Cherie Wrigley, and Esaun Pinto to be confidential and privileged under the circumstances. *See* Salzman's Opp. to Mot. To Comp. at 4-5 (*citing and quoting* Salzman's May 9, 2019 deposition testimony).

Mr. Dain testified at a deposition on September 6, 2018 in the Chicago federal case that an oral common interest agreement existed as early as 2014[4], describing the agreement among Defendants as follows:

> MR. DAIN: It would have been among all the parties that had an interest in that. So it would have been among Ira Salzman, Joanne Black, Cherie Wrigley, Melissa Cohenson and her - her employer, Mr. Raphan, any other party to that. Esaun Pinto, would have been involved.  I don't know if he had counsel at that

---

[4] The relevant portions of Mr. Dain's testimony are annexed hereto at Exhibit D.

Hon. Steven L. Tiscione
May 14, 2020
Page 8 of 9

time.  It would have been - it would have included me and any other parties that had a common interest in assisting or defending Joanne Black's interests.

Ex. D at 22:19-23:2.  Regarding the scope and timing of the agreement, Mr. Dain testified:

> MR. DAIN: It covered the common interest in the conservatorship proceedings in Colorado, the guardianship proceedings in Colorado, the guardian proceedings in New York, the threatened litigation by Bernard Black and his various counsel in New York. It included then the litigations in New York, both the litigation against Ms. Wrigley, Ms. Pinto -- Mr. Pinto and his company, I think CPA or C -- whatever his -- his private investigation company was. It included -- and then it broadened to include his threats of litigation and other litigation against Joanne Black, including his purporting to represent the issue trust in suing Joanne Black in Illinois. It included the subsequent threats to sue Ms. Wrigley, Ms. Kerr, Ms. Cohenson, Mr. Raphan, in Illinois, in the subsequent litigation in Illinois. Included the FINRA litigation that Mr. Black brought, and it includes the collusive judgments that Mr. Wrigley and Ms. Litvak and Ms. Dal brought, and all actions related to that. And it includes any other threatened litigation and actions that Bernard Black has made in its broad or his family has made in broad.
>
> MR. SCHAALMAN: And -- and can you give us an approximate date, month or year, when this common interest joint defense agreement was reached?
>
> MR. DAIN: I think among the first smaller group, it was probably at least as early as 2014, probably when Mr. Black first threatened litigation. His e-mail that, quote/unquote, "When I fight, I fight hard." That he would consider Ms. Wrigley's actions a breach of her fiduciary duty. So that's probably the fall of 2014. So at least as early as that. And -- and then it encompassed every litigation since then. It's since been reduced to writing. But initially it was oral.

Ex. D at 23:8-24:16.

The aforementioned testimony constitutes competent evidence in support Defendants' assertion that a common interest agreement existed prior to 2018.

**V.     The Court Must Apply a Conflict of Laws Analysis Based On The Specific Communications Requested To Determine Which State's Privilege Law Applies**

Plaintiffs have been erroneously arguing New York privilege law applies to all the Defendants' communications, regardless of the fact that two of the Defendants are California residents and the majority of the litigation concerning this matter took place outside of New York.  Although Plaintiffs are correct in noting that Fed. R. Evid. 501 requires application of state privilege law, the determination of which state's privilege law applies is determined by a conflict of law analysis regarding the specific discovery sought.

"In applying state privilege law, however, a federal court must also apply the state's choice of law rules concerning privilege." [] *A.I.A. Holdings, S.A. v. Lehman Bros.*, 97 Civ. 4978

Hon. Steven L. Tiscione
May 14, 2020
Page 9 of 9

(LMM)(HBP), 1999 U.S. Dist. LEXIS 1183, at *26-27 (S.D.N.Y. Jan. 29, 1999) (internal citations omitted). "Although it appears that New York law will otherwise apply to the substantive claims in this action because of choice of law clauses in the licensing agreements, a separate inquiry into which state's law will apply is necessary with respect to an assertion of the attorney-client privilege." *SATCOM Int'l Grp. PLC v. ORBCOMM Int'l Partners, L.P.*, 98 CIV. 9095 (DLC), 1999 U.S. Dist. LEXIS 1553, at *2 (S.D.N.Y. Feb. 16, 1999) (*citing Tartaglia v. Paul Revere Life Ins. Co.,* 948 F. Supp. 325, 326-27 (S.D.N.Y. 1996)). "New York choice of law gives controlling effect to the law of the jurisdiction which, because of its relationship or contact with the occurrence or the parties, has the greatest concern with the specific issue raised in the litigation." *Tartaglia,* 948 F. Supp. at 326-27 (internal citations and quotations omitted).

Here, depending on the communications sought, the Court will be required to conduct a New York state conflict of law analysis concerning the specific communications Plaintiffs seek. If, for example, Plaintiffs sought production of emails sent between Dain, Wrigley, and the Colorado guardian *ad litem* concerning Bernard Black's conduct as a conservator in Colorado, New York conflict of law analysis would not require application of New York privilege law because neither the communications, subject matter, nor the parties, had anything to do with New York. *Delta Fin. Corp. v. Morrison*, 831 N.Y.S.2d 352, 352 (Sup. Ct.) (applying South Carolina privilege law because that was jurisdiction in which the assertedly privileged communications were made); *Mazzella v. Philadelphia Newspapers, Inc.*, 479 F. Supp. 523, 527 (E.D.NY 1979) (applying Pennsylvania's newsmen's privilege in defamation suit where defendants were a Pennsylvania based newspaper and journalist, and the confidential communications between sources and reporter apparently occurred in Pennsylvania); *see also Lego v. Stratos Lightwave, Inc*., 224 F.R.D. 576, 579 (S.D.NY 2004) ("in cases requiring a choice of privilege law, the interest analysis usually had led New York courts to apply the law of the jurisdiction in which the assertedly privileged communications were made, which in most of the cases was also the jurisdiction in which the party that made the communications resided").

## VI.    Conclusion

For the above reasons, and those contained in our initial moving papers, we respectfully request the Court reconsider its March 16, 2020 docket Order granting in part Plaintiffs' motion to compel on the grounds that Defendants failed to establish the existence of a common interest privilege prior to 2018.

We thank Your Honor for your continued attention and consideration of this matter.

Respectfully submitted,

Andrew Mancilla, Esq.

Encl.
cc.    Anthony Dain via Email
       All other parties of record via ECF