# Exhibit A

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK


```
----------------------------X
                            :
SARAH H. BLACK, et al.,     :
                            :      16-CV-1238 (CBA)(ST)
              Plaintiff,    :
                            :      August 6, 2019
                            :
              V.            :      Brooklyn, New York
                            :
ANTHONY DAIN, et al.,       :
                            :
              Defendant.    :
----------------------------X
```

TRANSCRIPT OF CIVIL CAUSE FOR MOTION HEARING
BEFORE THE HONORABLE STEVEN TISCIONE
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For the Plaintiff:          MICHAEL SCHAALMAN, ESQ.
                            SHARAN ABRAHAM, ESQ.


For the Defendant:          HARRIS KATZ, ESQ.
                            ANDREW MANCILLA, ESQ.
                            ROBERT FANTONE, ESQ.
                            ALEX RU, ESQ.
                            ANTHONY DAIN, PRO SE

Audio Operator:


Court Transcriber:          ARIA SERVICES, INC.
                            c/o Elizabeth Barron
                            102 Sparrow Ridge Road
                            Carmel, NY 10512
                            (845) 260-1377



Proceedings recorded by electronic sound recording,
transcript produced by transcription service

1          THE COURT:  Civil cause for motion hearing,

2  16-CV-1238, Black, et al. v. Dain, et al.

3          Counsel, please state your appearances for

4  the record.

5          MR. SCHAALMAN:  Good afternoon, your Honor.

6  Michael Schaalman and Sharan Abraham on behalf of the

7  plaintiffs.

8          MR. KATZ:  Good afternoon, your Honor.

9  Harris Katz from the law firm Winget Spadafora &

10  Schwartzberg for the defendant Ira Salzman.

11          MR. MANCILLA:  Good afternoon, your Honor.

12  Andrew Mancilla and Robert Fantone for defendants

13  Cherie Wrigley, Esaun Pinto, and CPI Investigations.

14          MR. RU:  Good afternoon, your Honor.  Alex

15  Ru from Kennedys for defendants Cohenson and Raphan,

16  P.B.

17          THE COURT:  Can I just have the spelling of

18  your last name?

19          MR. RU:  R-u.

20          THE COURT:  Thank you.

21          MR. DAIN:  Good afternoon, your Honor.

22  Anthony Dain appearing pro se.

23          THE COURT:  All right.  Before I deal with

24  the privilege motion, let me just turn to the motion to

25  compel that was filed by defendant Salzman.  It's just

1   easier to get that one out of the way first.  As I

2   understand it, is there a second damage expert report

3   that's been provided at this point?

4          MR. SCHAALMAN:  Your Honor, what's been

5   provided -- and I have a copy to give you.  In looking

6   at it, it's about 500 pages worth of backup

7   information, very detailed information to support the

8   expert report in terms of the scheduling of 1, 2, 3,

9   and 4.  There are virtually no additional documents

10  other than what we already produced back in May and

11  this last production of these backup charts, which

12  identify each and every expense of each and every law

13  firm for each and every trust (ui).  That's the core of

14  our damages case and that has been produced as of July

15  31st (ui).

16         THE COURT:  And that's in addition to the

17  expert reports.

18         MR. SCHAALMAN:  Yes.

19         THE COURT:  That's kind of a supplement to

20  the expert report.

21         MR. SCHAALMAN:  Yes, it would be (ui)

22  supplement (ui).

23         THE COURT:  Okay.  Explain to me why that's

24  not sufficient to answer your questions.

25         MR. KATZ:  Your Honor, the problem with the

1  documents that they've provided previously and the ones

2  they've provided on the eve of their deadline to oppose

3  the motion is, they don't answer all of the questions

4  that were in our supplemental interrogatories, which

5  they previously agreed to answer.  In particular, these

6  spreadsheets and the numbers on these documents don't

7  tell us in all instances where the source of the

8  payments came from.  That's important because Judge

9  Amon has already dismissed claims that relate to

10 Bernard Black personally.  So depending on the source

11 of the payments --

12             THE COURT:  In other words, there would only

13 be damages if they were paid by the trust.

14             MR. KATZ:  Yeah, I mean, potential damages,

15 you know.  We deny that but --

16             THE COURT:  Agreed.

17             MR. KATZ:  But in addition to that, what

18 they agreed to provide was --

19             THE COURT:  I thought their interrogatory

20 response said that all of these expenses were paid by

21 the trust.  I mean, you can certainly disagree with

22 that as a factual matter but if I remember correctly,

23 their supplemental response said that all of those

24 expenses were paid and they list out which trusts.

25 Isn't that in the schedules?

1              MR. KATZ:  Your Honor, I don't believe the

2    information they provided indicates that the trusts

3    paid these expenses.  They've claimed, even on the

4    documents that we have here, that some of these

5    payments were made through purported loans.  We believe

6    they were collusive loans that aren't enforceable, but

7    they weren't necessarily paid through the trust's

8    money, so that's one of the issues.

9              The other issue, if you look at the -- their

10   purported accounting expert report, the accountant says

11   they relied on information that Mr. Black provided to

12   them, information we don't have.  So the

13   interrogatories --

14             THE COURT:  Or you may have.  You don't know

15   what the information is.

16             MR. KATZ:  Certainly the information we

17   sought in the interrogatories was that very

18   information.  The purported basis -- so in other words,

19   what we were asking for -- if you have an invoice that

20   you're claiming as damages, what's the Bates stamp

21   number of it, what's the source of payment for that

22   invoice, what was the purpose of the funds, okay?

23   That's important in terms of what they're claiming is

24   damages, and why is it purportedly recoverable against

25   the trust?

1          They're actually claiming that the trusts

2     owe this money.  That's their claim.  They're not

3     saying that the trust paid these funds -- I mean, in

4     some instances, they might be claiming that.  But with

5     respect to money that they claim they've incurred on

6     their side, they're claiming they've spent monies that

7     they're trying to have the trusts now repay to them, so

8     it's their case.  We are entitled to information to

9     challenge all of their damages, and they can't hide

10    behind a report that says Bernard Black has provided

11    all of this information.

12          We're seeking the information

13    interrogatories, they agreed to provide it, and then

14    they decide it's too much work so we're not going to

15    provide it and we'll just give you a spreadsheet on the

16    eve of opposing my motion.  They didn't even

17    voluntarily give us this document.  So I think they've

18    already agreed to provide it, it's their case, and they

19    can provide it.  They're not saying they can't provide

20    each invoice, tell me the Bates stamp number, the

21    source of the payment.

22          If it came from Bernard Black's personal

23    bank account, I'd like to know that.  If it came from

24    the estate, I want to know that.  What was it used for?

25    What was the exact purpose of this purported money and

1  legal expense and why it is purportedly recoverable

2  against the trusts or any defendant in this action?  I

3  think it's an appropriate request given this case.

4          THE COURT:  That's more of a legal theory

5  than -- I understand the first two parts but the last

6  part is more of a legal theory.

7          MR. KATZ:  The last part is more of a

8  contention-type interrogatory.  But, again, they agreed

9  in the joint report -- I made this motion before.  They

10  agree -- this is on their letterhead, paragraph 3 in

11  the joint report.  They agree to provide answers to all

12  sub-parts of the interrogatories.  Why am I -- I'm back

13  here again making the same arguments that they've

14  already agreed to answer.

15          THE COURT:  Okay.  Why haven't you provided

16  that additional information?

17          MR. SCHAALMAN:  Your Honor, we have and that

18  is contained in these documents that we now have

19  produced.  In other words, the theory of damages is

20  that these funds were paid on behalf of the trusts and

21  the monies are going back to the trusts, not to the

22  individual, not to Mr. Black, not to any other trustee.

23  They're going into the trusts because these are now an

24  obligation of the trust.  We have listed by every law

25  firm, we have provided every law firm's bills, and we

1    have provided -- the source of all these payments are

2    in those documents.  We provided it transaction by

3    transaction.  They know the purpose of each of those

4    payments because they have the invoices by the law

5    firms.  This particular chart in the supplemental

6    information is law firm by law firm, all of the

7    obligations that have been paid to the law firms by the

8    (ui) trusts, and it gives the source of where these

9    funds came from, whether they came from loans or they

10   came from -- and which accounts they were paid from.

11            THE COURT:  And did you provide all the loan

12   information?

13            MR. SCHAALMAN:  Yes.

14            THE COURT:  In this, or is that previously?

15            MR. SCHAALMAN:  Previously.  In addition, I

16   think in fairness, they made an interrogatory which is

17   focused on the allegations in the complaint.  The

18   allegations in the complaint certainly are the core and

19   they're supposed to inform you as to the basis of the

20   damages.  But when you get to presenting your damages

21   through an expert, their presentation will not be

22   exactly as necessarily explained in allegation in the

23   paragraph (ui).  And they asked us and we agreed to

24   supplement our responses, to provide answers to all

25   sub-parts of the interrogatories, including but not

1    limited to each loan, expense, and/or transaction (ui)

2    damages of this action, identifying each document

3    associated with the loans and with each of the

4    transactions, and that we believe we have provided.

5              I guess the last thing I would say is,

6    there's going to be a deposition also of an expert,

7    where they now can spend as much time getting the

8    specificity that they think they may need in addition.

9    When they take that expert's deposition, they will be

10   armed with this particular document.

11             THE COURT:  So these are the underlying, I

12   guess -- who created these?

13             MR. SCHAALMAN:  These were also created by

14   the expert, and that's why we waited to get these

15   documents until we knew we had them from the expert.

16   I'll walk you through any questions you might have on

17   (ui).  That's a lot to digest and it's very specific.

18             THE COURT:  Have you gone through these

19   documents yet?

20             MR. KATZ:  I went through them, not in

21   complete detail because they were recently provided and

22   we've had depositions on this case since then.  I'll

23   tell you, there's not information, for example, of what

24   account -- if it says Mr. Black paid $10,000 or

25   $12,000, I don't see an account number or what account

1   it came from or whether it was his personal account or

2   an estate account or something like that.  So the

3   information is very limited.

4              THE COURT:  In some of these, they say, Mr.

5   Black's Chase account --

6              MR. KATZ:  Okay, some of them.

7              THE COURT:  -- Mr. Black's U.S. bank.

8              MR. KATZ:  If you look at -- there aren't

9   page numbers on this but --

10             MR. SCHAALMAN:  There are at the top.  Each

11  one says 104, 105 --

12             MR. KATZ:  Right, but I mean, if I'm

13  pointing to something in the middle of the document --

14  I'm looking on a page that says 1 of 5 for -- what is

15  this, Arden Besunder (ph), for example.  There are

16  payments here where it will say, invoice unknown.

17  There might be check numbers but I don't know which

18  account that came from.  I don't have that -- all of

19  that information.  Why should I have to go look through

20  all of the legal invoices to determine what these

21  monies were used for?

22             For example, if $600,000 that they're

23  claiming as damages was used based on invoices that are

24  somewhere in their production that relate to monies

25  that Bernard Black used to defend himself on the civil

1   theft claim that he lost, they should identify those

2   for me so that I know, here are monies Bernard Black

3   paid to defend himself on a civil theft claim that he

4   lost.  What they're saying is, I have to go through all

5   of the invoices they produced and try to use this

6   document to figure out really what portions of these

7   monies were used for things like that, and I think

8   that's their responsibility and that's why I served the

9   interrogatories to begin with.

10         I mean, this provides some additional

11   information but it does not answer the interrogatories

12   in full by any means that I propounded.  Again, this

13   information is coming from their expert.  I served

14   interrogatories that are supposed to be responded to on

15   behalf of his clients.  This is just a document --

16         THE COURT:  Yeah, but when you're asking for

17   information on damages --

18         MR. KATZ:  Well, a lot of this --

19         THE COURT:  Depending on how it is, the

20   expert might be the more intelligent person to give you

21   the answer.

22         MR. KATZ:  Well, the problem is the expert

23   is relying on factual information that Bernard Black

24   has purportedly provided to them.  That's the problem.

25   The expert -- they don't have personal knowledge as to

1  what exactly these funds were used for or how Mr. Black

2  wants to allocate the funds.

3          THE COURT:  Okay, but, again, you can

4  dispute any of these factual things.

5          MR. KATZ:  But I don't even have the factual

6  information to dispute.  That's the problem.  And I

7  shouldn't have to go through every invoice and try to

8  match it up with the spreadsheet to try and figure out

9  what monies were used to defend a civil theft claim

10  that he lost and an appeal that he lost, and actions he

11  took against Joanne Black that were unsuccessful.  They

12  should identify -- we used this money on Bernard

13  Black's civil theft claim, okay, here's the invoices

14  for that, okay?  And then if they use invoices for

15  other things, they can list that out invoice by

16  invoice.  I don't see why that's unreasonable to ask.

17  What they're trying to do is make a very vague and

18  unintelligible set of documents that are very hard for

19  us to determine what exactly they're claiming.  That's,

20  in my view --

21          THE COURT:  Doesn't this first page show --

22          MR. KATZ:  So these are collective figures.

23          THE COURT:  Okay.

24          MR. KATZ:  This just shows me there could

25  have been -- I don't know how many invoices -- the SNT

1   here, what does that mean?  He's got a number of

2   $523,067.00.  Where does that come from?  It's very

3   confusing and what I'm asking them to do is certainly

4   possible to do.

5           THE COURT:  So how are these separated out?

6   You've got the collective figures here so at some

7   point, the expert must have separated out which

8   invoices go with which transactions.

9           MR. SCHAALMAN:  Yes.

10          THE COURT:  Is that --

11          MR. SCHAALMAN:  That's in what you're

12  looking at, your Honor.  If you wanted to take a page

13  -- I'm looking at (ui) scroll back on to that --

14          UNIDENTIFIED SPEAKER:  Judge, I don't want

15  to interrupt but Tony Dain just let me know that he got

16  disconnected.  Sorry.

17          THE COURT:  Here, let me --

18          UNIDENTIFIED SPEAKER:  I wrote his number

19  down.

20          THE COURT:  Is it (619) --

21          UNIDENTIFIED SPEAKER:  Yeah, 818 --

22          (The Court is calling Mr. Dain.)

23          MR. DAIN:  Good afternoon.  Sorry, I got

24  disconnected.

25          THE COURT:  Sorry about that.

1        MR. DAIN:  I'll put it on mute again, thank

2   you.

