# Exhibit D

```
 1            UNITED STATES DISTRICT COURT
 2         FOR THE NORTHERN DISTRICT OF ILLINOIS
 3
 4   KATHERINE BLACK,
 5           Plaintiff,
 6      vs.                    CIVIL ACTION NO. 17-CV-101
 7   CHERIE WRIGLEY, et al.,
 8           Defendants.
     _____
 9
10
11       VIDEOTAPED DEPOSITION OF ANTHONY J. DAIN
12
13               September 6, 2018
14                  9:11 a.m.
15
16
17        1230 Columbia Street, Suite 400
18               San Diego, California
19
20
21
22
23   REPORTED BY:
24   Renée C. Roberts
25   CSR No. 6910
```

```
 1   APPEARANCES:

 2
          For Plaintiff Katherine Black:
 3
               HALLING & CAYO, S.C.
 4             MICHAEL H. SCHAALMAN
               320 East Buffalo Street, Suite 700
 5             Milwaukee, Wisconsin 53202
               414.271.3400
 6             mhs@hallingcayo.com

 7                  -AND-

               SHARAN R. ABRAHAM, ESQ, PLLC
 8             SHARAN R. ABRAHAM (TELEPHONICALLY)
 9             37 South Street
               Roslyn Heights, New York 11577
10             516.672.1039
               sharanrabraham@gmail.com
11

12

13        For Defendant Cherie Wrigley:

14             MANCILLA & FANTONE LLP
               ROBERT FANTONE
15             ANDREW MANCILLA
               260 Madison Avenue, 22nd Floor
16             New York, New York 10016
               585.613.6204
17             robert@law-mf.com
               andrew@law-mf.com
18

19

20        For Defendants Melissa Cohenson and Brian A. Raphan,
          P.C.:
21
               LITCHFIELD CAVO LLP
22             THOMAS M. CRAWFORD
               303 West Madison Street, Suite 300
23             Chicago, Illinois 60606
               312.781.6677
24             crawford@litchfieldcavo.com

25
```

```
 1   APPEARANCES (CONTINUED):

 2        For Defendant Pamela Kerr:

 3             MANDELL MENKES LLC
               STEVEN L. BARON (TELEPHONICALLY)
 4             DANIELLE N. TWAIT (TELEPHONICALLY)
               One North Franklin, Suite 3600
 5             Chicago, Illinois 60606
               312.251.1017
 6             sbaron@mandellmenkes.com
               dtwait@mandellmenkes.com
 7

 8

 9        ALSO PRESENT:

10             CHERIE WRIGLEY

11             MICHAEL DUARTE, VIDEOGRAPHER

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1   Ms. Cohenson, me, Mr. Salzman and Ms. Young.  The subject
2   matter is as I said.
3        Q.   And if I'm understanding this exhibit correctly,
4   the next person to respond to Ms. Kerr's e-mail was
5   Melissa Cohenson?  Is that why she's listed as the next
6   author?
7        A.   I believe that -- that's correct.  There may
8   be -- as we go along, there might have been one that -- I
9   mean, it's possible that in putting them together, I got
10  one out of order.  But I -- I think that's generally
11  correct.
12       Q.   Okay.  And thank you for -- for indicating that
13  these are in the wrong order.  At a break, we'll
14  reassemble Exhibit 1.  And it should -- it should read --
15  the bottom page should be the first page.  The top --
16  what is now the top page should be the second page.  The
17  next page, which has a Number 3 on it, should be the
18  third page of the exhibit?
19       A.   Yes.  But, I mean, the way they're numbered, it
20  makes it pretty clear.  So I don't know if you need to do
21  that or not.
22       Q.   Yeah.  And the -- and the fax cover sheet is not
23  a part of your exhibit at all?
24       A.   Correct.
25       Q.   Okay.  Now, in this e-mail string, you have --

Case 1:16-cv-01238-CBA-ST   Document 246-4   Filed 05/14/20   Page 6 of 13 PageID #: 7982