3        THE COURT:  Okay.

4        MR. SCHAALMAN:  I guess what I'm saying,

5   your Honor, is the first page of this document, which

6   is basically the general schedule which comes from the

7   expert report, all of the documents that follow support

8   the detail for each one of those columns by legal

9   vendor.

10       THE COURT:  Okay, but --

11       MR. SCHAALMAN:  So if you look at -- I'm

12   sorry, I didn't mean to --

13       THE COURT:  No, that's all right.

14       MR. SCHAALMAN:  So if you look at the next

15   page, this is from Ms. Abraham.  She's the next --

16   alphabetically, she's the first legal vendor.  So it

17   gives the date of the invoice, the amount of the

18   invoice, the date paid by Mr. Black, the amount paid by

19   Mr. Black, the check number for that payment, and

20   that's done for each and every invoice for each lawyer.

21       THE COURT:  But not which case or what it

22   was used for.  The only way to determine that would be

23   to go back to the actual invoice and figure it out.  In

24   other words, you or the expert divided this up by legal

25   representative as opposed to say dividing it up by

1   money spent on particular cases.

2          MR. SCHAALMAN:  First of all, the invoices

3   themselves indicate it on the invoice.

4          THE COURT:  Yes.

5          MR. SCHAALMAN:  Which case the --

6          THE COURT:  What I'm saying is, the only way

7   to actually separate it out would be to actually go in

8   and look up each individual invoice.

9          MR. SCHAALMAN:  Yes, the invoices are the

10  places where this is specifically listed, that's

11  correct, and I think that's as easily available to the

12  defendants as it would be to the plaintiffs.  I don't

13  believe we have to present it in a separate chart or

14  add to the chart for that.  What we've done is actually

15  done a lot of the work for them by indicating to which

16  -- if you look at the summary page, it certainly talks

17  about for example the Dain case.  It's on the first

18  page.  That's all the attorneys' fees by loan and by

19  payments, by spending.

20          And the Wrigley Pinto (ph) case, which is

21  (ui) is also listed on that.  So it would not be hard

22  at all to go to the 7,000 pages of invoices which we

23  provided and look to see what was actually being spent

24  by which law firm on each case.  I frankly think the

25  invoices themselves probably would have been enough to

1  answer the interrogatories.  We state the purpose of

2  the legal fees, who's performing the legal (ui), which

3  case the legal fees are for, and how much the legal

4  fees are.  I'd also like to just add that there are no

5  efforts -- I think Mr. Katz knows this -- to collect

6  any of the legal fees with regard to the (ui) civil

7  theft case.  That's not part of this case.

8          MR. KATZ:  I don't know that.  I mean, I

9  don't have enough information to confirm that.  So

10 you're saying where it says SNT including Colorado

11 appeal, and it's not a number of $523,067.00, you're

12 representing that includes no monies whatsoever that

13 were either spent on Bernard Black's defense of the

14 civil theft claim or any of the appeals associated with

15 that?  Are you representing that?

16         MR. SCHAALMAN:  My understanding is that it

17 had nothing to do specifically with the civil theft

18 case or other appeals to Colorado, but I would have to

19 double-check.

20         THE COURT:  What does SNT stand for?

21         MR. KATZ:  Exactly.

22         MR. SCHAALMAN:  Supplemental needs trust.

23 The beneficiaries of that issue trust and the

24 supplemental needs trust, trustees basically --

25 trustees are not involved in this case.  The

1   beneficiaries, contingent beneficiaries of the SNT are

2   involved in this case.

3               THE COURT:  It seems like all the

4   information is there.  It might not be in the format

5   that you want it.

6               MR. KATZ:  Your Honor, plaintiffs' counsel

7   couldn't even just confirm whether or not the $523,000

8   figure includes the amounts that were incurred to

9   defend Bernard Black on the civil theft claim.  I think

10  that shows you how confusing the information is in the

11  format they provided it.  I mean, in order --

12              THE COURT:  Well --

13              MR. KATZ:  In order for us to try to figure

14  out exactly what they've done here, we would have to

15  spend countless hours reviewing the 7,000 pages and try

16  to formulate our own, you know, guesswork as to what

17  they've done.  Their expert say this, your Honor, in

18  their report:  They said, "We relied for this

19  allocation" -- and they're talking about the report

20  itself -- "on a combination of information contained in

21  the litigation bills themselves, allocation information

22  provided by counsel at our and Mr. Black's request, and

23  Mr. Black's own allocations."

24              So their analysis is in part based on

25  information that counsel and Mr. Black provided the

1   expert.  We don't have that information.  So it's very

2   difficult for us to evaluate the --

3            THE COURT:  What does that mean?

4            MR. KATZ:  It means --

5            THE COURT:  Most experts' opinions are based

6   on information provided by people.  When you say the

7   allocation -- I mean I guess I don't understand what

8   that means so maybe a clarification needs to be asked

9   to the expert as to what exactly that means.

10            MR. SCHAALMAN:  In fact, Mr. Black is being

11   deposed tomorrow, and I'm assuming -- I'm quite certain

12   that a lot of these damage questions will be asked of

13   him by Mr. Katz.  I would assume he can explain better

14   than I can the issue of allocations.  I don't

15   necessarily agree that the allocations amount to a

16   document.

17            THE COURT:  Does that mean allocation of a

18   particular expense to a particular category?  What does

19   that mean exactly?

20            MR. SCHAALMAN:  I believe what was attempted

21   to be done here was to allocate, first and foremost,

22   whether the expense was an expense of the SNT, the

23   supplemental needs trust, or (ui).  That's the last

24   column here (ui).  I'm quite certain that was the input

25   that Mr. Black provided, which trust (ui).  The expert

1   I don't think had that information.

2               THE COURT:  Fair.

3               MR. KATZ:  And that's part of the

4   information we've asked for in the interrogatories, why

5   they're claiming that these expenses should be paid by

6   the trusts, which is what these allocations purport to

7   represent.

8               THE COURT:  I see, so --

9               MR. KATZ:  And how would I know that?

10              THE COURT:  I mean, I think you've got to

11  ask Mr. Black.

12              MR. KATZ:  I mean, your Honor, we can ask

13  Mr. Black but to go through this document -- they said

14  it's a 500-page document.  I didn't count the pages.  I

15  mean, I don't even know if I'd get through this in

16  seven hours.  I think Mr. Black's deposition is going

17  to have to be longer than seven hours just given all of

18  the parties here.  Again, I think the plaintiffs are

19  pursuing this case and they should be required to

20  provide us with this information so that we can contest

21  it.  I don't think we should have to spend our seven

22  hours --

23              THE COURT:  I think that what you're asking

24  for is more of a legal theory.  Why are they saying

25  that these particular expenses should be paid for the

1   issues trust or the SNT trust?

2           MR. KATZ:  Part of it is just asking factual

3   information, where the money came from, what it was

4   used for, because that issue of what it was used for --

5   for example, the Denver probate court determined that

6   Mr. Black can't seen certain reimbursement for

7   expenses.  So depending on exactly what certain funds

8   were used for, they're just out.  I mean, he can't

9   possibly seek anything relating to that.  Judge Amon

10  has already ruled that if they're expenses that Mr.

11  Black has incurred, they're out of the case.  So

12  without detailed information about exactly where the

13  money came from, what it specifically was used for,

14  it's prejudicing our ability --

15          THE COURT:  I think -- I think the

16  information is all there, it's just not all in one

17  place.  In other words, this lists where the money came

18  from.  The invoice should list what it was for.

19          MR. KATZ:  I mean, your Honor, I think the

20  problem is, in order for us to even go down that road,

21  that requires the defendants to review all 7,000 pages

22  of invoices and try to extrapolate information from

23  that and compare it to this document, which I think is

24  a complete burden on defendants.  Besides time and

25  money, it would be more appropriate for the plaintiffs

1  who are pursuing this case to have to do that.  I think

2  this is purposely being provided in a way that it's

3  difficult to extrapolate the information to contest

4  this document.

5          MR. SCHAALMAN:  I believe that under the

6  rules, we could have answered these interrogatories

7  simply with documents if the documents actually were

8  (ui) to the questions he asked in the interrogatories.

9  Certainly the legal invoices are in and of themselves

10 answering many of the interrogatory questions.

11         THE COURT:  It's complicated, which is the

12 whole reason why they had an expert go through all of

13 this stuff and come up with a report.

14         MR. KATZ:  But the expert is not providing

15 any information about what -- how the allocations work

16 or what money relates to the civil theft claim versus

17 not relates to that.  The expert is not doing anything

18 of that nature.  That's why plaintiffs' counsel can't

19 even confirm right here whether the $523,067 includes

20 any of that.  I mean, that's the problem.  There's

21 factual information that's not in here that is

22 important for us to have to defend the claim.

23         MR. SCHAALMAN:  All of that information is

24 in the invoices.  The invoices indicate the kind of

25 work that was done in the case and that the work was

1  done (ui).

2          THE COURT:  Have you looked at the invoices?

3  Do they have that information?

4          MR. KATZ:  Some of the invoices are

5  partially redacted.  I have not looked at every single

6  invoice so I can't represent with specificity what's on

7  each one of them.

8          THE COURT:  Because, look, the way you

9  phrased your question, I think they provided you with

10 the information.  It might not be in the format you

11 want it but it's there.  If you have more specific

12 questions you want to ask, like for example, you can

13 ask, are any of these expenses from the civil theft

14 suit?  They will have to tell you if it is or not.

15         MR. KATZ:  I don't --

16         THE COURT:  I mean, there are certain

17 categories of damages that you think should be excluded

18 because of that reason.

19         MR. KATZ:  I don't think the legal invoices

20 provide the information precisely as to what accounts

21 all the monies came from and whether they were paid

22 from personal accounts as opposed to some kind of other

23 account.  I don't think that -- that information, I

24 don't believe --

25         THE COURT:  I thought that's the information

1    that's on this.  It says where the money is coming

2    from.

3              MR. KATZ:  I mean, it just --

4              THE COURT:  Whether it's from Bernard

5    Black's -- like the money is coming from, you know,

6    which loan it's coming from or if it's coming from

7    Bernard Black's Chase account or Bernard Black's --

8              MR. KATZ:  I guess I would just ask for a

9    representation from counsel then.  If it says on here,

10   date paid per Mr. Black, and it has a check number, can

11   you represent that that's his personal account?

12             MR. SCHAALMAN:  I can certainly represent

13   that he paid it.  I can't tell you as I'm standing here

14   now which account it was but I think that's a fair and

15   easy question for you to ask Mr. Black tomorrow.

16             MR. KATZ:  So I have to ask him for every

17   single check that's listed here, what account that came

18   from tomorrow?

19             MR. SCHAALMAN:  I suspect if you asked him

20   the sources of the monies that he used to pay these

21   legal bills, you'll find he will identify the account

22   or accounts if there are several.  We have the check

23   numbers even in here.  I'm sure he'll be able to let

24   you know which accounts he uses.

25             MR. KATZ:  Did you produce the checks?

1        MR. SCHAALMAN:  I don't believe we produced

2    the checks.

3        MR. KATZ:  We requested all documentation

4    relating to the alleged damages, so why haven't those

5    been provided?

6        MR. SCHAALMAN:  I think we provided

7    sufficient answers to your interrogatories and provided

8    sufficient documentation to answer all the

9    interrogatory questions.

10        MR. KATZ:  I mean, I don't think they've

11    been answered.  I think what you're saying is, I can

12    question Mr. Black and try to obtain additional --

13        MR. SCHAALMAN:  That's not what I'm saying,

14    that's not what I'm saying.

15        MR. KATZ:  I think the checks should have

16    been provided already and if they haven't been,

17    definitely should be produced, at a minimum.  I mean,

18    they're alleging more than -- they're alleging over

19    four million dollars in this case.  I don't think

20    it's --

21        THE COURT:  The checks are certainly

22    evidence.  I mean, if these are monies that were paid

23    by check and you're alleging that they need to be

24    reimbursed as damages, then I do think the checks are

25    relevant documents to your damage claim and should have

1  been produced.

2          MR. SCHAALMAN:  If that's the Court's

3  decision, we'll do it.

4          MR. KATZ:  Your Honor, there are also

5  instances where, instead of a check, they paid by wire,

6  and there's just no -- there's no designated account

7  number, so I'm not even sure how we would be able to

8  identify the source of those funds.  I guess to the

9  extent that there's wire information, I would request

10 that that be provided as well.

11         THE COURT:  I assume the bank has records of

12 wire transfers the same way they have records of

13 checks.

14         MR. SCHAALMAN:  I would assume so, your

15 Honor.

16         THE COURT:  I mean, it doesn't list the

17 account numbers but I think it does identify the

18 account, and you can certainly ask Mr. Black, what's

19 your Chase bank account number, and you can get those

20 records.

21         MR. KATZ:  But they don't all say Chase

22 like --

23         THE COURT:  No, but --

24         MR. KATZ:  Some of them just say, paid by

25 Mr. Black, and then it has a check number.  I mean,

1  yeah, sure, I can ask him tomorrow and he might say, I

2  don't know.  I mean, either way, I think we are

3  entitled to the checks.

4          THE COURT:  You're going to get the checks.

5          MR. KATZ:  Okay, all right.

6          THE COURT:  I've already said that they've

7  got to produce the checks.

8          MR. KATZ:  Thank you, your Honor.

9          THE COURT:  And to the extent you have wire

10  documents, you need to turn them over.

11          MR. SCHAALMAN:  Yes, sir.

12          THE COURT:  Look, I think the information is

13  all there.  It might not be sufficient for them to

14  prove damages and you can certainly argue that it's

15  not.  And if there are clarifying questions you want to

16  ask about any of this, you can ask Mr. Black or you

17  could ask the expert, but I think all of the

18  information that you need is contained in what's been

19  turned over.  If there's additional clarification you

20  need, you can certainly ask those questions.  But I do

21  think they get the checks and the wire transfer

22  documents.

23          MR. KATZ:  Thank you, your Honor.

24          THE COURT:  So we're dealing with the

25  privileged documents.  I guess there are different

1    categories of issues here.  There are some where there

2    are clearly privilege logs provided and you're

3    essentially claiming that the documents were improperly

4    withheld because they were over --

5              MS. ABRAHAM:  Yes.

6              THE COURT:  -- you know, the assertion of

7    privilege was over-broad.  There are other instances

8    where you're claiming no documents or log was provided.