```
 1   you have claimed common interest and attorney-client
 2   privilege.  Were you representing any parties to this
 3   matter when this e-mail string was sent to you?
 4       A.   Yes.
 5       Q.   Who were you representing?
 6       A.   Cherie Wrigley.
 7       Q.   And when did you begin representing Cherie
 8   Wrigley?
 9       A.   Back in probably 1982.
10            Not to be glib, but I've always represented my
11   sister.  She always asks me for legal advice.  So in
12   addition to being her brother, I would consider myself
13   her attorney for any matter that she needed legal advice.
14       Q.   So 1982 was basically the year after you
15   graduated from law school?
16       A.   Yeah.  I think that it was the year I was sworn
17   in.
18       Q.   Okay.  So you've been her lawyer for 20 -- 36
19   years?
20       A.   Yeah.  That's correct.
21       Q.   Now, I assume that -- that Ms. Wrigley hasn't
22   needed legal advice from you every one of those 36 years?
23       A.   Not in the normal sense.  But, look, she could
24   have real estate issues that come up and she would call
25   me.  She would have -- while she was teaching, she would
```

```
 1   have instances where parents would complain and she would
 2   call me.  So, I mean, in terms of answering questions, or
 3   she just might have general legal questions.  But not
 4   on -- in terms of lawsuits or anything, no.
 5        Q.   In 2016, did -- you were obviously at Procopio;
 6   correct?
 7        A.   Correct.
 8        Q.   Did you open a new matter or a file number for
 9   the guardianship matter in which this string of e-mails
10   was entered?
11        A.   No.  I'm an owner of Procopio.  I have a right
12   to represent my family pro bono.  I don't need to open up
13   a new matter.
14        Q.   Okay.  That's a firm policy, that the lawyers
15   there can represent family members without identifying
16   them as clients to other members of the firm?
17        A.   I'm not going to get into what our firm policy
18   is.  I'm not required to do it.  That's all I'll say.
19        Q.   Okay.  And you did a conflicts check, no doubt,
20   to make sure that in representing your sister, you had no
21   conflicts?
22        A.   I had no conflicts.
23        Q.   At the time you were representing your sister in
24   2016, was she represented by any other attorneys?
25        A.   She may have been.  I don't know.  I don't -- I
```

1   don't recall exactly when she would have hired the first
2   attorney that represented her.  But even today I still
3   consider that I'm her attorney for purposes of advice,
4   even if she has other counsel.
5        Q.   At the time Ms. Kerr sent the e-mail -- started
6   the e-mail string -- and as I understand it, she was the
7   initiator?
8        A.   Yes.
9        Q.   -- was there a written joint defense agreement
10  in place between counsel for the defendants in the
11  guardianship matter?
12       A.   I don't believe it was written.  I believe, at
13  that time, it was oral.  And when you say "joint defense
14  agreement," you're equating that to common interest?
15       Q.   Well, you could call it a common interest
16  agreement, but I think it's -- you and I would agree,
17  it's commonly known as a joint defense agreement when --
18       A.   Not always.  I mean, you could be plaintiffs --
19       Q.   Again, Mr. -- you have to let me finish the
20  question.
21       A.   Okay.
22       Q.   Go ahead.
23       A.   Well, I'm not agreeing, is what I'm saying.
24            You can have common interest agreements among
25  plaintiffs.  You could have common interest agreements

```
 1   when there's no lawsuit existing.
 2       Q.   Was there ever an oral agreement, either common
 3   interest or joint defense among counsel, in the
 4   guardianship matter?
 5       A.   Among parties in not just the guardianship
 6   matter, but in parties that had a common interest in
 7   Colorado, I believe in New York, either Bernard had
 8   already threatened litigation or brought litigation.  I'm
 9   not sure.  So it wasn't just limited to Colorado.  We --
10   we had common interest in litigation, in addition to the
11   conservatorship.
12       Q.   I think we probably ought to make sure -- I
13   ought to make sure that we're talking about the same
14   terms here.  So I didn't define things for you.
15            Can we agree that when I refer to "the
16   guardianship matter," I'm talking about the matter in
17   Richmond County, New York?
18            (Telephone interruption)
19            MR. SCHAALMAN:  Excuse me.  I should have turned
20   this off.
21            THE WITNESS:  I -- I don't know that that's
22   fair, because I believe Mr. Black also brought a
23   guardianship proceeding in Colorado.  So you could, but
24   you might have to occasionally clarify.
25   ///
```