9    But clearly, there were -- the allegation is that there

10   were documents that should have been provided or a log

11   should have been provided, so let's deal with that

12   second category first.  In particular, I think your

13   suggestion that Mr. Dain should have produced documents

14   or at least a log for stuff that was being withheld as

15   privileged --

16             MS. ABRAHAM:  Mr. Dain did produce some

17   documents.  He produced roughly 113 pages of documents.

18   But as both codefendants' privilege logs reveal, he was

19   part of hundreds or thousands of communications that

20   were responsive to plaintiffs' requests, as well as in

21   another proceeding, his firm produced a privilege log

22   of his emails and his communications, which revealed

23   additional communications that were not produced and

24   not logged, that were directly responsive to

25   plaintiffs' requests just on their face.  We don't know

1  how many more logged entries were responsive that just

2  don't have enough detail to tell us.

3          THE COURT: Okay.

4          MS. ABRAHAM: Additionally, Ms. Wrigley has

5  produced no documents at all and no privilege log, and

6  she as well appears on hundreds or thousands of

7  communications in the codefendants' privilege logs, and

8  there has been no explanation for why she has no

9  documents.

10          MR. MANCILLA: There is nothing responsive.

11  Can you point to one entry on the privilege log, one

12  out of the thousand, that's responsive to the requests

13  in this case, the first set of requests?

14          MS. ABRAHAM: Yeah, I can -- I don't have

15  the privilege logs with me right now but --

16          MR. MANCILLA: Your requests were very

17  tailored, very tailored, very specific.

18          THE COURT: That's why I asked you, because

19  the defendants are saying they didn't withhold anything

20  for privilege.

21          MR. MANCILLA: We didn't. I think we

22  attached as an exhibit to our response -- there were

23  six requests -- again, we're talking about the first

24  set -- that were specifically tailored mostly to

25  inquiries regarding an investigation of Esaun Pinto.

1    She doesn't have any of that.

2            MS. ABRAHAM:  Our requests to defendants

3    were somewhat redundant from defendant to defendant,

4    and her codefendants thought that all these other

5    documents were responsive and put these documents on

6    their privilege logs.

7            MR. DAIN:  Your Honor --

8            THE COURT:  That doesn't make them right.

9            MR. DAIN:  Your Honor, plaintiffs just state

10   in a vacuum that there are thousands of documents

11   responsive but we provided the requests.  In fact, I

12   provided the requests and the subpoena that was to my

13   firm, and they're miles apart.  Their requests were

14   very specific and use very loaded terms.  And as

15   counsel just said, for instance, all documents that

16   evidence your investigation of the theft or whatever,

17   of the taking of monies from the supplemental needs

18   trust by Ms. Wrigley and Mr. Pinto.  One, there weren't

19   any monies taken.  Two, there was no investigation

20   conducted, so I have no documents.  There's nothing to

21   withhold, there's nothing to produce.

22           Most of them -- there were only I think in

23   ours -- I don't have them right in front of me but,

24   again, most of them, there were no documents that were

25   responsive.  But ones where there were documents

 1  responsive, we provided them.  There was nothing

 2  privileged, nothing to withhold.  So they just keep

 3  making these bold statements that these documents

 4  should be responsive, and they use as an example the

 5  subpoena to Procopio, which if you go through those

 6  requests, they're voluminous and they're incredibly

 7  broad, so you're going to have a different response to

 8  that subpoena, the firm is, than I had to their

 9  requests, and that's why he provided those, but they

10  have no specificity.  The only examples they provided,

11  the documents were not responsive to their requests,

12  and they were both post-litigation by a year and a half

13  or two years.  So we've given them everything that was

14  in the requests, we withheld nothing.

15          THE COURT:  Okay.

16          MR. KATZ:  Your Honor, I recall -- the

17  requests to Salzman were different.  They asked for

18  communications, specifically requested communications

19  with various people.

20          THE COURT:  Yeah.

21          MR. KATZ:  So that's why we produced

22  documents but we also produced privilege logs.  I don't

23  recall with specificity what was requested from other

24  defendants but I remember them not being the same.

25          THE COURT:  The ones to Mr. Dain at least

1    are highly specific.

2                MS. ABRAHAM:  And plaintiffs are not

3    claiming that t he entire 7,000-plus-entry privilege

4    log from Procopio was responsive to plaintiffs'

5    requests.  But there are certain entries that, as I

6    said, on their face are responsive, and there are other

7    entries that likely are responsive if more information

8    were provided.

9                MR. MANCILLA:  I doubt that.

10               MR. DAIN:  But, your Honor, one, they didn't

11   state which -- they give you no examples so there's

12   nothing for me to respond to and say --

13               THE COURT:  There's no way for me to

14   actually make any decision based on that argument on

15   either side because I'm not reading through 7,000

16   emails.  So if there's a specific document you think

17   should have been provided and they haven't provided it,

18   tell me what it is.

19               MS. ABRAHAM:  We did give examples in our

20   motion.  Mr. Dain has several communications with Chase

21   that are in the Procopio privilege log and we did

22   specifically ask for those in the document requests.

23               MR. DAIN:  Your Honor, I explained that they

24   asked for -- you did mention that they were very

25   specific.  They asked for all documents I produced to

1    Chase.  The one example they gave was a letter that

2    Chase sent to Mr. Schaalman and to my counsel in

3    Chicago, so it was from Chase.  There was no need for

4    me to produce that back; they already have it.  There

5    was nothing privileged about it so it wouldn't have

6    been on a privilege log, and it was post-litigation.

7    It was discussing a FIMRA (ph) arbitration award that

8    happened a year and a half after they instituted the

9    lawsuit and is unrelated.

10          So yeah, of course, you can't go through all

11   7,000 but that's in another privilege log anyway.  Your

12   Honor, I can tell why you're saying they're specific.

13   If you go through the requests, they are very specific

14   so are there hundreds, thousands?  No, there aren't

15   even tens or one.  I went through it again just in case

16   and there's nothing more I can produce.

17          THE COURT:  That's not a good example for

18   you.

19          MS. ABRAHAM:  As we also noted in our

20   motion, in that privilege log, there's an identical --

21   in all 7,000-plus entries has an identical description.

22   So as I said, there are several more entries that, if

23   actual information were provided as opposed to the

24   boiler plate privilege claims and boiler plate

25   explanation of what the document is, it would give us

1   more information to know what other documents are

2   responsive to our requests.

3            MR. DAIN:  That is in a privilege log in

4   another case and I had provided the example where

5   they're going back and forth.  Counsel for Procopio

6   amended his privilege log per their discussions and

7   sent a letter back explaining why their privilege log

8   is complete.  That happens in the normal course and

9   it's the appropriate thing to do.  But, your Honor, you

10  can't in this case address what they haven't done in

11  the other case, which is -- well, hopefully, they have

12  by now -- complete their meet and confer and their

13  attempt to resolve any issues they have over that

14  privilege log.  That's not in this case.  The question

15  is just, should we have provided a privilege log

16  because we withheld documents.  We did not.  Should

17  there be more documents we should have produced, there

18  are not.

19           MS. ABRAHAM:  And there are -- Mr. Dain said

20  that the document we identified in our motion was an

21  email to him.  There are in his privilege log

22  additional entries from him to Chase, so it's not --

23           THE COURT:  Yeah, but that's not what you

24  asked for.  You asked for documents that he produced to

25  Chase.

1          MS. ABRAHAM:  Right, and the email would be

2   the document.

3          THE COURT:  The email is not a document.

4   You didn't ask for communications between him and

5   Chase.  You asked for documents he produced to Chase.

6   If you had intended that to include communications he

7   sent to Chase, then you should have asked for that

8   because I don't think any plain reading of that would

9   suggest that that's what you meant.

10         MS. ABRAHAM:  I believe that that was in our

11  definitions.

12         MR. DAIN:  (Ui) the case is there are some

13  emails you think are responsive, please identify them.

14  If you tell me what it is -- again, I would have to go

15  looking through that.  I know they have -- whatever

16  they have, they have, because they've been seeking this

17  in multiple litigations all involving Mr. Black, so

18  there's no reason for me to withhold anything.  It

19  would be very simple.  So I'd go above and beyond if

20  they're claiming there's something they truly don't

21  have.  But I read their interrogatory, I've looked at

22  what they wanted, I produced what they wanted.  If

23  there's something more -- that's something you normally

24  do in give-and-take.

25         But remember, your Honor, this was the first

1   production and we had already addressed that.  We went

2   through that motion and your Honor said their only

3   further discovery is to deal with the second request

4   for interrogatories production, which had to be

5   severely narrowed.  That was your order -- and the

6   depositions.  And now they're trying to go back to the

7   beginning because they had a privilege log in another

8   case, and comparing apples and oranges.  I of course

9   agree that I shouldn't have to produce anything more

10  but we're way post when they should have brought this

11  issue up.  But, again, if they can point to anything

12  specific, you know, for what it's worth, if it's not

13  unreasonable, I would work with them, but they didn't.

14  I mean, the time was when they brought the motion, not

15  now.

16          THE COURT:  Do you have any other instances

17  where you asked for something that you think was not

18  provided for Mr. Dain.  Put aside the other defendants

19  because they're each -- their requests are different.

20          MS. ABRAHAM:  Right.  As we indicated, the

21  only thing that we know from his firm's privilege log

22  are the participants in the communications.  There's no

23  other information.

24          THE COURT:  Okay.

25          MS. ABRAHAM:  We believe that there are

1  additional documents in there that are responsive but

2  without information, we can't identify the specific

3  ones.

4          THE COURT: Okay. Why do you believe there

5  are other responsive documents?

6          MS. ABRAHAM: As we indicated, there are

7  some that are obvious, we believe, and --

8          THE COURT: Like what?

9          MS. ABRAHAM: Well, as we said, we believe

10 that the communications with Chase are responsive, and

11 just --

12         THE COURT: They're not.

13         MS. ABRAHAM: You know, in terms of

14 documents, a document per the local rules include

15 electronically stored information, and that would --

16         THE COURT: I'm sorry but I can't agree with

17 that. If you ask somebody to give me -- give me all

18 documents you produced to somebody else, I don't see

19 any possible way that somebody is going to construe

20 that to mean emails that you sent to somebody else.

21         MS. ABRAHAM: Okay.

22         THE COURT: It just doesn't make sense. I

23 understand that might be what you intended but that's

24 just not a fair reading of that. Putting aside the

25 Chase emails, what else do you think you asked for that

1   he's improperly withholding?

2            MS. ABRAHAM:  As we indicated, from this

3   information, we can't tell with specificity what there

4   is.  We also for instance can't tell from this --

5   within the Chase emails, we can't tell what had

6   attachments, which then would be unquestionably

7   documents.

8            THE COURT:  Yeah, I suppose if he sends an

9   email to Chase with documents attached, that would be

10  responsive.

11           MS. ABRAHAM:  Yes.

12           THE COURT:  But I don't know whether he did

13  or not.

14           MR. DAIN:  Your Honor, everything I would

15  have sent to Chase would have been through email, so I

16  would have -- you know, I wouldn't probably have sent

17  anything through snail mail.  But if that's their

18  request, I have no reason to withhold anything.  So

19  I'll tell you -- let's agree to that.  I will go back

20  and look at all my emails to Chase or Chase's counsel

21  and see if there are any documents or attachments that

22  I haven't produced, which I don't believe there are.

23  But if there are, I'll produce them.

24           THE COURT:  So what else besides the Chase

25  stuff?

1          MR. DAIN:  Your Honor, while she's doing

2    that, could I make a request that they -- if they can

3    identify for me those emails that they're saying I had

4    attachments to, that would make it a lot easier because

5    they're --

6          THE COURT:  I think she said she wasn't able

7    to tell which ones had attachments or not from the

8    privilege log.

9          MS. ABRAHAM:  That's correct.

10         MR. DAIN:  Oh, no, I just meant if she could

11   identify any emails that are to Chase.  Just identify

12   them to me because otherwise, I have to go to

13   Procopio's general counsel, ask her to get our attorney

14   to look for those, and that's a cost to the firm.  I'd

15   rather just incur it myself.  There really is a cost to

16   the firm because they have an attorney they've assigned

17   to responding to that subpoena.  So I'd rather do that

18   than have Procopio's attorney do it because it's my

19   responsibility.  But I think it's up to plaintiff to

20   say, here are the emails that are to Chase that we

21   believe would have documents.  I bet if they look at

22   them, they will see that whatever documents might have

23   been there were produced because, again, I would have

24   produced them by email.

25         MS. ABRAHAM:  We also believe that there are

1  likely documents on there that reflect actions that Mr.

2  Dain took as trustee in the administration -- as

3  trustee of the SNT and the issue trust, which was

4  requested.

5         MR. DAIN:  Your Honor, they requested for a

6  specific time period and that time period was before --

7  was while only Bernard Black was on the account, so I

8  had nothing to administer.  He not made me aware he had

9  yet transferred any funds, so I did produce everything.

10  They're saying that they believe -- again, if they can

11  sell me anything more than saying it's incomplete, I'll

12  work with them.

13         But just to make this statement, we believe,

14  it just -- it's like a statement we don't trust --

15  well, tell me.  Tell me why, you know, why you believe,

16  what you think I haven't presented.  The period they're

17  talking about was before all of the actions blew up

18  into this litigation, and there was very little that

19  was going on before that time so I believe I produced

20  everything.  Again, let them be specific and not just

21  make these comments.

22         THE COURT:  What if any actions do you think

23  Mr. Dain took during that time that would have -- there

24  would be documents about?

25         MS. ABRAHAM:  Well, that's why we requested

1    the documents.

2              THE COURT:  I know, but he said he didn't do

3    anything so -- I mean, it sounds to me like you just

4    don't believe him but there's nothing I can do about

5    that.

6              MR. MANCILLA:  Their complaint is replete

7    with allegations that during that specific time period,

8    Mr. Dain did nothing.  That's actually one of their

9    arguments in support of their claims is, during that

10   specific time period, he did nothing.

11             THE COURT:  It sounds like that part of the

12   complaint might be true.

13             MR. MANCILLA:  There you go.

14             THE COURT:  Look, if there's something

15   specific that you think is missing, tell me and I'll

16   make them produce it.  I mean, this speculation that

17   there's stuff out there, he's represented that there

18   isn't.  I don't know what I'm supposed to do with that.

19             MS. ABRAHAM:  I mean, we would just ask that

20   Mr. Dain make -- just take a closer look at the

21   documents that his firm located, that there are no

22   additional responsive documents to plaintiffs' document

23   requests because at the time we received his 113 total

24   pages of responsive documents, we obviously didn't know

25   there were additional -- at least 7,000 additional

1    documents that were unaccounted for that were not

2    identified.