```
 1  BY MR. SCHAALMAN:
 2      Q.   Okay.  Well, let -- let's -- between us, and you
 3  can certainly answer any way you think is appropriate,
 4  when I refer to "the guardianship matter," I'm talking
 5  about the matter in front of Justice Alliota in Richmond
 6  County.
 7      A.   Okay.
 8      Q.   Okay?
 9           In the guardianship matter, when was -- to your
10  knowledge, when was a common interest or joint defense
11  agreement reached?
12      A.   It probably would have been reached as soon as
13  it came on the radar, whether that was when there was a
14  first filing or when there was a discussion about a first
15  filing.  And I don't know when they -- the date of that
16  would have been.
17      Q.   And -- and between whom was that agreement
18  reached?
19      A.   It would have been among all the parties that
20  had an interest in that.  So it would have been among Ira
21  Salzman, Joanne Black, Cherie Wrigley, Melissa Cohenson
22  and her -- her employer, Mr. Raphan, any other party to
23  that.  Esaun Pinto, would have been involved.  I don't
24  know if he had counsel at that time.  It would have
25  been -- it would have included me and any other parties
```

1  that had a common interest in assisting or defending
2  Joanne Black's interests.
3      Q.   And what was -- to your knowledge, what was
4  the -- the state of the agreement?
5      A.   I don't understand what you mean.
6      Q.   What did the agreement cover?  What was the
7  scope?  What was its purpose?
8      A.   It covered the common interest in the
9  conservatorship proceedings in Colorado, the guardianship
10 proceedings in Colorado, the guardian proceedings in
11 New York, the threatened litigation by Bernard Black and
12 his various counsel in New York.  It included then the
13 litigations in New York, both the litigation against
14 Ms. Wrigley, Ms. Pinto -- Mr. Pinto and his company, I
15 think CPA or C -- whatever his -- his private
16 investigation company was.  It included -- and then it
17 broadened to include his threats of litigation and other
18 litigation against Joanne Black, including his purporting
19 to represent the issue trust in suing Joanne Black in
20 Illinois.  It included the subsequent threats to sue
21 Ms. Wrigley, Ms. Kerr, Ms. Cohenson, Mr. Raphan, in
22 Illinois, in the subsequent litigation in Illinois.
23 Included the FINRA litigation that Mr. Black brought, and
24 it includes the collusive judgments that Mr. Wrigley and
25 Ms. Litvak and Ms. Dal brought, and all actions related

1    to that.  And it includes any other threatened litigation
2    and actions that Bernard Black has made in its broad or
3    his family has made in broad.
4         Q.   And -- and can you give us an approximate date,
5    month or year, when this common interest joint defense
6    agreement was reached?
7         A.   I think among the first smaller group, it was
8    probably at least as early as 2014, probably when
9    Mr. Black first threatened litigation.  His e-mail that,
10   quote/unquote, "When I fight, I fight hard."  That he
11   would consider Ms. Wrigley's actions a breach of her
12   fiduciary duty.  So that's probably the fall of 2014.  So
13   at least as early as that.
14            And -- and then it encompassed every litigation
15   since then.  It's since been reduced to writing.  But
16   initially it was oral.
17        Q.   And when was it reduced to writing?
18        A.   I know there were drafts going back and forth
19   and back and forth.  Sometime earlier this year.  I can't
20   give you an exact time.  Sometime earlier this year.
21        Q.   And do you have a copy of a final agreement
22   which has been signed by others?
23        A.   It was signed in counterparts.  I think -- I
24   think Ms. Kerr's counsel might have all the signatures.
25   But I -- I know I have a copy that has at least my

```
 1   signature and counterpart.
 2       Q.   And are you representing a party in this case?
 3   And by "this case," I'm talking about Black versus
 4   Wrigley, Case Number 17-CV-101?
 5       A.   No, I'm not representing a party in a formal
 6   appearance before the court, but I still advise
 7   Ms. Wrigley.
 8       Q.   And when you say "advise," you give her legal
 9   advice with regard to the matters involved in the case I
10   just mentioned?
11       A.   I do.
12       Q.   In this case?
13       A.   In this case.
14       Q.   And you realize you're appearing as a witness in
15   this case, being Black versus Wrigley 17-CV-101?
16       A.   Yes.
17       Q.   Have you identified yourself to any of the
18   courts in which any of the litigation you just mentioned,
19   as an attorney for a party?
20       A.   No.  Other than where I've appeared in pro se as
21   a party.
22       Q.   But you've not indicated to any of the courts
23   that you are also representing anyone other than
24   yourself?
25       A.   No.
```