3           MR. DAIN:  Your Honor, that's a very clever

4    way of turning their, you know, insufficient request

5    into making it look as though there were some more

6    documents I should have produced.  Their requests were

7    what they were and that's on them, and I produced

8    those.  To make me go back and take another look just

9    because they're saying -- I guess they're conceding

10   that they're just saying, we don't trust you.  Well, I

11   did produce some documents, don't get me wrong.  It's

12   not that there were zero.  They just said it was a

13   hundred and some.  But to say now, go back and do a

14   second look -- tell me where you think there's more?

15   If you're saying that Bernard has an email from me or

16   some documents I sent that you want to confirm that I

17   also have, I'll be happy to look for them.

18           I have no reason to withhold anything.

19   There's so much litigation.  We've been responsive in

20   multiple subpoenas, multiple requests to produce.  But

21   just to make a statement, go through it again, you have

22   to accept that I didn't do the job twice so far.  I've

23   looked twice -- well, I looked multiple times but again

24   after their motion, I went back and looked and that's

25   not fair.  They need to be specific and not just this

1   kind of general distrust and, we just believe there's

2   something out there.  That's not fair.

3           THE COURT:  Look, unless you can point to

4   something specific that you think is being improperly

5   withheld -- I mean, he's told you that he doesn't have

6   any responsive documents.  I'm not sure what else --

7           MR. DAIN:  And I don't want it to be a trap.

8   That's why I'm saying I'll work with them.

9           THE COURT:  The few examples that you've

10  provided I don't think were responsive or, you know, he

11  has an explanation for why he doesn't have documents

12  that are responsive.  If there's something specific,

13  ask him about it but --

14          MS. ABRAHAM:  I mean, we simply don't have

15  enough information from the privilege logs, you know.

16          THE COURT:  And you also don't have enough

17  information to say that he hasn't produced something.

18  You can't have it both ways.  Look, the legal system

19  requires a small amount of trust on both sides.  When

20  you make a request, the other side has a responsibility

21  -- certainly Mr. Dain is pro se but he's still an

22  attorney and an officer of the Court.  He has a

23  responsibility to, you know, comply with valid

24  discovery requests.  But it's not enough to just say,

25  we think there might be more out there.  He says there

1  isn't.  Unless you can give me some reason to doubt

2  that, I have to take him at his word.

3       MR. DAIN:  Your Honor, I interrupted you but

4  I meant to say I don't want this to be a trap, either.

5  If they really believe -- they have some reason to

6  believe there's something out there.  For instance, if

7  they have some document that indicates I have another

8  document, I'll work with them.  I just don't want it to

9  be a go-fish, where I continuously have to go back on

10  pins and needles and try to make sure, is there

11  anything I can read into this that could be responsive?

12       If they have nothing, like if they don't

13  have any other document that indicates it, then there's

14  nothing I can do.  I in good faith went through

15  everything multiple times.  So I want to make that

16  clear, that I want to work with them.  I just don't

17  think there could be anything else but anything they

18  can point me to, you know -- I don't want it to be a

19  trap.  I'll produce it to them.  But I'm not getting

20  that and I don't think you are, either.

21       MS. ABRAHAM:  We will be happy to take Mr.

22  Dain up on his offer to work with us and provide him

23  with more specific examples and information.

24       THE COURT:  Okay.  If there's something

25  specific, ask him about it.  If he refuses to produce

1    it, then we can talk about it.  But as it is right now,

2    I don't see anything that he should have done

3    differently.

4           What about -- do you have the same issue

5    with Wrigley and Pinto?  Did they produce logs or no?

6           MS. ABRAHAM:  They produced no privilege

7    logs.  Mr. Pinto did produce some documents, Ms.

8    Wrigley produced no documents.  However, they both, in

9    response to the document requests, made several

10   privilege objections.  They now say there were no

11   documents so the basis for the privilege objections are

12   a little curious.  You know, I'm not sure what

13   privilege they were protecting if there were no

14   documents in their responses.

15          MR. FANTONE:  Judge, the only responses that

16   include, admittedly, somewhat boiler-plate references

17   to privilege --

18          THE COURT:  See, this is why you shouldn't

19   be doing boiler-plate objections.

20          MR. FANTONE:  Fair enough, but they certify

21   that there are no documents, okay?  Maybe it's there

22   because in the event that something is subsequently

23   found, I wouldn't want to waive any privilege argument,

24   and the question itself may indicate privilege on the

25   face of it, but it's very clear -- I'm looking at what

```
 1   was attached as Exhibit A.  That's document 19710

 2   attached to our opposition.  I'm on ECF page 506.

 3            So response 1 does mention attorney/client

 4   privilege but certifies not aware of the existence of

 5   any responsive documents.  That's the same for response

 6   3.  Either way, response 3, we did produce those

 7   documents.  That's maybe five or six documents which

 8   are actually the core of the allegations in the

 9   Northern District of Illinois case.  Those are

10   documents that Ms. Wrigley sent to Northwestern as part

11   of her complaint, which formed the basis of Katherine

12   Black's deprivation action.  So those documents have

13   been produced in multiple places.

14            THE COURT:  Okay, what documents or category

15   of documents did you ask for that you think they should

16   have produced?

17            MS. ABRAHAM:  Well, I mean, Mr. Fantone just

18   gave a great example, document request number 3.  There

19   are documents there and Ms. Wrigley has produced no

20   documents in this case.

21            MR. FANTONE:  We did produce.  I

22   specifically emailed those to Mr. Schaalman, even

23   though I told him, you already have these in the other

24   case, do you want me to -- yes, I sent the email.

25            THE COURT:  That's for category 3?
```

1          MR. FANTONE:  For category 3.  I don't think

2     that's really the issue here.  They have those six

3     documents.  By the way, is there any claim of privilege

4     in category 3?  No, so it's really not even an issue in

5     their entire application.  It doesn't say anything

6     about privilege in category 3.  The only objection

7     there is that they already have it because of the other

8     lawsuit, so that's not at all even relevant to their

9     application.

10          THE COURT:  Okay.

11          MR. FANTONE:  Judge, the reason I can

12     confidently say that they can't even give us one

13     example is because just by reading these requests, they

14     don't exist.  They're talking about communications --

15     just generally, they're talking about communications

16     between Anthony Dain and Cherie Wrigley relating to

17     this investigation of Esaun Pinto that never happened.

18     That's why I can pretty confidently tell you that none

19     of these exist.  They can't give us one example.  They

20     can't give us one example, okay?  Not that this was a

21     major --

22          THE COURT:  So what is your actual answer to

23     that?

24          MR. FANTONE:  We don't have any.

25          THE COURT:  Did you say, we don't have any

1    documents, we don't have any responsive documents?

2                MR. MANCILLA:  None exist.

3                MR. FANTONE:  None exist.  I mean, yeah,

4    which we said.  We said that.  Defendant responds that

5    she's not aware of the existence of any responsive

6    documents.

7                THE COURT:  Okay.

8                MR. FANTONE:  That's it, and now we're

9    facing this motion to compel.

10               THE COURT:  So what basis do you have for

11   believing that there are responsive documents that they

12   haven't produced?

13               MS. ABRAHAM:  I mean, first off, I would

14   just note that not -- the requests don't necessarily

15   require an investigation.  It asks for any

16   communications concerning any of this.  Even if it's

17   an, oh, we don't believe this kind of communication,

18   that would be concerning.

19               THE COURT:  But that's not --

20               MS. ABRAHAM:  But essentially, you know --

21               THE COURT:  That might be what you want but

22   that's not what you asked for.

23               MS. ABRAHAM:  No, that actually is what we

24   asked for there.

25               MR. FANTONE:  Which one are you looking at?

1          MS. ABRAHAM:  If you look at request number

2    2, any documents reflecting communications concerning

3    fraud or potential fraud.

4          MR. FANTONE:  There are no communications

5    between Cherie Wrigley and Anthony Dain concerning

6    fraud or potential fraud by Esaun Pinto.  There is no

7    fraud by Esaun Pinto.

8          MS. ABRAHAM:  A communication doesn't

9    necessarily mean what the answer is.  There can be no

10   fraud and there can still be a communication about

11   that, so that's not the request.

12         MR. FANTONE:  Hold on.  There could be no

13   fraud and there still be a conversation about fraud?

14         MS. ABRAHAM:  Yes.

15         THE COURT:  There could be a conversation

16   about -- look, there was an allegation of fraud.

17         MR. FANTONE:  Right.

18         THE COURT:  They might not believe it but

19   they could still talk about it.

20         MR. FANTONE:  None exist.

21         THE COURT:  They didn't have any

22   conversations at all about the allegations of fraud?

23         MR. FANTONE:  No.

24         THE COURT:  Okay.

25         MR. FANTONE:  Not that we're aware of, as

1    has been certified in this response.

2              THE COURT:  There's your answer.

3              MR. FANTONE:  Judge, this is why we asked

4    for Rule 37 expenses, not that this was a giant task in

5    responding but, frankly, I think that they had some

6    legitimate issue with other defendants and thought, it

7    doesn't take much for them to include a small thing

8    against Ms. Wrigley, Mr. Pinto, and CPI Investigations.

9    And even though it wasn't a lot, we still had to review

10   -- you know, review the application, do a little

11   research, issue a response, and then review the reply.

12   I mean, our appearance here today -- I think we

13   probably would have been here anyway but, you know,

14   these little things add up when we're doing this work

15   involving three cases.

16             MS. ABRAHAM:  I would suggest that if the

17   answer was that there were no responsive documents,

18   rather than objecting on the basis of attorney/client

19   privilege, attorney work product doctrine, and the

20   common interest privilege, the proper response is,

21   there are no responsive documents.

22             MR. FANTONE:  But then --

23             MS. ABRAHAM:  And that would have avoided a

24   lot of confusion.

25             MR. FANTONE:  First of all, this is a very

1  common response, so there really shouldn't be any

2  confusion.  Second of all, what happens then if

3  subsequently, we find documents?

4          MS. ABRAHAM:  Then you supplement your

5  responses.

6          MR. FANTONE:  Have we then put ourselves in

7  a position where we've waived the attorney/client

8  privilege because it wasn't indicated in our initial

9  response?  So I think it's, you know, our obligation to

10 be cautious in doing so.  And by the way, having a

11 conversation about that prior to filing an application

12 is also a way to avoid this situation, which wasn't

13 done.  We just received the -- plaintiffs' application.

14         MS. ABRAHAM:  Since boiler-plate privilege

15 objections are not effective under the Federal Rules

16 anyway, it's not an abundance of caution.

17         THE COURT:  Look, it's a moot point.  It's a

18 boiler-plate objection because they can't provide more

19 details since there are no responsive documents.

20         MS. ABRAHAM:  Right, which --

21         THE COURT:  I don't think you should have

22 put the boiler-plate responses?  I think the answer to

23 that question is, there are no responsive documents.

24 You can't assert a prospective privilege for stuff that

25 doesn't exist.  If you find stuff later, then you can

1  assert a privilege based on what you find.  The bottom

2  line is, there are no responsive documents, so moving

3  on.

4          What about Cohenson?

5          MS. ABRAHAM:  Yes.  In terms of Ms. Cohenson

6  and Mr. Salzman, they both did produce privilege logs

7  and our issue there is more with the over-expansive and

8  boiler-plate privilege and common interest claims.  In

9  general, we think that they have failed to establish

10 any of the required elements.  We also think that there

11 are several participants to their alleged common

12 interest that frankly cannot be part of a common

13 interest.

14         One frequent participant based on the

15 privilege logs is Pamela Curr (ph), who they claim a

16 common interest with her both as to the New York

17 guardianship proceeding, which she submitted a

18 declaration in this court saying that she had no

19 involvement in that, that she was not retained for

20 that.  In Colorado, where she was retained, she

21 committed to providing information and sharing all

22 communications with Mr. Bernard Black, so there's no

23 common interest there, either.  There's just no common

24 interest with somebody who is committed to sharing her

25 communications with everybody.  So we think that any

1   communications shared with her were waived or any

2   potential privilege is waived.

3           There's Eve Markovitch (ph), who is the

4   minor plaintiff's guardian in Surrogate's Court.  We've

5   heard different stories as to why documents and

6   communications with her have been withheld.  The most

7   recent story is that they were going to submit a joint

8   affirmation.  That doesn't in and of itself create a

9   privilege when her duty is to represent the minor

10  plaintiff's interest.  It's not to represent Mr.

11  Salzman or his interests.  Her interests do not align

12  with his and there can be no common interest there.

13          Gail Young in Colorado, it's also been ruled

14  that she doesn't have privilege.  She represented

15  herself as the eyes and ears of the court and was

16  ordered to turn over documents in response to a

17  subpoena.  Defendants are claiming that they have a

18  common interest with her as well.  They have several

19  parties that are frankly -- plaintiffs don't know who

20  they are.  No parties in the privilege logs were

21  identified, who they were, what their roles were, just

22  by name.  Plaintiffs were able to identify the majority

23  of them but there were additional parties that

24  plaintiffs just can't identify.  Over a month ago, in

25  June, defendants were asked to identify these

1    individuals and plaintiffs have received no response,

2    not even just saying who they were, what their role

3    was, what the basis of the common interest with them

4    is.

5              THE COURT:  Okay.  Let's take them one at a

6    time.  So Curr was the accountant, right?

7              MS. ABRAHAM:  Yes.  She was a forensic

8    accountant in Colorado, who was for the plaintiff.

9              MR. KATZ:  Your Honor, if I may respond.

10             THE COURT:  Yes.

11             MR. KATZ:  I think you wanted to take this

12   one at a time.

13             THE COURT:  Yeah, let's talk about her

14   first.

15             MR. KATZ:  Sure.  So Pamela Curr was

16   retained by Gail Young.  Gail Young was the court-

17   appointed guardian ad litem for Joanne Black.  So the

18   retention was for Joanne Black.  The way that the

19   plaintiffs are trying to characterize her role I think

20   is incorrect.  Pam Curr -- I think this is even cited

21   in a footnote in the plaintiffs' papers -- indicated or

22   testified that she was not court-appointed or some kind

23   of neutral.  So she was retained on behalf of Joanne

24   Black, as I understand it.

25             In addition, this one communication they're

54

1   talking about with Bernard Black was in the beginning,

2   I think, of that matter, after she was retained.  She

3   goes on to say, after the sentence they cite -- they

4   omit the sentence where she says, if that is not

5   satisfactory, please let me know.  Then obviously, she

6   did not disclose the communications to the plaintiffs

7   or to Mr. Black.  Otherwise, they wouldn't even be

8   making it an issue on this motion.

9          So in addition, as the Court may know, Ms.

10  Curr has been sued in cases by Mrs. Black.  She was

11  named in this case even though she got out on a motion

12  to dismiss.  So I think it's clear that she was working

13  with the other individuals to defend against Bernard

14  Black's civil theft.  That was a common, limited

15  purpose to address that.  I think the common interest

16  doctrine does apply.  In addition, work product would

17  protect any communications that she would be on as

18  well.

19          Again, the plaintiffs don't have these

20  communications precisely because Ms. Curr did not

21  provide them to them.  So I think it's pretty clear

22  that the communications with her on them is not

23  discoverable.  I think Mr. Dain -- I mean, he could

24  probably speak more to the Colorado litigation, since

25  he was involved in it.

1          MS. ABRAHAM:  What Mr. Katz did not show is

2     where there's the followup email saying, this is not

3     acceptable.  That Ms. Curr didn't follow through on her

4     commitment does not take away that she had committed

5     publicly to sharing all communications with Mr. Black.

6     It also does not give her a role or an interest in the

7     New York guardianship proceeding, which is required for

8     the common interest exception waiver to apply.  You

9     need to have a common interest, a common legal

10    interest, and a desire to see one party over another

11    party is not a common legal interest sufficient to

12    satisfy that.

13          MR. KATZ:  Work product --

14          MR. DAIN:  I'm sorry, I just wanted to add,

15    your Honor, because I was -- this is Anthony Dain

16    again.  I was actively involved in the Colorado

17    litigation.  Ms. Curr's role was, she was a hired

18    forensic expert by the guardian ad litem, helped

19    uncover Bernard's defalcations, Bernard Black's

20    defalcations.  She was involved in the New York

21    guardianship proceedings to counter the accounting by

22    Bernard Black's accountant, who the court in Colorado

23    refused to allow to testify because her accounting was

24    a fictitious accounting.  So she was representing

25    Joanne Black's interest.  Ira Salzman's interests were

1    aligned.

2            In addition, very early on in Colorado, we

3    were aware of Bernard Black's threat to sue us all

4    because he had initially hired another attorney prior

5    to the ones that represent him now and paid them a

6    retainer.  When we discovered the retainer, we inquired

7    and we were told that Bernard Black was going to sue

8    everyone, including Pam Curr, including Gail Young, and

9    he did, including us in the two suits.  One of them was

10   filed in 2016, one in March of 2016.  But we were aware

11   of much earlier than that, that Bernard Black was

12   threatening to sue everybody who was involved in

13   protecting Joanne Black and uncovering his theft.  So

14   we had strategy discussions.  We had discussions

15   separate and apart from any discussions with Mr. Black

16   or his counsel.

17           We internally, including Mr. Salzman, Ms.

18   Curr, Ms. Young, and Ms. DiPonio, who was also sued,

19   me, Ms. Wrigley, Esaun Pinto -- all strategy

20   discussions, all the litigations that were subsequently

21   brought, all were interrelated in that sense.  So to

22   say that she was a disinterested, appointed party that

23   was merely interested in one side winning is absolutely

24   incorrect.  Ms. Curr was part of the team that was

25   developing the strategy to defend Bernard Black's

1  actions.

2          MS. ABRAHAM:  I would just like to point out

3  that Ms. Curr's declaration submitted to this Court

4  contradicts what Mr. Dain just said about her

5  involvement in the New York guardianship case.  She

6  says very clearly that she was not involved in that

7  case.  The full extent of my involvement in the

8  guardianship proceeding was my presence in the

9  courtroom on March 22nd, 2016, is what she puts in her

10 sworn declaration.

11         MR. DAIN:  She was arguing about

12 jurisdiction, that they were trying to gain

13 jurisdiction in New York by her appearance as a

14 witness.  She was there as a potential witness.  That's

15 a different issue than whether she was part of a team

16 that would be protected by a common interest.

17         MS. ABRAHAM:  And in arguing against

18 jurisdiction, she said that the full extent of her

19 involvement was her appearance.  I mean, her sworn

20 statement doesn't change because of the purpose of it.

21 It still is her sworn statement.

22         MR. DAIN:  It's taken out of context, your

23 Honor.  She was there as a potential witness.  She

24 provided accounting information for Mr. Salzman's use

25 in defending in Joanne against Bernard's guardianship

1    action.  Obviously, the court agreed that there was no

2    jurisdiction over her so that was an entirely separate

3    issue.  Again, that was in this case, the

4    jurisdictional question.

5         MS. ABRAHAM:  Defendants are saying that Ms.

6    Young hired Ms. Curr.  As Ms. Young was ordered to turn

7    over documents in response to a subpoena after arguing

8    that she shouldn't have to due to privilege, any

9    privilege that Ms. Curr has would stem from being

10   retained by Ms. Young or from court-appointed.  So if

11   Ms. Young doesn't have privilege, she can't extend that

12   to -- she can't extend any privilege to Ms. Curr and

13   her work.

14        MR. DAIN:  The documents that Ms. Young was

15   ordered to turn over related to, prior to the common

16   interest, her first meetings with Joanne as guardian ad

17   litem, her first meetings with Bernard and the

18   attorneys.  That was prior to the common interest

19   agreement being entered into.  That was a different

20   issue.  She felt she had a privilege in protecting

21   Joanne Black and the court said no.  She had her

22   deposition taken.  This was very, very early -- either

23   late in 2014 or early in 2015, and that's a separate

24   issue from her protection of the common interest

25   agreement when she became a potential defendant in this

1    very case.

2              MS. ABRAHAM:  Additionally, Ms. Curr

3    testified in deposition that keeping communications

4    confidential was never discussed.  There's no common

5    interest without essentially that discussion, that

6    communications between these people will remain

7    confidential.  It's an element of privilege, it's an

8    element of common interest.  She clearly testified

9    under oath that it was never discussed.

10             MR. DAIN:  Ms. Young are you saying?

11             MS. ABRAHAM:  Ms. Curr.

12             MR. DAIN:  Ms. Curr?  Ms. Curr was never

13   deposed.

14             MS. ABRAHAM:  Ms. Curr was deposed in

15   another action and the transcript is --

16             MR. DAIN:  That's taken out of context

17   again.  You're going to need -- Ms. Curr was a

18   participant even in one of the written common interest

19   agreements.

20             Again, your Honor, she's taking statements

21   out of context but if you look at the entire course of

22   conduct, if you look at the entire course of the facts

23   and circumstances, she was part of the team that was

24   protecting Joanne and she was a potential defendant

25   from very early in 2015 at the latest.

1          MS. ABRAHAM:  In a deposition in 2018 --

2    it's Exhibit 9 to plaintiffs' motion to compel.  Ms.

3    Curr was asked, did Ms. Young tell you that

4    communications that she had with you in which other

5    people were included were confidential?  There's a

6    series of objections and then Ms. Curr says no.  She

7    then says, my answer is no, and then a followup

8    question:  She didn't tell you that they were

9    confidential when other -- in communications which

10   other shared, correct?  Answer:  It was never

11   discussed.  It's hard to take that out of context.

12          MR. DAIN:  No, that is a very limited

13   context.  That's asking if Ms. Young told her the

14   communications.  That doesn't mean they weren't and

15   that doesn't mean that she isn't part of the common

16   interest agreement, and that doesn't mean she doesn't

17   know that there's a common interest agreement in

18   writing at some point that covered nunc pro tunc

19   earlier.  It's just asking whether at the time Ms.

20   Young conveyed a particular statement to her, she said,

21   this is confidential.

22          MS. ABRAHAM:  It was asked --

23          MR. DAIN:  She doesn't have to.

24          MS. ABRAHAM:  It was asked --

25          MR. DAIN:  She's an attorney -- I'm sorry, I

1    don't mean to interrupt.  I apologize.  And it's also

2    work product.

3              MS. ABRAHAM:  It was asked at the time of

4    the communications if there was a discussion about the

5    communications being confidential, and her response was

6    that it was never discussed.  That in 2018 it was

7    discussed does not retroactively create a common

8    interest in 2016 or earlier.

9              MR. KATZ:  I think the testimony that

10   counsel just cited just refers to whether she discussed

11   that with Ms. Young.

12             MS. ABRAHAM:  Ms. Young, who defendants say

13   retained Ms. Curr.

14             MR. KATZ:  It's not asking whether it was

15   discussed with anyone.  It's clearly, at a minimum,

16   work product.  Again, Ms. Curr did not disclose these

17   communications to plaintiffs.  That's why they don't

18   have them over the course of numerous years.  So the

19   strategy communications that were had clearly would be

20   work product.

21             MR. DAIN:  I would add that in the Chicago

22   litigation, Judge Kanelly (ph), a district court judge,

23   has found that Ms. Curr's documents were covered by the

24   common interest agreement because she was a defendant,

25   irrespective of being an accountant, and she was a

1   prospective defendant.  That is in Judge Kanelly's

2   order.  So this would be inconsistent, to claim that

3   there it's covered but here, it isn't.

4           MR. FANTONE:  In Mr. Salzman's response, his

5   own explanation for work product does not protect these

6   communications.  He cited law that says exchange of

7   subpoena among attorneys with identical litigation

8   perspectives doesn't render the information vulnerable

9   to pretrial discovery.  These are not communications

10  between attorneys with identical pretrial -- identical

11  litigation perspectives.  These are communications with

12  parties who have committed to sharing information.

13          Mr. Katz keeps mentioning how it's obviously

14  work product because the plaintiffs haven't seen these

15  documents.  Mr. Katz produced in discovery multiple

16  redacted communications, including in plaintiffs'

17  motion to compel, we produced Exhibits 10 and 11.  Mr.

18  Katz produced a fully redacted email chain.  Ms.

19  Wrigley in 2015, before defendants came up with the

20  idea of claiming common interest, produced an identical

21  email chain, a slightly longer email chain with no

22  redactions, no privilege objections, no common interest

23  objections.

24          MR. KATZ:  Judge --

25          MS. ABRAHAM:  If defendants had had a common

1    interest or a privilege claim at some point, that's

2    been waived to these communications, to other

3    communications that have been produced, and to the

4    subject matters.

5            MR. KATZ:  Judge, I think there's case law

6    that says one party can't unilaterally waive a

7    privilege that benefits other parties if there's some

8    disclosure by the one party.  Obviously, that wasn't

9    done in this case.  The case that I'm referring to is

10   21st Century Diamond LLC v. Allfield Trading, 142 A.D.3d

11   913.  It's a First Department of New York Appellate

12   Division 2016 case.  I don't have any information about

13   this one email that they're referencing or what case it

14   related to, but I think there's New York case law that

15   indicates that that wouldn't mean that the privilege

16   would be waived for parties in this case.

17           MS. ABRAHAM:  The privilege that hasn't been

18   established yet.

19           MR. KATZ:  We think it clearly has been.

20           THE COURT:  When are these communications

21   alleged to have -- the communications that you're

22   asking for with Ms. Curr, what time period are they

23   from?

24           MS. ABRAHAM:  Most of them are in 2015.

25           THE COURT:  Are you asking for --

1          MS. ABRAHAM:  There are some in 2016 but

2     primarily, it appears to be 2015.

3          THE COURT:  What was the -- were they all

4     communications or was there a limitation on it?

5          MS. ABRAHAM:  We believe that any

6     communication with Pamela Curr concerning the New York

7     guardianship proceeding, in which, as has been stated,

8     she swore that she had no part in, were not subject to

9     common interest.  In Colorado, where she committed to

10    sharing all communications with Bernard Black, we

11    believe there's no common interest there.  It's worth

12    noting that Ms. Cohenson has testified twice now in two

13    depositions that there was no common interest in 2016.

14         MR. DAIN:  That's an incorrect statement,

15    your Honor.  Again, that's taken out of context.  It

16    was talking about when she believed the common interest

17    agreement was entered into, not that there wasn't one.

18    She's a signatory.

19         THE COURT:  The one that you submitted to

20    me, was there --

21         MS. ABRAHAM:  She did not sign anything in

22    2016.

23         THE COURT:  Was that the -- I have the

24    common interest agreement that the parties submitted.

25    Was that the first written one or was there a prior

1   written agreement?

2           MR. KATZ:  That's the --

3           MR. DAIN:  Your Honor, there were multiple

4   drafts over the years.  It took that long to finally

5   reduce it to writing because there were multiple

6   litigations that kept getting filed, and we had some

7   issues with -- some of the parties were parties in

8   multiple states, and the insurance carriers for

9   instance weren't comfortable with adding a litigation

10  that was handled by maybe another carrier in another

11  state.  So we had iterations of that going on and,

12  again, those would have still been covered by an oral

13  common interest agreement.

14          The one you have may be the first one

15  reduced to writing that would involve this case.  There

16  are others that were involving other cases as well

17  because we had to have one that was kind of an umbrella

18  and others that were partial to one or more cases.

19  That may be the first one that was fully executed.

20          MS. ABRAHAM:  I would say that Ms. Cohenson

21  as recently as 2018 testified that she didn't know what

22  common interest was.  So for Mr. Dain to say that she

23  was previously part of a common interest agreement and

24  that she joined one on behalf of her client Ms. Wrigley

25  is -- she testified -- Brian Raphan on behalf of Brian

1   Raphan P.C. testified that they did not know what a

2   common interest was.  Mr. Raphan said that other than

3   assuming, he wouldn't know.

4              UNIDENTIFIED SPEAKER:  (Ui).

5              MR. KATZ:  In addition, I would say that her

6   communications would clearly be work product.  There

7   was no indication that a communication to her would

8   increase the likelihood that the plaintiffs would get

9   those documents.

10             MS. ABRAHAM:  As far as -- as far as the

11  work product claims, as we addressed in our reply, we

12  believe that any work product has been waived with some

13  of the disclosures and sharing the documents with

14  people who did not agree to keep it confidential,

15  sharing documents with people who admitted to sharing

16  communications with Bernard Black, sharing the

17  documents with people who had fiduciary duties to

18  plaintiffs.

19             MR. DAIN:  The documents that were shared

20  with Mr. Black were documents that were part of a

21  stipulated accounting that Mr. Black had stipulated to

22  with all the other parties, so that would have been

23  providing information that was relevant to all parties.

24  That's separate from information that is relevant to a

25  common interest in defending against Bernard Black.

1    With Ms. Cohenson, the testimony is taken out of

2    context.  It was more related to her understanding of

3    what a common interest covers and what it is, not

4    whether her communications would be confidential under

5    it.

6            Ms. Cohenson is a probate attorney so she's

7    not a litigator per se.  So it would be under -- it's

8    understood that she wouldn't have, you know, the best

9    grasp of common interest agreements because she may

10   have never entered into one before this.  But she was

11   clearly a potential defendant, then a defendant.  She

12   was representing Ms. Wrigley, who was a potential

13   defendant and defendant.  So taking testimony out of

14   context to try to say she denied the common interest

15   agreement is really specious.

16           THE COURT:  When was the first time that

17   Bernard Black threatened a lawsuit against --

18           MS. ABRAHAM:  Other than what defendants are

19   saying here, we --

20           MR. DAIN:  If you're asking me, the first

21   time he threatened Ms. Wrigley was in September of

22   2014.  He began threatening the others shortly

23   thereafter and there are documents we've uncovered that

24   we need to bring to the attention of the Court

25   separately that between September of 2014 and maybe the

1  first quarter of 2015, there were the beginnings of a

2  determination that they were going to potentially bring

3  an action against other parties.

4        The ones that are particularly related to

5  Ms. Wrigley and me would have been September of 2014.

6  Then probably during the first quarter of 2015 is when

7  Ms. Curr was beginning her forensic examination and we

8  started discovering these checks.  Then I think Mr.

9  Salzman had a conversation with the attorney in court

10  that had indicated to him that Bernard was going to sue

11  for exactly what he's suing for here, a conspiracy to

12  breach fiduciary duty.  So I would say for everybody,

13  probably somewhere around the first quarter of 2015 to

14  maybe early summer 2015.

15        THE COURT:  So these -- the communications

16  that are at issue, were they about the Colorado action,

17  the New York action, or some combination thereof, and

18  the potential for a lawsuit by Mr. Black?

19        MS. ABRAHAM:  They appear to be primarily

20  about the New York guardianship and the Colorado

21  proceeding.

22        MR. DAIN:  The communications are about the

23  Colorado litigation, which is related -- it was related

24  to the guardianship proceeding in New York because the

25  idea was, the conservatorship in Colorado was to be

1   transitioned to the guardianship proceeding in New

2   York.  So the forensic accounting, the uncovering of

3   the civil theft was all interrelated.  But then there

4   are communications that are related therein beyond that

5   to strategy because it was now involving Colorado, it

6   was involving New York, and it subsequently started

7   involving the potential of Bernard suing everyone.

8   Then in January of 2016, he began those suits.

9           Your Honor, if I could just add, it was I

10  think very early in 2015 if not late 2014 when we first

11  learned in the guardianship proceeding that Mr. Black

12  had admitted in an affirmation that he had diverted a

13  third of the assets and quoted a false order, an order

14  that didn't exist that allowed him to do that.  So that

15  would have been part and parcel of a joint strategy as

16  well, as to how we were going to get Joanne's stolen

17  money returned.  So I can say that would have been as

18  early as December of 2014 or January, 2015.

19          That's how the guardianship proceeding in

20  New York interrelated, because Mr. Black was affirming

21  -- and I should say the probate proceeding as well.

22  Mr. Black was affirming in those proceedings that he

23  had transferred the money and that's what led to the

24  subsequent freezing of assets and the holding of a

25  trial and all proceedings.  So the threats may have

1  begun against the two of us in September but by late --

2  either December, 2014 or January, 2015, we were already

3  becoming aware of the theft, and that required the

4  group, from Ira Salzman to Gail Young to Lisa DiPonio

5  (ph) to Ms. Wrigley and Mr. Pinto, to begin

6  strategizing how we were going to protect Joanne from

7  this deprivation.

8           When Ms. Curr was appointed subsequently --

9  not appointed, was hired, my bad -- was hired shortly

10 after that, and then when Ms. Cohenson came in the

11 picture probably in early 2015 as well, that all became

12 part of the team.  In fact, it was called team Joanne

13 because we were all the ones protecting her from

14 Bernard and trying to determine the full extent of what

15 he had done, so there would have been communications.

16 Even if a communication said guardianship of Joanne

17 Black, it would have been related to that, to

18 uncovering the theft, to uncovering the other

19 malfeasance.

20          So all of those things would have been

21 interrelated and as I said, we had multiple discussions

22 about a common interest agreement over the next few

23 years, multiple drafts.  Ultimately, we had a draft

24 that was signed that was in the draft state.  It was

25 meant to extend back to the entire period of the oral

1    common interest agreement.

2              MR. SCHAALMAN:  Your Honor, I don't know if

3    you want a response.  Mr. Dain is obviously testifying.

4    He hasn't been sworn in this matter.  Despite all the

5    obfuscation, it's really pretty simple.  We have people

6    who are supposedly part of this common interest who say

7    they don't know anything about it.  Ms. Cohenson (ui).

8    Ms. Curr testified she never discussed the confidential

9    nature of such communications with the person who

10   retained her.  It's very clear she wasn't talking about

11   one particular communication but all these

12   communications.  People have to understand that what

13   they're engaged is confidential.

14             If this was such a great, organized team

15   effort, supposedly, as Mr. Dain has expounded, they

16   would have had a written agreement much, much earlier.

17   We're talking about communications in 2014, 2015, and

18   early '16.  The written agreement does not occur until

19   2018.  How many iterations would they have had to have?

20   How many carriers would they have had to have?  In

21   fact, Mr. Dain has provided for the first time

22   information that the carriers weren't necessarily on

23   board and were permitting their lawyers apparently in

24   engaging in common interest participation or

25   communication because they were concerned about the

```
1   various representations in multiple matters.

2               They have abused -- they have abused the

3   whole notion of common interest and joint defense.  It

4   pervades every single document that they have withheld.

5   They have privilege logs in the hundreds, not with

6   attorney/client privilege but with common interest and

7   joint defense.  It's very clear they had all kinds of

8   individuals who were involved, who should not have --

9   could not possibly have been made to participate in a

10  confidential, privileged matter or an exception to the

11  waiver of privilege, not to mention that --

12              THE COURT:  Except all of those people

13  ultimately ended up as defendants.

14              MR. SCHAALMAN:  Not all.  That's not true.

15  Gail Young is not a defendant, Lisa DiPonio is not a

16  defendant.

17              MR. FANTONE:  They were both main defendants

18  in this action.

19              MR. DAIN:  They were.

20              MR. FANTONE:  They were both main

21  defendants.

22              MR. SCHAALMAN:  They're not actively

23  defendants and we're talking --

24              THE COURT:  That's not the question, whether

25  they're actively defendants.
```

1          MR. SCHAALMAN:  We're talking about

2     communications prior to them being sued and we're

3     talking about years before Mr. Dain, again testifying,

4     claims that there were all these threats and

5     allegations of litigation.  If there really were, if

6     everyone were fearful of that, then they would have sat

7     down and would have created a document, and they would

8     have certainly made it clear to all of the individuals

9     who were involved what a common interest is.

10          To say that Ms. Cohenson, because she's a

11     trusts and estates lawyer, wouldn't have any

12     understanding of a common interest joint defense is

13     facetious.  She said, I didn't know what it was.  Brian

14     Raphan, speaking on behalf of his law firm said, I have

15     no idea what that even is.  You can't participate in

16     one of these unless you have some idea that this is a

17     collective effort to keep matters confidential as an

18     exception to the waiver of the attorney/client

19     privilege.

20          MR. DAIN:  Your Honor, there's case law that

21     common interest can be created by conduct, so Mr.

22     Schaalman is not -- is speaking out of school.  You can

23     create a common interest by your conduct in acting in

24     furtherance of a common strategy.

25          Please, don't take out of context, Mr.

1  Schaalman, my statement about carriers.  That's a

2  common thing that people -- it didn't even have to be

3  related to that.  If you have one litigation,

4  generally, there may be a belief, well, we should have

5  a common interest for this one lawsuit and you have a

6  common interest for another lawsuit.  But if they

7  overlap, then you may have difficulties in creating a

8  written common interest agreement that would cover

9  everything in the same way, so please don't take that

10  out of context, too.

11         But the bottom line is, everybody was named

12  as a defendant.  The fact that they got out of it is

13  not relevant, and I don't have to testify.  There are

14  documents that were filed going back to the affirmation

15  of Mr. Lamberti on behalf of Bernard Black in the

16  Surrogate's Court proceeding, in which he reveals for

17  the first time that Mr. Black had diverted a third of

18  the assets and based it on a -- I mean, he had a quote

19  from an order that was a fictitious order.  So we can

20  relate to the documents that are on file way back then.

21         You deposed me if you wanted testimony.  I

22  explained to you about Mr. Black's threats.  You had

23  every opportunity if you wanted me to testify, but the

24  bottom line is, in every one of these cases, you're

25  trying to attack the common interest.  Judge Kanelly

1    issued an order regarding the common interest and Gail

2    -- I mean and Pam Curr was covered under that.

3           In every one of these cases, there was a

4    common interest between -- as a potential defendant and

5    as a defender of Joanne.  And even -- and taking out of

6    context where one person says -- you asked them, what

7    does the common interest mean?  If you're a litigator,

8    you can regale on it.  If you're a trusts and estates

9    attorney, you may just have an understanding that

10   everything is privileged but you don't know all the

11   details and the law on common interest.  I mean, Mr.

12   Schaalman himself doesn't.  So the bottom line is,

13   they're trying to breach what has clearly been a common

14   interest among all these parties for years.

15          THE COURT:  What case was the -- you said

16   there was a decision by Judge Kanelly.  What case was

17   that in?

18          MR. SCHAALMAN:  In fact, your Honor, Judge

19   Kanelly did not rule in that regard because there was a

20   production of privileged and joint defense documents

21   made subject to a stipulation in which there would be

22   non-waiver.  That at a minimum should be what the Court

23   does here, and that says, you ought to produce all

24   these documents to claim privilege where you claim

25   joint defense and common interest without a waiver that

1    could be established at a trial.  But in the meantime,

2    we are entitled to see those documents because despite

3    -- again, Mr. Dain's testimony and recitation of all

4    kinds of documents that are not before the Court --

5    they're not part of anybody's submission here.

6           The fact of the matter is that Judge Kanelly

7    in fact didn't have to rule on these because in fact

8    there was a stipulation that they would not -- that

9    joint defense/ common interest would not be waived but

10   the documents would be produced.  So in the Northern

11   District of Illinois case, the defamation case, which

12   is set to go to trial on the 20th of August, those

13   documents are still available and there has been no

14   ruling by a court on those documents.  Mr. Dain knows

15   that full well.

16          MR. DAIN:  Mr. Schaalman, Mr. Schaalman,

17   there was a ruling and Ms. Curr was covered under that.

18   What you're talking about is, there was a subsequent

19   demand for further production of documents, where Judge

20   Kanelly said if he had to go through all these

21   documents, then one party or the other was going to be

22   sanctioned, the party who brought the motion or the

23   party who was defending.  And what he said is, you guys

24   through it and you see what you can do.  And what came

25   out of that was a stipulation for further documents, to

1   produce further documents subject to an attorney/client

2   privilege right that could be asserted after the fact,

3   and that was done for convenience.

4           But Judge Kanelly did issue an order that

5   Pam Curr, irrespective of being a forensic accountant,

6   was covered and could be covered by a common interest

7   agreement.  So it's in the Illinois federal litigation

8   that Kate Black nee Litbeck (ph) brought against Ms.

9   Wrigley, Ms. Curr, and Ms. Cohenson, who has now been

10  dismissed out of that case.

11          MR. SCHAALMAN:  And in fact, the documents

12  covered by Ms. Curr or part of the stipulation in those

13  documents were produced.  So if Ms. Curr thought that

14  there was some extraordinary reason why she would not

15  have to produce those documents, she would have done

16  so.  In fact, the majority of the documents that

17  produced such a stipulation waiver were from Ms. Curr.

18          MR. DAIN:  There is not a waiver.  Mr.

19  Mancilla and Mr. Fantone can speak to it better but

20  that's the point.  That's what we raised to your Honor

21  in an earlier motion, that they were trying to use

22  those documents in this case and they were covered

23  under an attorney/client privilege protection, but I'll

24  let them speak to that.

25          MR. FANTONE:  Judge, what happened was,

1    there was probably close to a thousand documents, and

2    the parties just agreed, instead of fighting over it,

3    not to do production pursuant to a stipulation, non-

4    waiver, and confidentiality.  That covered a majority

5    of the production.  However, there were still select

6    documents that the parties chose to stand their ground,

7    so to speak, on their claims.  Judge Kanelly did issue

8    a ruling, which I can read from the last paragraph

9    here.  This is in case number 17-CV-101.  It's document

10   229 filed November 15th, 2018.  I'm starting at the

11   bottom of page 2 and I'm reading the last paragraph

12   before the conclusion on page 3.

13           It says, "Document Curr 1845 consists of

14   Curr's comments to counsel regarding allegations in a

15   lawsuit against her.  It's protected by attorney/client

16   communication as well as work product.  The remaining

17   documents consist of a series of email exchanges, most

18   of them overlapping with each other.  They involve

19   various members of a large collection of people, some

20   lawyers, some not.  Defendant Wrigley, Attorney Lisa

21   DiPonio, Wrigley's brother Anthony Dain, who is an

22   attorney, attorney Ira Salzman, defendant and attorney

23   Cohenson, defendant Curr, someone with the email

24   address dezen@q.com (Ph) [that's Gail Young], attorney

25   Melissa Schwartz, attorney Michael Custon (ph), and

1  perhaps others.  These emails concern discussion about

2  settlement, pending litigation, and litigation

3  strategy.  They're all protected work product, if

4  nothing else.  Again, the court sees no viable basis

5  for a claim of waiver.  The non-lawyers involved all

6  had common interest in connection with all sorts of

7  pending and anticipated litigation even if they did not

8  have written agreement to this at the time.  Dain was

9  not a party to the litigation but it's clear from the

10  contents and context of the emails that he was

11  participating not just as Wrigley's brother but also

12  because he was providing input as an attorney."

13         I'm happy to provide a copy of this.  I

14  don't have a hard copy for you but we can give you the

15  whole decision.

16         THE COURT:  So is it fair to say that you've

17  already produced most of these documents just pursuant

18  to that stipulation?

19         MR. FANTONE:  Yeah, but the purpose of the

20  stipulation, having been part of those discussions with

21  procurement, was specifically to prevent their use in

22  collateral proceedings, including this one.

23         THE COURT:  Gotcha.

24         MR. SCHAALMAN:  There are more documents --

25  we now have privilege logs that are much larger than

1    the privilege logs that were produced.  We have Mr.

2    Salzman's privilege log.  There was no privilege log

3    from Mr. Salzman in the Chicago case, where Mr. Dain

4    wasn't a party.  Now we have a much larger privilege

5    log and we have a larger privilege log of Ms. Cohenson

6    and Mr. Raphan.  We know that there are a lot of

7    emails.  We know there were very extensive

8    communications which are germane and relevant to this

9    case, as to their attempts to aid and abet the breach

10   of fiduciary duty.  I don't think Judge Kanelly's order

11   reached any of the things that we're talking about now.

12            MR. DAIN:  Your Honor, Mr. Schaalman just

13   got through telling you there was no such order.  That

14   order is as clear as it could be.  The communications

15   that were produced -- as counsel said, it's not all

16   communications.  There are some that are absolutely

17   beyond question.  The only ones that were produced were

18   ones where, could there be an argument, and those have

19   been produced in this case.  The ones that are withheld

20   are the ones that are clearly privileged in this case

21   and were meant not to be produced in this case.  Now

22   Mr. Schaalman went from saying there's no such order,

23   it doesn't exist, to now saying, yeah, there's an order

24   but now we have a broader privilege log.  Well, of

25   course, because every production request they issue is

1   different, so you'll have maybe less, you'll have maybe

2   more, as you saw earlier in this case.  But clearly, if

3   you take Judge Kanelly's order, that paragraph, it

4   couldn't be more clear.  There was a common interest

5   agreement and we're part of it, and those documents are

6   protected.

7            Counsel hasn't shown with any specificity

8   what he believes shouldn't still be covered by that.

9   By the way, he has some produced documents from the

10  other case that are maintained as privileged but not to

11  be used in this case.  He hasn't even discussed with us

12  -- met and conferred and discussed with us why he

13  somehow thinks they should be.  He just brought this

14  motion.  So the motion should be denied and I think you

15  could -- I mean, Judge Kanelly to me couldn't have said

16  it better.

17           THE COURT:  It sounds to me like Judge

18  Kanelly unfortunately had the benefit of seeing some of

19  these documents.

20           MR. SCHAALMAN:  Yeah.  And, your Honor, of

21  course, the order that Mr. Dain is talking about also

22  provides -- and I think the Court ought to read the

23  order.

24           THE COURT:  Does anyone have the order?

25           MR. SCHAALMAN:  I have it in my computer,

1    sure.

2              MS. ABRAHAM:  It's touch screen so you can

3    scroll.

4              THE COURT:  Clearly, the judge recognized

5    there was a common interest for all of the same players

6    that are here.  I'll tell you what.  Why don't you

7    produce to me for in camera inspection the documents,

8    at least the ones that have already been produced.  So

9    both sides already have them, even though they're not

10   technically supposed to be used in this case.

11             MR. FANTONE:  (Ui).

12             THE COURT:  Yeah.

13             MR. FANTONE:  I think there's -- we have no

14   problem doing that.  I just want to forewarn the Court,

15   I think there's probably close to a thousand pages or

16   more.

17             THE COURT:  Okay.  Well, I'm not saying I'm

18   going to necessarily read every single page.

19             MR. FANTONE:  Yeah.

20             THE COURT:  But at least I want to have some

21   context for some of this.

22             MR. FANTONE:  We can do that.

23             MR. MANCILLA:  Can we limit it to responsive

24   documents?  I'm not sure that -- these are documents

25   produced in response to (ui).

1          THE COURT:  Different case, yeah.  The only

2   reason I said that might be a starting place is because

3   both sides have those documents, so it might be easier

4   to talk about them once I review them.  If we're

5   talking about other documents that the other side

6   doesn't have --

7          MR. FANTONE:  It might be better if the

8   plaintiffs identify which documents, so your Honor can

9   read a select few of those documents -- otherwise --

10  this is speaking perhaps as your law clerk, not to

11  review all of these documents.

12         MR. SCHAALMAN:  We'd be glad to do that.  I

13  think that's a reasonable suggestion.  We'll submit --

14         THE COURT:  Look, you both have those sets

15  of documents.

16         MR. SCHAALMAN:  We do.

17         THE COURT:  Why don't you confer and just

18  agree on a set to provide to me that gives like an

19  overview of the types of documents we're talking about.

20         MR. SCHAALMAN:  That's fine.

21         THE COURT:  So that I have some context for

22  the -- because, look, this is a highly fact-specific

23  inquiry.

24         MR. SCHAALMAN:  Sure.

25         THE COURT:  Sometimes it's hard for me to

1  make these decisions without seeing them.  As much as I

2  hate reviewing all of this stuff in camera all the

3  time, I often find that these privilege questions are

4  difficult to address without actually looking at stuff.

5  MR. FANTONE:  All right, we can work it out.

6  Just by way of example, in the conversation we had

7  earlier, the requests in the Illinois case were much

8  broader than what plaintiffs -- at least on behalf of

9  Wrigley.

10  THE COURT:  Okay.

11  MR. FANTONE:  Pinto wasn't even a part of

12  that case.

13  MR. SCHAALMAN:  We'll see if we can agree to

14  a subset that applies to (ui).

15  MR. FANTONE:  Okay.

16  THE COURT:  Look, either agree to subset or

17  submit the whole darned thing.

18  MR. SCHAALMAN:  Right.

19  THE COURT:  But I'll very disappointed in

20  you if you make me read the whole thousand pages.

21  Let's put it that way.

22  MR. SCHAALMAN:  Understood.

23  MR. FANTONE:  In plaintiffs, right, your

24  Honor?

25  MR. SCHAALMAN:  In the truth-seeking

1 process, of course.

2          THE COURT:  Why don't we pick a date to come

3 back so we can resolve this issue, unless there's

4 something else coming up that you think we need to

5 address.

6          MR. KATZ:  There are a few other issues,

7 unfortunately.  One is, Bernard Black is supposed to be

8 deposed tomorrow.

9          THE COURT:  Okay.

10          MR. KATZ:  We got an email from one of his

11 attorneys.  Mr. Schaalman was on the email.  He

12 indicated that -- we had noticed it for a court-

13 reporting office in midtown.  His attorney indicated he

14 refuses to appear there.  He'll only appear at his

15 lawyer's office.  We've already set this up with a

16 videographer.  I don't understand why Mr. Black refuses

17 to appear at where we noticed the deposition, so that's

18 an issue.

19          MR. FANTONE:  Whish is at the court-

20 reporting office.

21          MR. KATZ:  Right.  Esquire, in midtown.  So

22 that's an issue.  There's an outstanding issue about

23 finishing Katherine Black's deposition, and then I

24 think there's an issue about the current expert

25 deadline for us to serve reports because I think

1  clearly from taking Katherine Black's deposition

2  yesterday, which was not finished in the seven hours

3  for all defendants, Bernard Black's deposition, I'm

4  very confident, is not going to be finished within a

5  day for all defendants.  There are so many issues that

6  have to be addressed.  Then I think we need a further

7  extension of our deadline to serve reports because by

8  the time we finish these depositions and get the

9  transcripts, we're not going to be able to do it by the

10 current deadline.

11          THE COURT:  Okay.

12          MR. SCHAALMAN:  Let me address the first

13 issue.  Mr. Black would prefer to have his deposition

14 at his attorney's office.  He has made an accommodation

15 by coming to New York.  He's not a party to this case,

16 he's a (ui) witness.  I don't think it's a lot to ask

17 that we move the deposition.  There is room for the

18 videographer.  We emailed the other side.  Mr. Katz

19 said he would check if there was room in the lawyer's

20 office.  I think it's a small, incidental request, your

21 Honor, that Mr. Black would prefer that.

22          I know the videographer is not wedded to the

23 court reporter's office.  He does depositions all over

24 the city, and I'm sure he'll be glad to show up at Mr.

25 Sunder's (ph) law office as much as he would go to the

1   court reporter's office.  So I think that's a very

2   small -- and I don't really understand what the major

3   objection was.  The only questions raised by Mr. Katz

4   when we made the request was, is there a conference

5   room big enough?  Can everybody fit?  Can you do the

6   videographer?  The answer came back yes, the conference

7   is large enough, the videographer can be accommodated.

8   So I don't think this is really a major issue which the

9   defendants (ui).

10          MR. FANTONE:  Your Honor, I don't know why

11  plaintiff's counsel continues to assert that he is not

12  a party.  He is the plaintiff in the 430 matter, which

13  we've agreed these depositions count for both of those

14  cases.  Both Mr. Schaalman and Mr. Grayson have

15  asserted that repeatedly for other witnesses as well.

16          MR. MANCILLA:  And Samuel Black, who is a

17  plaintiff in the 403 action.

18          MR. DAIN:  Your Honor, he didn't just

19  request a transfer.  He said he will not show up.  He

20  will refuse, so there's something going on here that's

21  more than just a request.  He's using this kind of as a

22  sworn.

23          THE COURT:  It's noticed for the court

24  reporter's, right?

25          MR. KATZ:  It's not even at my office.

1          THE COURT:  So it's at a neutral site.

2          MR. KATZ:  Correct.

3          THE COURT:  Do it at a neutral site.

4    There's no reason why -- I mean, this is the kind of

5    stuff that's just silly.  There's absolutely no reason

6    why it can't be done at the court reporter's.

7          MR. SCHAALMAN:  As to Mrs. Black, she was

8    deposed yesterday for seven hours.  She has a trial

9    coming up starting I believe on the 20th of August.  She

10   just came back from Israel.  She's still (ui) because

11   she had a broken ankle and she still finds it difficult

12   to travel.  She resides now (ui).  We have agreed to

13   have her deposition taken on the day after the trial

14   ends in Chicago, in Chicago, where she resides.

15         THE COURT:  Okay.

16         MR. SCHAALMAN:  The only part that has not

17   -- Mr. Dain has appeared by telephone.  It should make

18   no difference to him where this deposition -- Mr. Katz

19   has finished his questions.  He had seven hours.  He

20   didn't allocate any time for his codefendants.  Ms.

21   Wrigley and Mr. Pinto are the principal defendants and

22   we they have to finish up.  Her lawyers are going to be

23   in Chicago and we will take the deposition immediately

24   after the trial is over.  We can do it on a Saturday if

25   need be.  If the case goes on to Saturday, we'll

1   accommodate that in Chicago at a law office, and she

2   will be there.

3           There's no reason for her to come back to

4   New York to take this deposition.  I made this proposal

5   to them in writing this morning.  They asked for

6   proposal, I made it.  She would be willing to sit for

7   another three hours for her deposition, so that means

8   in total, she would have sat for ten hours for her

9   deposition.  I would assume that that's more than

10  adequate to get her deposition taken, given the fact

11  that she's basically appearing here as a plaintiff on

12  behalf of her minor children.  She's their guardian.  I

13  think that's a very reasonable approach.  It's a

14  compromise and I don't understand why defendants, who

15  are going to be in Chicago anyway --

16          MR. MANCILLA:  Your Honor, first of all, we

17  spoke to Mr. Schaalman before this proceeding.  The

18  trial is not ending before the 24th.  He knows that and

19  he's just continuing to represent to the Court -- the

20  trial is expected to go from the 20th to the 29th or

21  28th.

22          MR. SCHAALMAN:  He misunderstood me and I

23  clarified this before we started.  I thought the trial

24  was over by the 24th.

25          MR. MANCILLA:  And you were mistaken,

1    correct?

2              MR. SCHAALMAN:  I was mistaken.

3              MR. MANCILLA:  So don't make that

4    representation to the judge.

5              MR. SCHAALMAN:  No, I told you this before

6    we started.  There's no reason now for you to say that

7    I mis-stated this to the Court.  I just said when the

8    trial is over, Ms. Black will be appearing -- will be

9    willing to be deposed in Chicago for three hours.

10             MR. MANCILLA:  On the 24th?

11             MR. SCHAALMAN:  Whenever the trial ends.

12   When is the trial going to end, Mr. Mancilla?  Do you

13   know?

14             MR. MANCILLA:  We're not sure yet.

15             MR. SCHAALMAN:  That's right, but she will

16   know because she is the plaintiff.  So she will appear

17   the next day for her deposition in Chicago for three

18   hours.

19             MR. MANCILLA:  There is another defendant in

20   this case, Melissa Cohenson and Brian Raphan, who we

21   also have not been able to question, and we should all

22   be afforded more time, both for her deposition and for

23   Bernard Black's deposition because these, number one,

24   are relating to two cases, and number two, these cases

25   are significantly -- are vast.  We would request that

1    Ms. Black be deposed this week or next week, that her

2    continued deposition occur this week or next week, and

3    with Mr. Black, that we are allotted an additional

4    amount of time for Mr. Black's deposition.

5              THE COURT:  Is she in New York right now?

6    When does she --

7              MR. SCHAALMAN:  He will be in New York for

8    the deposition.

9              THE COURT:  Ms. Black.  She was just --

10             MR. SCHAALMAN:  Ms. Black is back in

11   Chicago.

12             THE COURT:  She's back in Chicago?

13             MR. SCHAALMAN:  Where she resides.  She has

14   two minor children.

15             THE COURT:  I thought she was in Israel.

16             MR. SCHAALMAN:  She was.  She broker her

17   ankle in Israel so it's very difficult for her to

18   travel.  She came in in a walking cast yesterday and

19   she's now back in Chicago.

20             MR. MANCILLA:  We provided the 8th, the 14th,

21   and the 16th as potential dates for the continuance of

22   Ms. Black's deposition.  Anticipating that we might not

23   be able to agree on it, we actually issue a notice for

24   the 16th at the neutral court reporter's office where we

25   conducted her first -- the first portion of her

1  deposition.  Again, she is a plaintiff.

2            MR. SCHAALMAN:  I think that's the week

3  before the trial (ui).

4            MR. MANCILLA:  The same trial that we're

5  attending.

6            THE COURT:  Do you have a problem doing it

7  in Chicago?  How much extra time do you need to do

8  this?

9            MR. MANCILLA:  I would say probably at least

10  five hours, not that we intend to cover a lot of what

11  Mr. Katz has covered.  But, again, this is --

12            THE COURT:  I would hope not since you all

13  have a common interest agreement.

14            MR. MANCILLA:  Yeah.  It's just that there

15  are two separate cases so there's a lot of -- part of

16  agreeing to do these joint depositions is just going to

17  be --

18            THE COURT:  I agree.  Look, I'm willing to

19  give you some extra time because it's two cases.

20            MR. MANCILLA:  Right.

21            THE COURT:  Not necessarily because there's

22  multiple defendants.  You guys just need to coordinate

23  better if that's your issue.

24            MR. SCHAALMAN:  I would just remind the

25  Court that I don't believe that the discovery in the

1   430 case is still open.  I think we agreed that we

2   could use discovery in that case but to say that they

3   now have an additional reason to because of that other

4   case -- we've noticed in this case.  We agreed that

5   once it's noticed in this case (ui).

6              THE COURT:  Was she ever deposed in the

7   other case?

8              MR. SCHAALMAN:  No.  They never requested

9   her deposition in the other case.

10             MR. MANCILLA:  We agreed on a joint

11  discovery schedule, and I think I have emails with one

12  or two of them or maybe both of them, agreeing that the

13  depositions would be joint, in an effort to save

14  everybody money.  It's frankly a little disingenuous

15  now to try to back out of that under these

16  circumstances.

17             MR. SCHAALMAN:  We're not backing out of any

18  agreement.  I don't think you're stating what the

19  agreement was.

20             MR. MANCILLA:  Okay.

21             THE COURT:  Look, she's a plaintiff, she

22  brought the case in New York.  If they want to do the

23  depositions in New York, she's going to have to do the

24  depositions in New York.  If she can't do it next week

25  because she's in Chicago, then you're just going to

1   have to pick another day after the trial.

2           MR. MANCILLA:  We still haven't been

3   informed that she's unavailable on the 14th or the 16th.

4   That question was never answered.  Defense counsel is

5   available, all of us.

6           MR. SCHAALMAN:  Well, Ms. Abraham has shown

7   me a transcript in which -- we were criticized by the

8   other side for not having provided notices in the other

9   case.  But, your Honor, she's not available next week,

10  she's not available this week.  It's going to have to

11  be after the trial.  Again, your Honor, I know you feel

12  that she's the plaintiff.  She's really a nominal

13  plaintiff.  She is the guardian of the minor children.

14  The minor children certainly don't have to know the

15  facts in this case.  They're 11 and 13, I believe, or

16  10 and 12.  They're there because they are contingent

17  beneficiaries of the SNT.

18          THE COURT:  Yeah, but if she didn't have

19  personal knowledge, it wouldn't take them ten hours to

20  depose her.

21          MR. SCHAALMAN:  Well, that's an interesting

22  -- that's a whole nother question, why it takes them

23  ten hours.

24          MR. DAIN:  Your Honor, I do want to say

25  she's not a nominal defendant.  She drafted the

1  complaint.

2          MR. SCHAALMAN:  Having this done in Chicago

3  is just an eminently reasonable (ui).

4          MR. DAIN:  She drafted the complaint in this

5  case.

6          MR. SCHAALMAN:  There is really no reason to

7  drag Ms. Black back to New York.  I really think it's

8  terribly unfair.  Again, two of the lawyers are going

9  to be there already and Mr. Katz has no more questions

10  to ask.  He can certainly dial in.  Mr. Dain has felt

11  very capable of dialing in and participating by phone.

12          MR. DAIN:  Your Honor --

13          MR. SCHAALMAN:  This isn't done for any

14  reason other than (ui).

15          MR. DAIN:  Ms. Black is not a minor

16  plaintiff.  She drafted the complaint, she orchestrated

17  the litigation.  It's clear by saying that she

18  represents the two minor children -- of course, we

19  can't depose the two minor children.  They don't the

20  facts, she does.  She drafted the entire complaint,

21  two-hundred-and-some pages of it.  That's why obviously

22  with that case and the other case, it's taking longer.

23  I just wanted to make that clear.  I think five hours,

24  if we could get five hours, would be sufficient, but

25  I'll let the other attorneys address who were in New

1    York -- Mr. Katz may have followup questions after

2    we're done, and Mr. Schaalman may ask some questions

3    that lead to followup questions.

4            MR. SCHAALMAN:  Whether she drafted the

5    complaint, whether she knows things, it has more to do

6    with the time that it takes.  She clearly, in terms of

7    where she should be deposed, is a nominal plaintiff at

8    best.  If she weren't the guardian of these two minor

9    children, if she were merely a witness, we would have

10   never done this deposition in New York.  We would have

11   done it in Chicago.  Everybody knows that and this is

12   only to make her life more difficult.  She has two

13   young children, she's facing another trial that she's a

14   plaintiff in, which is going to trial on the 20th of

15   August.  I just think this is a very reasonable

16   accommodation and I think the Court has the power to do

17   that.

18           THE COURT:  Look, in the first instance, if

19   you knew that this deposition was going to take over

20   seven hours, you should have either agreed on something

21   ahead of time or if you couldn't agree, you should have

22   brought it to my attention ahead of time instead of

23   waiting until after your seven hours are up and now

24   asking for more time.  You could have coordinated

25   things better.  You certainly could have coordinated it

1  so that the New York attorneys asked their questions

2  while she was in New York, and then the lawyers that

3  were going out to Chicago could finish up while she's

4  in Chicago. At the very least, if you knew it was

5  going to be over multiple days, you could have had two

6  successive days just to get it over with, instead of

7  letting her go all the way back to Chicago and now

8  forcing her to come back.

9          THE COURT: Where does Bernard Black live?

10         MR. SCHAALMAN: In Chicago. He returned

11 from Israel. Both of them are starting their

12 tournament at Northwestern University Law School in the

13 next month or so, so they've come back for that.

14         MR. MANCILLA: Could we plan maybe to do

15 Bernard's deposition then on the 7th and the 8th, to

16 avoid those situations?

17         THE COURT: I think you should do it in two

18 successive days.

19         MR. MANCILLA: He's already going tomorrow

20 so then Thursday I believe is open. It's in between

21 actually -- we're doing another deposition of Samuel

22 Black on the 9th.

23         MR. SCHAALMAN: I'm not available. I'm

24 leaving, your Honor. I'm going to Chicago (ui).

25         MR. MANCILLA: Did you plan on asking him

1   any questions because I think he's going to be

2   represented by separate counsel.  Ms. Besunder is going

3   to be there, at the office at which he's requesting to

4   take his deposition.  So he has independent counsel

5   appearing on the 7th and the 8th.  I don't want to speak

6   out of turn but Mr. Schaalman -- I don't expect him to

7   ask any questions of Mr. Black.

8              MR. SCHAALMAN:  You're incorrect.  I'm

9   representing (ui).  Now we're not using the offices

10  (ui).  We're going to Esquire Court Reporting, as the

11  Court has just indicated.

12             MR. MANCILLA:  So Ms. Besunder -- you don't

13  expect her to attend?

14             MR. SCHAALMAN:  I don't know.

15             THE COURT:  I'll give you four extra hours

16  for both Mr. and Mrs. Black.

17             MR. MANCILLA:  Is that four each, your

18  Honor?

19             THE COURT:  Four total for each.

20             MR. MANCILLA:  Four each, right, four for

21  Ms. Black and four for Mr. Black?

22             THE COURT:  Yeah.

23             MR. MANCILLA:  Okay.

24             THE COURT:  I thought you were saying four

25  each for each of you.

1          MR. MANCILLA:  No.  Judge, I'm sorry, I

2    didn't mean to -- I'm sorry for making a confusing

3    comment.

4          THE COURT:  When is Mr. Black supposed to go

5    to Chicago?

6          MR. SCHAALMAN:  Your Honor, I don't know

7    but, again, he would be willing to be deposed in

8    Chicago on the same day that Ms. Black is being

9    deposed.  The suggestion that the Court has made -- if

10   Mr. Katz will share his time with counsel for Ms.

11   Cohenson tomorrow, I don't imagine he'd have much to

12   ask.  At this point, then the New York phase would be

13   finished and we could do the deposition in New York, in

14   Chicago along with Ms. Black because, again, Ms.

15   Wrigley and Mr. Pinto (ui) Mr. Dain (ui).  Again, it

16   would be quite efficient.  Then we have another long

17   day, each for four hours, and we can do that in Chicago

18   (ui).

19          MR. MANCILLA:  We have to coordinate airfare

20   and also get extensions or additional housing while

21   we're there.  So it's really -- even though we're going

22   to be there for the trial, we're not doing this during

23   the trial and it's going to be an extra cost to us, not

24   to mention the work that we're missing staying out of

25   New York.

1          MR. SCHAALMAN:  But you don't even know how

2   long the trial is going to last.  It could be a day

3   shorter than you believe and then we'd be able to get

4   these depositions done and you would not have stayed an

5   extra day.

6          MR. MANCILLA:  Possibly.

7          THE COURT:  I don't know how --

8          MR. MANCILLA:  I highly doubt that.

9          THE COURT:  I don't know how logistically

10  you're going to do it.  Since you don't know exactly

11  when the trial is going to end, you're going to have to

12  have a court reporter on standby.

13          MR. SCHAALMAN:  That would really not be a

14  difficulty in Chicago.

15          THE COURT:  No?  All right.

16          MR. SCHAALMAN:  You can call them up the

17  same morning.  We would certainly know the night

18  before, when the case goes to the jury.

19          MR. MANCILLA:  I think that it's going to go

20  so long that the judge has already indicated that he's

21  probably going to set limits on us, so I think we're

22  going probably until the 28th or 29th, and we're set to

23  leave on the 31st.  That's leaving a day for the jury.

24  I think that was the preliminary discussion, that the

25  testimony would go to the 29th and then we get one day

1  for the jury, and we're set to leave on the 31st.

2  Again, I'm really not trying to be difficult.  It's

3  just, candidly, these are the costs that we would have

4  to incur to accomplish this.

5          MR. SCHAALMAN:  While the jury is out,

6  certainly one of the two of you who are trying the case

7  could certainly do the depositions.

8          MR. MANCILLA:  We certainly could not do a

9  deposition of Ms. Black while the jury is out because

10  jury notes that come in -- those are issues that are

11  taken up on appeal pretty regularly.

12          MR. SCHAALMAN:  One of you could be sitting

13  and waiting for the jury and the other could be taking

14  the deposition.  You have two lawyers.  Yeah, but we're

15  not asking to take the deposition.

16          MR. MANCILLA:  Bernard could stay an extra

17  day on the 8th and she can handle it.

18          MR. SCHAALMAN:  I don't know what his

19  schedule is.  You haven't noticed for it.  You noticed

20  yesterday -- you noticed one day.  You didn't notice

21  more than one day for Bernard.

22          MR. MANCILLA:  We noticed Katherine Black

23  for next week.

24          MR. SCHAALMAN:  Yesterday, while she was

25  taking her deposition, they cutely served a notice on

1  us for next week.  Yes, you did, but you didn't do that

2  -- even last night, you didn't do it for Bernard for

3  another day.

4          MR. MANCILLA:  We were having that

5  discussion.

6          MR. SCHAALMAN:  Bernard is here for one day.

7  He's here for one day, as far as I know.  I don't know

8  what his schedule is.

9          MR. MANCILLA:  Why don't we call him and

10  avoid all this bickering.  Can we make one phone call

11  quickly to ask him if he's available on the 8th?

12          MR. SCHAALMAN:  I already told you I'm not

13  available on the 8th.

14          MR. MANCILLA:  But you've got two lawyers,

15  as you just reminded us of.

16          MR. SCHAALMAN:  I'm the one he's asked to

17  defend the deposition.  If he's available on the 8th, we

18  might be able to make it work, but I don't know that he

19  is.  I can't make a commitment to the Court on that.

20          MR. MANCILLA:  It's 4:04 in Chicago.  You

21  can't just call him right now to try to --

22          MR. FANTONE:  He should be here.  His

23  deposition is tomorrow at 9:00 a.m.

24          MR. MANCILLA:  Oh, right.

25          THE COURT:  Look, I'm not dealing with this.

1    You guys figure out the logistics.  This isn't rocket

2    science.  Figure it out.  Whatever you end up doing,

3    you end up doing.  If you can't agree on stuff and you

4    want to file a motion for costs, go for it.

5              MR. MANCILLA:  Okay.

6              THE COURT:  But I'm not going to try to

7    coordinate your schedules.

8              MR. MANCILLA:  Fair enough.

9              THE COURT:  You'll figure it out on your

10   own.  Anything else?

11             MR. KATZ:  I think the last thing, Judge, is

12   just the deadline for the defendants to serve their

13   expert reports, which is currently I believe September

14   9th.  But as a result of us not going to be finished

15   with these depositions, it looks like --

16             THE COURT:  Why don't you finish the

17   depositions first and then you'll have a better idea of

18   how long you need.  You can just put in a written

19   request to extend the deadline.

20             MR. KATZ:  Okay.

21             THE COURT:  I don't want to just arbitrarily

22   pick a day now.  You don't even know when these

23   depositions are going to be done.

24             MR. KATZ:  That's fine.  I just wanted to

25   make sure that we would be able to get an extension

1    given that the schedules are being extended.

2              THE COURT:  That's fine.

3              MR. KATZ:  Thank you, your Honor.

4              MR. SCHAALMAN:  I don't want to test the

5    Court's patience but I just want to make sure I

6    understand what you're asking us to do.  Are you asking

7    us to negotiate also the possibility of Katherine

8    Black's deposition being taken in Chicago?

9              THE COURT:  I'm asking you to discuss all of

10   the logistics of the two depositions and try to come to

11   an agreement for both of them that is most convenient

12   for the most number of people.

13             MR. SCHAALMAN:  Thank you.

14             THE COURT:  And if you can't do that and you

15   end up having to do something that's inconvenient and

16   you want to make a motion for costs on that basis,

17   either side is more than welcome to do that.

18             MR. KATZ:  Thank you, your Honor.

19             MR. MANCILLA:  Thank you, your Honor.

20             MR. DAIN:  Thank you, your Honor.

21             THE COURT:  All right, have a good day.

22                       *  *  *  *  *  *

23

24

25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18          I certify that the foregoing is a correct

19    transcript from the electronic sound recording of the

20    proceedings in the above-entitled matter.

21

22

23

24

25    ELIZABETH BARRON                    May 11, 2020