UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF NEW YORK

SARAH H. BLACK, DANIEL L. BLACK and
JACOB L. BLACK,

        Plaintiffs,                                    Case No. 1:16-cv-01238(CBA)(ST)

v.

ANTHONY DAIN, CHERIE WRIGLEY, IRA
SALZMAN, MELISSA COHENSON,
BRIAN A. RAPHAN, P.C., PAMELA KERR,
ESAUN G. PINTO, and CPI INVESTIGATIONS

        Defendants.

---

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS'
MOTION FOR PARTIAL SUMMARY JUDGMENT**

---

Michael H. Schaalman, Esq.
GassTurek LLC
241 N. Broadway, Suite 300
Milwaukee WI 53202
414 224-7785
schaalman@gassturek.com

April 29, 2022

# Contents

Scope of Plaintiffs' Motion for Partial Summary Judgment ............................................... 1

Glossary of Defined Terms ............................................................................................. 1

I.  Summary of Argument ............................................................................................. 2

II.  Introduction and Dain's Actions in Periods 1 and 2 ...................................................... 6

    A.  Basic Background on the Trusts, Their Creation, Purpose, and Trustees................ 6

    B.  Background on the Colorado Conservatorship and the Disclaimer ......................... 8

    C.  2013:  Disclaimer Carried Out, SNT and Issue Trust Funded ............................. 15

    D.  Roth IRA ............................................................................................... 17

    E.  Dain's (In)action as Trustee in 2013 and 2014 ..................................................... 18

    F.  Dain Seeks to Reverse the Disclaimer In New York and Colorado ...................... 19

    G.  Alternatives to Reversing the Disclaimer ......................................................... 21

    H.  Settlement Offers in 2015 and Thereafter ........................................................ 23

    I.  Statements By Dain and Others about the Disclaimer to the DPC ......................... 24

    J.  2015 Hearing:  DPC Statements and Decision ................................................... 25

III.  Overview of Period 3 (Sept. 2015 through July 2018) ............................................... 26

    A.  Remaining Plausible Claims Against the Issue Trust ........................................ 26

    B.  Estate Accounting ...................................................................................... 27

    C.  2016:  Declaratory Judgment Action by Issue Trust Trustees in Illinois ............... 28

    D.  2016-2017:  Dain Spends SNT Funds on Litigation ......................................... 28

    E.  March 2018 FINRA Decision:  Trust Funds Cannot be Used for Litigation .......... 29

    F.  April 2018:  Dain Seeks to Defund the Trusts, Again ........................................ 30

    G.  May 2018: Chase Files an Interpleader Case in Illinois for Both Trusts ............... 31

IV.  Dain's Actions in Period 4 (July 2018 to Present) ..................................................... 31

V.  Threshold Legal Questions ....................................................................................... 33

    A.  Which State's Fiduciary Law Applies? ............................................................ 33

    B.  Dain's Continuing Fiduciary Duty to the Issue Trust ........................................ 35

    C.  Proximate Cause for the Issue Trust .............................................................. 36

    D.  Statute of Limitations for a Claim Against the Issue Trust ................................. 37

    E.  Burden of Proof, When a Trustee Attacks or Fails to Defend His Own Trust ........ 38

    F.  What Weight to Give to Statements by the DPC? .............................................. 38

VI.  Legal Analysis of Dain's Actions for the SNT ........................................................... 40

    A.  Duty of Loyalty; Duty to Defend the SNT When Dain Attacked in 2015 ............. 40

    B.  Duty Not to Attack the SNT ........................................................................ 43

    C.  Period 3:  Additional Bases for Defending the SNT in 2018 ............................... 44

    D.  Period 4:  Bases for Defending the SNT Today ................................................ 45

    E.  Duty of Impartiality Between SNT Beneficiaries .............................................. 46

    F.  Duty to Cooperate with Co-Trustees .............................................................. 48

    G.  Dain's Expected Reliance on Statements by the DPC ....................................... 50

VII.  Legal Analysis of Dain's Actions for the Issue Trust ............................................. 50

    A.  Duty of Loyalty; Duty to Defend ....................................................................... 50

    B.  Duty Not to Attack the Issue Trust ................................................................... 53

    C.  Additional Defenses Against Defunding the Issue Trust in Periods 3 and 4 .......... 53

VII.  Relief Requested .................................................................................................. 53

    A.  Relief Requested for the SNT ............................................................................ 53

    B.  Relief Requested for the Issue Trust ................................................................. 54

**Cases**

*Bernard Black and Samuel Black, as SNT Trustees v. Joanne Black and Anthony Dain,*
Case No. 2021 CH 6049 (Cir. Court for Cook County IL,
Chancery Division (Dec 6, 2021) .......................................................................32

*Boles v. Lanham,* 865 N.Y.S.2d 360 (App. Div. 2d Dep't 2008) ...........................41

*Burrows v. Palmer,* 5 Ill. 2d 434 (1955) ...............................................................47

*Campbell v. Alberts,* 313 Ill. App. 152 (1942).................................................40-41

*Davidson v. McClellan,* 16 P.3d 233 (Colo 2001) ................................................51

*Ehrlinger v. Parker,* 372 P.2d 267 (1958) .............................................................51

*Giagnorio v. Emmett C. Torkelson Trust,* 292 Ill. App. 3d 318 (1997)................44

*Grot v. First Bank of Schaumburg,* 292 Ill. App. 3d 88 (1997)............................44

*Illinois National Bank v. Givin,* 390 Ill. 345 (1945) ............................................45

*In re Adoption of P.H.A.,* 899 P.2d 345 (Colo App. 1995)....................................51

*In re Chase Manhattan Bank,* 6 N.Y.3d 456 (2006)..............................................44

*In re Heller,* 6 N.Y.3d 649 (2006) .........................................................................46

*In re Luckenbach's Will,* 303 N.Y. 491, 104 N.E.2d 870 (NY Ct. App. 1952).....35

*In re Watson,* 213 N.Y. 177 (1914) .......................................................................47

*In re Will of Gleeson,* 5 Ill. App. 2d 61 (1955)......................................................40

*In the Interest of Joanne Black, Protected Person v. Bernard Black,*
422 P.2d 592 (Colo. App. 2018)..............................................................26

*In the Matter of Joanne Black, Protected Person v. Bernard Black,*
482 P.3d 460 (2020)..............................................................................30

*JP Morgan Chase Bank v. [Issue Trust],*
2017 WL 1807879 (NY Supr., New York County)...............................27, 34

*Laubner v. JP Morgan Chase Bank, N.A.,* 386 Ill. App. 3d 457 (2008)................43

*Martinez v. Dixon,* 710 P.2d 498 (Colo. App. 1985) .............................................51

*Meinhard v. Salmon,* 249 N.Y. 458 (1928)............................................................41

*Milea v. Hugunin*, 2009 WL 1916400, at *7 (Sup.Ct. Onondaga Cty.) ...............47

*Northern Trust Co. v. Heuer,* 202 Ill. App. 3d 1066 (1990)..................................47

*Rennacker v. Rennacker,* 156 Ill. App. 3d 712 (1987) ...............................40-41, 48

*Salter v. Jefferson Cnty.*, 292 P.2d 345 (Colo. 1956) ............................................51

*Sauvage v. Galloway,* 329 Ill. App. 38, 66 N.E.2d 740 (1946) .............................41

*Scanlan v. Eisenberg,* 669 F.3d 838 (7th Cir. 2012)................................................47

*Schlosser v. Schlosser,* 218 Ill. App. 3d 943 (1991) ................................................45

*Wallace v. Malooly,* 4 Ill 2d 86 (1954) ................................................................40

*Weingarten v. Warren,* 753 F. Supp. 491 (S.D.N.Y. 1990).....................................46

## Statutes

735 ILCS 5/13-205 ................................................................................................37

760 ILCS 5/12 .......................................................................................................36

C.R.C.P. 60 (b)...............................................................................42, 45, 46, 51

C.R.S. § 13-80-108 ...............................................................................................37

C.R.S. § 15-11-1201 .......................................................................................11, 50

C.R.S. § 15-11-1205 .......................................................................................26, 50

C.R.S. § 15-11-1206 ..............................................................................................11

C.R.S. § 15-14-324 ................................................................................................11

F.R.C.P. 60.............................................................................................................51

Uniform Trust Code § 706(b)(2) (2000) ...............................................................48

## Other Authorities

Bogert, *The Law of Trusts and Trustees* § 541 ......................................................47

Bogert, *The Law of Trusts and Trustees* § 581 ................................................41, 43

Frost, Martyn, *Trusts in Prime Jurisdictions* (Alon Kaplan ed., 2000) .................43

Restatement (Third) of Trusts § 37.........................................................................48

Restatement (Third) of Trusts § 76.........................................................................43

Restatement (Third) of Trusts § 78...................................................................36, 40

Restatement (Third) of Trusts §§ 79(1), 79(2)......................................................47

New York Estate Probate and Trust Law § 7-2.6 ..................................................35

New York Surr. Ct. Proc. Act 207 (1) ...................................................................34

Rounds, Charles E, Jr., *Loring: A Trustee's Handbook* (8th ed. 2006) ...................43

Turano, Margaret, *Practice Commentary to N.Y. Estate Powers and Trusts Law*............................................................................................................35

Wardle, Lynn D. & Nolan, Laurence C., *Family Law in the USA* (2011)...............43

## Scope of Plaintiffs' Motion for Partial Summary Judgment

The plaintiffs seek partial summary judgment against Defendant Anthony Dain ("**Dain**"), as to liability, for the following counts in the amended complaint with damages to be determined at trial.[1] For the Supplemental Needs Trust for the Benefit of Joanne Black (the **"SNT"**):

15. Breach of Duty of Impartiality through Efforts to Defund the SNT.
16. Breach of Duty of Impartiality through Effort to Expend SNT Assets to Benefit Primary Beneficiary at Expense of Remainder Beneficiary
17. Breach of Duty of Loyalty to Remainder Beneficiaries of the SNT through Efforts to Defund the SNT.
28. Breach of Duty to Defend the SNT against Litigation to Defund It.
31. Breach of Duty to Obey the Terms of the SNT, through Attempts to Defund the SNT.
36. Breach of Duty to Cooperate with Co-Trustees of the SNT.

For the Irrevocable Trust for the Benefit of the Issue of Renata Black (the "**Issue Trust**"):

1. Breach of Duty of Loyalty to Beneficiaries of Issue Trust through Efforts to Defund the Issue Trust.
8. Breach of Duty of Loyalty to Beneficiaries of the Issue Trust, through Representing a Non-Beneficiary in Litigation against the Issue Trust.
9. Breach of Duty to Defend the Issue Trust against Litigation to Defund It.
12: Breach of Duty to Obey the Issue Trust Instrument, through Attempts to Defund the Issue Trust.

## Glossary of Defined Terms

| Defined Term | Meaning |
|---|---|
| 2013 Trust | Joanne Black 2013 Trust |
| Bernard | Bernard Black, trustee of the Issue Trust and the SNT, executor for Renata's estate, and conservator for Joanne from 2012-2015 |
| Black family trusts | The Issue Trust and the SNT |
| Chase | Chase Bank and its securities affiliate, J.P. Morgan Securities |
| Chase Bank | JPMorgan Chase Bank, N.A. |
| Dain | Anthony Dain, trustee of the Issue Trust and the SNT |
| DiPonio | Lisa DiPonio, Esq., Joanne's court-appointed Colorado counsel |
| DPC | Denver Probate Court |
| EPTL | New York Estate, Probate and Trust Law |
| FINRA | Financial Institutions Regulatory Authority |
| Glatstein | Carl Glatstein, Esq., Bernard's Colorado counsel |
| Goodwin | Jeanette Goodwin, Joanne's conservator, appointed by the DPC |
| Harper | Melinda Harper, CPA |
| Harper Affidavit | Affidavit of Melinda Harper (Feb. 20, 2020) |

---

[1] Relative to their pre-motion submission, seeking leave to move for summary judgment, the plaintiffs have removed several counts, in the interests of simplifying and shortening this motion.

| Defined Term | Meaning |
| --- | --- |
| Issue Trust | Irrevocable Trust for the Benefit of the Issue of Renata Black |
| Joanne | Joanne Black |
| NDIL Interpleader Case | Chase v. Bernard Black et. al, Complaint for Interpleader and Declaratory Relief, Case 18-cv-03447 (N.D. Ill.) |
| Renata | Renata Black, the mother of Bernard and Joanne |
| Salzman | Ira Salzman, Esq., counsel to Joanne in New York |
| Samuel | Samuel Black, trustee of the Issue Trust and the SNT |
| SNT | Supplemental Needs Trust for the Benefit of Joanne Black |
| SSDI | Social Security Disability Insurance |
| Wrigley | Cherie Wrigley, Dain's sister and co-Defendant |

## I. Summary of Argument

This case is factually complex, made so by the extraordinary misconduct of trustee Dain in attacking and seeking to defund his own trusts multiple times, from 2015 to the present; and launching or fostering litigation in several states against the trusts and their trustees. But it is legally simple. Dain has acted, and continues to act, far outside the bounds of his fiduciary duty.

In 2015, while a trustee of the Issue Trust and the SNT (together, the "**Black family trusts**"), Dain claimed that a disclaimer that Bernard Black ("**Bernard**") carried out in 2012 as conservator for his sister, Joanne Black ("**Joanne**"), should have resulted in *all* of the disclaimed assets flowing to the SNT, rather than the actual distribution of the disclaimed assets under Renata Black's ("**Renata**") will, under which two-thirds of residual assets flow to the SNT and one-third to the Issue Trust. A sensible remedy for this perceived wrong would have been to transfer funds from the Issue Trust to the SNT. Dain never sought that remedy and rejected it when Bernard, his co-trustee for both trusts, offered it in settlement. He instead used his trustee status to pursue the "remedy" of reversing the disclaimer, which would have completely defunded both trusts. Dain's effort failed; the disclaimer remained in place. Dain has continued to seek to defund both trusts since then. These efforts violate his duty of loyalty to both trusts, his duty to defend the trusts and his duty of impartiality between SNT beneficiaries.

The amount at stake – the funds that flowed to the Issue Trust as a result of the disclaimer – was around $1 million. Dain's litigate-first-and-often strategy has imposed costs on the two trusts that approach $6 million, yet achieved no recovery.

2

*Dain's expected defenses*. Dain cannot deny using his trustee status to attack and seek to defund the Black family trusts. He will instead throw mud at Bernard. But this case is about Dain's conduct as trustee, not Bernard's conduct as conservator. Dain is also expected to argue that his conduct in attacking the trusts falls within an exception to the usual duty of loyalty.

Plaintiffs believe that, as a matter of law, a trustee can **never** attack and seek to defund his own trust in litigation. This bar is part of the broader duty of loyalty, and has no exceptions. Moreover, a trustee has a strict duty to defend the trust against attacks by others: the trustee must defend unless there is no reasonable basis for defense. The trustee, however, still cannot attack. At a minimum, a trustee cannot seek to defund his own trusts if a less extreme alternative exists, as here, where the remedy of transfer of funds from the Issue Trust to the SNT was available.

Even if this court were to rule that attack on one's own trust is permitted in exceptional cases, similar to when a trustee can refuse to defend his trust against attack by others, defense was manifestly reasonable in 2015 when Dain attacked, since his effort to reverse the disclaimer failed. Nor can defense be considered futile thereafter, given that the 2015 attack failed.

Dain cannot claim that he had no choice but to seek to defund the trusts. He had a duty to cooperate with his co-trustees and see if settlement could be reached. Bernard offered to settle in 2015 by transferring *all* Issue Trust funds to the SNT – a full remedy for the harm that Dain asserted! Dain however, refused to discuss settlement, then and since.

Dain also cannot deny acting, as an SNT trustee, to favor Joanne (the primary SNT beneficiary) over the Issue Trust (the remainder beneficiary).[2] This is a clear violation of his duty to act impartially as between beneficiaries, including a primary and remainder beneficiary.

*Relevant time periods*. This case involves four distinct time periods, which are relevant to the SNT, the Issue Trust, or both.

*Period 1. Pre-attack period*. The first relevant period is from 1997 until Dain and his sister Cherie Wrigley ("**Wrigley**") launched their assault on the Black family trusts in September

---

[2] Plaintiffs will seek to prove at trial, that Dain's motive was to benefit himself and his sister. They accept arguendo for purposes of this motion that Dain sought to favor Joanne over the Issue Trust and its beneficiaries.

2014. This period began in 1997 when Renata established her estate plan, wrote her will, and created the Black family trusts). It includes her death in 2012; Bernard becoming Joanne's conservator in 2012 and carrying out a disclaimer on her behalf, as authorized by the Denver Probate Court (the "**DPC**"); and his actions as executor of Renata's estate, in distributing the $3 million in disclaimed assets under Renata's will, 2/3rds to the SNT and 1/3rd to the Issue Trust.

*Period 2. First Effort to Defund the Trusts*. The second relevant period covers September 2014 through September 2015. During this period, Dain and Wrigley developed a plan with two main parts: (i) Dain would use his trustee status to seek to reverse the disclaimer by claiming that *all* of the disclaimed assets should have gone to the SNT, rather than 2/3rds; and (ii) Wrigley would seek to become Joanne's guardian. Thus, if the disclaimer were reversed and the trust assets reverted to Joanne, Wrigley would control those assets.

This goal explains why Dain sought to defund the trusts, rather than seeking a transfer of funds from the Issue Trust to the SNT – the natural remedy for this perceived wrong. A transfer would leave the funds in the SNT, and thus not under Dain's and Wrigley's personal control.

The defunding effort failed – the DPC did not unwind the disclaimer. Dain achieved partial success, however, because the DPC awarded an alternative remedy: It found Bernard liable for damages for the amount of disclaimed assets which had gone to the Issue Trust, also found him liable for civil theft, and therefore trebled these damages.

*Period 3: From September 2015 Though July 2018.* Given the DPC ruling, Dain could have brought a claim during this period against the Issue Trust, seeking transfer of Issue Trust assets to the SNT, or perhaps to Joanne personally. Dain brought no such claim and the statute of limitations to do so expired in July 2018. He instead sought to persuade the DPC to reverse its 2015 decision, unwind the disclaimer, and defund the trusts – his original and continued goal.

*Period 4: From July 2018 to the Present.* The final relevant period runs from expiration of the statute of limitations for claims against the Issue Trust in July 2018 to the present. During this period, Dain has continued to seek to defund both trusts by persuading the DPC to unwind the

disclaimer, continued to reject settlement through transfer of funds from the Issue Trust to the SNT, and continued to seek to control the SNT despite being only one of three trustees.

Plaintiffs' core view is that Dain's attack on his own trusts cannot be justified, period. They believe that he was obliged in 2015 to defend the trusts if someone else attacked. But even if his attack in 2015 is found to be justified as to one or both trusts, this cannot justify Dain's continued efforts to defund the trusts in periods 3 and 4. His attack failed. He does not get to try again. For the Issue Trust, Dain's partial success in 2015 might justify a damages claim against the Issue Trust, but only until the statute of limitations expired for such a claim.

*The Remedy Dain Sought, versus the Remedy He Might Have Sought.* Dain's core claim, in attacking the trusts, was that the SNT should have received all of the disclaimed assets, rather than two-thirds. For this asserted harm, the natural remedy was transfer of Issue Trust assets to the SNT. That remedy was obvious, achievable, and was proposed by Bernard as a settlement. Dain refused and sought instead to completely defund both trusts.

For the SNT and its beneficiaries, a starker breach of the duty of loyalty is hard to imagine. Dain could have obtained for the SNT the assets he claimed it should have received. Bernard offered this in settlement, but Dain refused, and sought instead to remove all assets from the SNT. Having no assets cannot be better for the SNT and its beneficiaries than retaining the $2.4 million in assets it held in 2015, plus the additional $1.1 million then held in the Issue Trust.

For the Issue Trust, the harm from transferring funds to the SNT was small. The Issue Trust was the remainder beneficiary of the SNT. Support for Joanne during her lifetime was unlikely to exhaust the SNT. Thus, the likely effect of transferring Issue Trust funds to the SNT would be that these funds would be transferred back to the Issue Trust when she died. Thus, transfer of Issue Trust funds to the SNT – a remedy that Dain never sought, and refused to consider when offered – was far better for *both trusts* than the defunding remedy he pursued.

*Attribution*. Dain has worked hand-in-glove with Joanne's counsel in New York, Ira. Salzman, Esq, ("**Salzman**"), Joanne's court-appointed counsel in Colorado, Lisa DiPonio, Esq.

("**DiPonio**"), and Joanne's conservator, Jeanette Goodwin ("**Goodwin**"). For convenience, this motion often attributes to Dain actions formally taken by Salzman, DiPonio, and Goodwin.

*Dain's Expected Attack on Bernard's Actions as Conservator*. Dain's core conduct, we believe, cannot be defended. He is expected to deflect attention from his own conduct by attacking Bernard's conduct as Joanne's conservator, saying repeatedly that the Issue Trust assets were stolen, likely claiming that the SNT assets were stolen as well, asserting that the DPC approved his conduct as SNT trustee, and glossing over whether he could have sought a less extreme remedy than defunding. We respond briefly here to these legally irrelevant claims.

There is no basis for Dain to claim that the SNT assets were stolen. His claim in the DPC was that the SNT should have received all of the disclaimed assets, not two-thirds. The DPC found theft for the Issue Trust assets, but only because Dain persuaded the DPC into believing that Bernard had stolen a Roth IRA account, holding 10% of the disclaimed assets. No actual theft occurred, as Dain knew or had reason to know. It would also have made no sense for Bernard to risk his reputation and livelihood by stealing a small amount of assets. And this hypothetical theft would not in any event justify the defunding remedy that Dain sought.

With regard to Bernard's personal honesty, Bernard has never received any personal benefit from the Issue Trust. All assets transferred to the Issue Trust in 2013 are still there.[3] Bernard has declined the trustee fees which he is entitled to receive, under the trust instruments.

## II. Introduction and Dain's Actions in Periods 1 and 2

### A. Basic Background on the Trusts, Their Creation, Purpose, and Trustees

Renata died in May 2012.[4] She had two children, Bernard and Joanne.[5] This case involves two family trusts, the SNT and the Issue Trust, which Renata established in 1997 as part of her estate plan.[6] Joanne suffers from lifelong schizophrenia, is mentally disabled, and has never

---

[3] PSUMF 2.
[4] PSUMF 12.
[5] PSUMF 11.
[6] PSUMF 10, Exhs..BL-2 (Issue Trust); BL-3 (SNT).

worked.[7]  Renata's estate plan also included a simple 1997 will, barely over two pages double-spaced.[8]  This will has been admitted to probate in Westchester County, New York.[9]  The core provision of Renata's will, Article Fourth, provides that:[10]

> I give, bequeath and devise all the rest, residue and remainder of my estate as follows:
>
> (A) Two-thirds (2/3) to the Trustees of the [SNT];
> (B) The balance to the Trustees of the [Issue Trust].

Joanne is the primary beneficiary of the SNT and the sole beneficiary during her lifetime. The Issue Trust is the remainder beneficiary of the SNT.[11]  Dain has been a trustee of the SNT since 1997, and is currently one of three trustees; the others are Bernard and Samuel Black ("**Samuel**").[12]  The beneficiaries of the Issue Trust are Bernard and his children.[13]  Dain was a trustee of the Issue Trust from 1997 until his purported resignation in December 2015.  Bernard has been a trustee of the Issue Trust since 1997.  Samuel Black became a trustee of the Issue Trust in December 2015 after Dain's purported resignation.[14]  The plaintiffs believe that Dain's resignation was legally ineffective to relieve him of fiduciary duties.[15]

Bernard is the executor of Renata's estate.[16]  Bernard and Dain participated in Renata's estate planning and were familiar with her will, including Article Fourth.[17]  Renata funded the SNT and the Issue Trust with small amounts in 1997, but essentially all of the funds in both trusts came from distributions from her Estate.[18]

---

[7]  PSUMF 11.

[8]  PSUMF 12, BBlack Exh. BL-1 (Renata's will).)

[9]  PSUMF 12.

[10]  BBlack Decl. ¶ 13, Exh. BL-1 (Renata's will), art. Fourth.

[11]  PSUMF 8, BBlack Exh. BL-3 (SNT instrument).

[12]  PSUMF 7.

[13]  PSUMF 6, BBlack Exh. BL-2 (Issue Trust instrument).

[14]  PSUMF 3, 4; BBlack Exh. BL-5 (resignation email)

[15]  See discussion of the legal effect of Dain's resignation in **§ V.B** *infra*.

[16]  PSUMF 14, BBlack Exh. BL-1 (Renata's will), art. Sixth.

[17]  PSUMF 15.

[18]  PSUMF 10, 27.

Renata created the SNT, and provided that it would receive two-thirds of her estate, as part of a broader plan to provide lifetime support for Joanne after Renata's death.[19] That plan also included Joanne's receipt of workers' compensation benefits, based on her father's death at work, plus Social Security Disability Insurance ("**SSDI**") benefits.[20]

Joanne has never handled substantial sums of money, and had no capacity to do so in 2012, when Renata died. As the DPC determined in 2015, "Joanne Black's long-standing mental illness is not disputed; nor is her inability to manage her financial affairs."[21]

## B. Background on the Colorado Conservatorship and the Disclaimer

When Renata died unexpectedly in May 2012, Joanne was in bad shape. She had stopped taking her anti-psychotic medication, was deeply delusional, and was living in Colorado, nearly homeless.[22] Renata was making weekly transfers to Joanne's bank account. Bernard continued and increased those transfers.[23]

Most of Renata's financial assets (around $3 million) were held in several accounts at Vanguard Group.[24] On July 11, 2012, Vanguard informed Bernard that it had received internet instructions, weeks before Renata died, which had changed the payable-on-death ("POD") beneficiary designations on her principal accounts, so that 95% of the funds would go to Joanne, with the remaining 5% going to Bernard's older children.[25] The POD designation made no sense and would have been a disaster for Joanne, who was not capable of managing money even when on medication.[26]

In mid-2012, Bernard faced additional challenges in ensuring Joanne's financial well-being. Workers' compensation benefits were a crucial income source for Joanne. then

---

[19] PSUMF 16.

[20] PSUMF 17; see discussion of Renata's estate plan in **§ II.B** *infra*.

[21] DPC Order (Sept. 28, 2015), at 2, Schaalman Exh. SC-1.

[22] PSUMF 28.

[23] PSUMF 29.

[24] PSUMF 30.

[25] PSUMF 31; BBlack Exh. BL-11 (Letter from Vanguard Group (July 11, 2012)).

[26] See discussion of Joanne's inability to handle money in **§ II.A** *supra*.

around $1,000 per week, tax free, payments growing with inflation.[27]   However, Joanne refused to accept these payments, demanded that the workers' compensation law firm drop the case, and threatened to sue them if they did not.  The law firm informed Bernard that they had no choice but to withdraw.  Bernard persuaded them to hold off for a short period of time.[28]   Joanne was also apparently trying to cancel her SSDI payments, then around $1,300 per month, also tax-free and growing with inflation.[29]

The consensus among the members of the Black family was that the change of beneficiary on Renata's Vanguard accounts had to be a mistake.  Vanguard had no written confirmation of the change.  It was inconceivable that Renata would abandon her long-standing estate plan without telling anyone in the family, or consulting her trusts and estates counsel.[30]

Bernard faced intense time pressure in developing a plan to preserve Joanne's financial security.  The workers' compensation benefits were crucial – they had had an estimated pre-tax present value of around $2 million.[31]   If Joanne came into possession of $3 million, she might spend it quickly and have nothing left to live on.[32]   Joanne was demanding that Vanguard release the funds to her, and Vanguard informed Bernard that they would do so soon.[33]

Bernard's older children wanted to sue to invalidate the disclaimers.  Bernard believed that challenge was likely to succeed and that litigation would be very bad for Joanne – it would likely freeze the estate preventing Bernard from using estate funds for Joanne's support.[34]

Bernard consulted Renata's trusts and estates counsel, Lee Hoffman; his own trusts and estates counsel, Schiff Hardin in Chicago; and his cousins, Dain and Wrigley.[35]   Both were familiar

---

[27]  PSUMF 32.
[28]  PSUMF 32.
[29]  PSUMF 33.
[30]  PSUMF 34.
[31]  PSUMF 32.
[32]  PSUMF 18.
[33]  PSUMF 35.
[34]  PSUMF 36.
[35]  PSUMF 37.

with Renata's estate plan and her will.[36]   The "Conservatorship Plan" that evolved from these discussions, was as follows.  *Someone* would apply to become Joanne's conservator and seek authority to:[37]

> (i)      Disclaim of the POD designations, so that the Vanguard funds would flow through Renata's estate and into the two trusts;
> (ii)     Obtain workers' compensation benefits for Joanne; and
> (iii)    Preserve Joanne's SSDI benefits.

Under this plan, Joanne would be financially secure for life.  She would have around $2.75 million in the SNT ($2 million in disclaimed Vanguard assets plus other assets), $2 million in pre-tax value of workers' compensation benefits, and SSDI.[38]   Bernard asked Dain to be conservator and carry out this plan, but Dain declined, so Bernard applied to be conservator.[39]

Bernard hired Carl Glatstein, Esq. ("**Glatstein**"), an experienced Colorado trusts and estates lawyer, and presented this plan to him.  Glatstein thought it was reasonable and did not propose any changes.[40]   Vanguard gave Bernard a mid-October deadline to take court action, or else they would release their funds directly to Joanne; Bernard was able to file a conservatorship petition just before the Vanguard deadline.[41]

Bernard sought the power as conservator to carry out the three parts of the Conservatorship Plan.  For the disclaimer, he requested specific authority:[42]

> To disclaim Respondent's interest as beneficiary under all payable on death or transferable on death accounts owned by Respondent's mother, Renata Black, (DOD 5/1/2012) *allowing Respondent's share to pass under Article Fourth of the Last Will and Testament of Renata Black*, dated 12/19/1997, under which *two thirds* of the estate of Renata Black will be contributed to a Supplemental Needs Trust for the Benefit of Joanne Black.

Under standard disclaimer law, the disclaimed assets would revert to Renata's estate.  Moreover,

---

[36]  PSUMF 5, 15.

[37]  PSUMF 38.

[38]  PSUMF 39.

[39]  PSUMF 40.

[40]  PSUMF 41.

[41]  PSUMF 42; BBlack Exh. BL-12 (Conservatorship petition (Oct. 16, 2012))**.**

[42]  PSUMF 43, BBlack Exh. BL-13 (draft order for conservatorship powers (Nov. 13, 2012)).

to be effective for tax purposes, the disclaimer had to be unconditional.[43]  Bernard, when he disclaimed the POD assets as Joanne's conservator, had no power to direct how the disclaimed assets would be distributed under Renata's will.  The will would govern.[44]

The DPC appointed Young as Joanne's GAL and DiPonio as Joanne's counsel.  Bernard listed Dain and Wrigley as persons who should receive all filings with the DPC.[45]

The Conservatorship Plan created a conflict of interest for Bernard, which he disclosed to counsel.  Glatstein advised Bernard that he needed court approval under the Colorado statute addressing conflicts, C.R.S. § 15-14-324, which provides:[46]

> Any transaction involving the conservatorship estate that is affected by a substantial conflict between the conservator's fiduciary and personal interests is voidable unless the transaction is expressly authorized by the court after notice to interested persons.

Bernard requested the disclaimer powers quoted above on three separate occasions, with notice to Dain for two of these.[47]  These powers were approved, in writing, by Joanne's GAL and counsel, after reviewing Renata's will and the trusts.[48]

Bernard's request stated that the disclaimed assets would "pass under Article Fourth of the Last Will and Testament of Renata Black."  Article Fourth, in turn, stated that two-thirds of all residual assets would go to the SNT and one-third to the Issue Trust.  The request further stated that under Article Fourth, "*two thirds* of the estate of Renata Black will be contributed to [the SNT]."  Renata's will addressed what would happen to the remaining third.

Dain, Wrigley, Young, and DiPonio all asserted, when they challenged the disclaimer in 2015, that they believed that *100% of the disclaimed assets would go to the SNT*.[49]  The entire challenge to the disclaimer rested on the claim that even though the proposed powers said the SNT would receive two-thirds of the disclaimed assets, all believed it would receive three-thirds.

---

[43] PSUMF 44; Uniform Disclaimer of Property Interests Act, C.R.S. 15-11-1201ff; § 15-11-1206(2)(c).
[44] PSUMF 44.
[45] PSUMF 45.
[46] PSUMF 46.
[47] PSUMF 47, BBlack Exhs. BL-13, BL-14, BL-15.
[48] PSUMF 48.
[49] See discussion of the claims by Dain, Young, and DiPonio to the DPC in **§ II.I** *infra*.

This was, however, contrary to what the proposed powers said, contrary to Glatstein's testimony, discussed below, contrary to common sense, and contrary to disclaimer law. The legal effect of the disclaimer was, as Bernard's proposed order stated, that the disclaimed funds would be distributed according to her will – because that is how disclaimers work.

Dain received the proposed powers, which stated that the disclaimed assets would pass under Article Fourth of Renata's will. He was already familiar with the two-thirds to one-third division of assets under her will. The proposed powers stated that two-thirds of the disclaimed assets would go to the SNT (consistent with Article Fourth). Joanne's GAL and counsel also understood the effect of the disclaimer, or should have, from multiple sources. First, they received the proposed powers, which stated that the disclaimed assets would pass under Article Fourth of Renata's will. They each reviewed Renata's will, including Article Fourth.[50] Second, the proposed powers stated that two-thirds of the disclaimed assets would go to the SNT (consistent with Article Fourth). Third, as Glatstein testified, he spoke to each of them, walked them through the proposed powers, and explained the effects of the disclaimer.[51]

*For Joanne's guardian-ad-litem, Gayle Young:*

> Q. Tell us about your conversation with Ms. Young?
> A. . . . [I]n that conversation I was going over with her the effects of the disclaimer . . . . The two-thirds and the one-third aspect. . . . I walked [Ms. Young] through the two-thirds/one-third, and I also said rather than take my word for it you need to look at the estate planning documents.

*For Joanne's counsel, Lisa DiPonio:*

> Q. And did you discuss with [Ms. DiPonio] the division of assets that would occur if the disclaimer was exercised?
> A. I did. . . .
> Q. [W]ere you [plain] with her that one-third would go off to the Issue Trust?
> A. I made no bones about that . . . .

---

[50] PSUMF 48.

[51] PSUMF 49; Schaalman Exh. SC-2 (DPC transcript, June 16, 2015), at 244-47, Exh. SC-3 (DPC transcript, June 17, 2015), at 56. The duty to defend one's trust against attack includes inquiry to determine whether a basis for defense exists. Dain could have learned about these conversations, had he sought to learn the facts underlying the disclaimer before launching litigation.

Mr. Glatstein further testified:

> Q.  [I]n your telephone conversations with Ms. Young and Ms. DiPonio you told them specifically . . . two-thirds was going to go into the SNT and one-third would go into the Issue Trust for the benefit of Mr. Black and his children, do you recall that?
> A.  Yes.

Bernard submitted the proposed powers, quoted above, to the DPC in November 2012. After a hearing in December 2012, the DPC issued an order granting general conservator powers, which did not include the specific disclaimer authority that Bernard had requested, and needed to satisfy the conflict-of-interest statute.[52]  Mr. Glatstein immediately requested an amended order and highlighted the need for specific authorization of the disclaimer.  Mr. Glatstein's email, to the DPC's law clerk, Sumi Lee, cc to Young and DiPonio, explained (emphasis added):[53]

> I think *we will still need express authority by the Court to disclaim Respondent's interest in POD accounts so they flow back into the Estate, as originally requested in the Proposed Order Appointing Special Conservator*.  I have attached that Order and highlighted the relevant paragraph #1 on page 2. . . .
> May I provide a supplemental Order, or should we submit an Amended Order Appointing Conservator?

Mr. Glatstein attached the proposed order, with the disclaimer paragraph **boldfaced and highlighted in yellow**:

> 1.  **To disclaim Respondent's interest as beneficiary under all payable on death or transferable on death accounts owned by Respondent's mother, Renata Black, (DOD 5/1/2012) allowing Respondent's share to pass under Article Fourth of the Last Will and Testament of Renata Black, dated 12/19/1997, under which two thirds of the estate of Renata Black will be contributed to a Supplemental Needs Trust for the Benefit of Joanne Black ("Joanne Black Trust I").  The estate of Renata Black is under the supervision of the Surrogate's Court, Westchester County, State of New York, File #2012-1209.**

The court clerk responded by email the next day, saying simply "The Judge would like an Amended Order.  Let me know when you have filed it."[54]  Joanne's counsel and GAL received these emails and did not object to including this paragraph in the conservatorship order.

---

[52] Order appointing Conservator for Adult (Dec. 11, 2012), Schaalman Exh. SC-6.

[53] Exh. BL-14 (Emails among Glatstein, Young, DiPonio, and Sumi Lee (Dec. 11, 2012).

[54] *Id.*

In January 2013, Bernard submitted a proposed amended order, containing this language, with copies to Dain, Young, and DiPonio.  Young and DiPonio both confirmed that they would support the amended order.[55]

> From: Young/Zen [mailto:d.zen@q.com]
> Sent: Tuesday, January 29, 2013 4:27 PM
> To: diponiolawfirm@comcast.net
> Cc: Carl Glatstein; sumi lee
> Subject: Re: Joanne Black - Form of Order - Case No 2012 PR 1772
>
> The proposed Amended Letters and Amended Order are fine with me.
> Gayle
>
> On Jan 29, 2013, at 3:26 PM, diponiolawfirm@comcast.net wrote:
> Sumi and Carl,
> I have no objection with this just being issued.
> Thanks, Lisa
> Lisa DiPonio, Esq.

Thus, Bernard submitted the disclaimer language in the proposed order to the DPC three separate times.  Each time, Bernard and his counsel had reason to believe that the recipients understood and agreed with the proposal.  No objections were raised and no questions were asked. Bernard and his counsel could reasonably expect the DPC – a specialized probate court – to understand standard disclaimer law.  They could reasonably expect Dain, Young and DiPonio to either understand standard disclaimer law or, if they did not, to find out, or at least ask questions.[56]

In hindsight, the statement of proposed powers could have also said (addition in italics) "under which two thirds of the estate of Renata Black will be contributed to [the SNT] *and one third will be contributed to [the Issue Trust]*."[57]  Bernard's counsel could have explicitly told the

---

[55] PSUMF 49; Exh.BL-15.

[56] Following submission of the amended order to the DPC, Vanguard's counsel asked that the language be shortened to "To disclaim Respondent's interest as beneficiary under all payable on death or transferable on death accounts owned by Respondent's mother, Renata Black, (DOD 5/1/2012)."  Bernard reported this request to Glatstein, who resubmitted the proposed powers using Vanguard's language.  There was no change in substance, however.  The disclaimed assets would still pass into Renata's estate and be distributed under Article Fourth of her will.  The DPC issued an amended order using Vanguard's preferred language.  PSUMF 50; Schaalman Exh. SC-7 (DPC order, March 5, 2013).

[57] Bernard Black proposed this more complete phrase to Mr. Glatstein, who demurred on the grounds that the statement of powers was clear, and that such statements are customarily short.  PSUMF 51.

DPC that Bernard had a conflict of interest, rather than treating this as obvious.  But in the end, two-thirds cannot mean three-thirds.

## C.  2013:  Disclaimer Carried Out, SNT and Issue Trust Funded

Bernard, as Joanne's conservator, carried out the disclaimer.  Renata's had roughly $3 million at Vanguard.  As stated in Bernard's petition for conservatorship:[58]

| Description of Assets | Estimated value |
|---|---|
| Inheritance from TOD or POD account of Renata Black (Respondent' mother) | $3,000,000 |

The petition also stated that "Respondent is entitled to approximately $3 million in assets as a result of the death of her mother, Renata Black."[59]  Once disclaimed, the $3 million in Vanguard assets flowed into Renata's estate and were distributed in accordance with her will.[60]

The trusts needed to open bank and brokerage accounts to receive trust assets.   In early 2013, Bernard sent Dain account opening forms for checking accounts at Chase Bank for both trusts.  Dain signed them as co-trustee; Bernard then opened checking accounts.[61]

On July 1, 2013, Bernard filed an inventory of conservatorship assets with the DPC, with copies to Dain, Young and DiPonio.  The inventory disclosed assets of $2,175,000 in the SNT on March 31, 2013 – two-thirds of the $3 million in disclaimed Vanguard assets, plus appreciation:[62]

| Stocks, Bonds, Mutual Funds, Securities and Investment Accounts | | Current value |
|---|---|---|
| **Vanguard (Supplemental Needs Trust)  as of 3/31/13** | **Investment** | **$1,459,244** |
| **Vanguard (Supplemental Needs Trust)  as of 3/31/13** | **Brokerage** | **$  716,202** |
| | | **$2,175,456** |

---

[58]  PSUMF 52; Schaalman Exh. SC-8 (original and amended petitions (Oct. 15, and Nov. 19, 2012)).

[59]   Schaalman Exh. SC-8.

[60]  PSUMF 53.  As discussed in **§ II.D** *infra* (discussing Roth IRA account), Bernard distributed two-thirds of all estate assets to the SNT, but not two-thirds of each individual asset.

[61]  PSUMF 54, BBlack Exh. BL-10 (account opening forms).

[62]  PSUMF 55, Schaalman Exh. SC-9 (Conservator's Inventory (July 1, 2013)), at 2-3.

The SNT thus held $2 million in assets, plus appreciation through March 31, 2013, not $3 million.[63]  No one objected.  Dain later claimed no one had understood that there had been $3 million in Renata's Vanguard accounts (emphasis added):[64]

> [T]he reason Ms. DiPonio, Ms. Young, Ms. Wrigley, myself didn't object to [Bernard's] accountings is . . . we didn't at that time have any evidence or know there was additional money he had taken. . . . If we had known there was $3 million – over $3 million and a third was suddenly missing *there would have been objections everywhere*.

However, Dain and others knew or should have known that the Vanguard accounts held $3 million in assets.  Bernard's petition had said so, twice.  The natural implication from their failure to object is that they were not surprised – the $2 million in the SNT was two-thirds of the $3 million in Vanguard assets, as everyone had expected.

Bernard filed a conservator report for 2013 in June 2014, and an amended report in September 2014.  He again disclosed the SNT (year-end 2013 value of $2,241,000), as being the principal conservatorship asset.  From the initial and amended reports:[65]

| Description of Asset | Column **B**.     Name of Financial Institution | Column D.  Fair Market Value |
|---|---|---|
| Supplemental          Needs Trust | Chase Checking | 100.00 |
| Supplemental          Needs Trust | Chase Savings | 441.00 |
| Supplemental          Needs Trust | Chase Brokerage Account | 2,241,380,00 |

Once again, no one objected after learning that the SNT held around $2 million in assets.

Taking this disclosure as a whole, there was a reasonable basis for defending Bernard's disclosure.  Dain, Young, DiPonio, and the DPC had reason to understand that the SNT would

---

[63] If, as Dain stated to the New York guardianship court in 2015, see **§ II.F** *infra*, he expected the SNT to receive two-thirds, but for Joanne to receive the remaining third of the Vanguard assets in another way, the inventory should have listed $1 million in other assets.  It did not.

[64] Transcript of DPC status conference, April 2, 2015 (emphasis added).

[65] PSUMF 56, Schaalman Exh. SC-11 (original and amended Conservator's Reports for 2013), Step 5. Assets (other table columns omitted).  The other principal conservatorship asset was the Joanne Black 2013 Trust, which Bernard created principally to hold Joanne's workers compensation payments.  At year end 2013, this trust held around $160,000.

receive two-thirds of the disclaimed assets. Dain therefore had a fiduciary duty to defend the trusts, if someone else attacked them, and no right to attack himself.

## D. Roth IRA

A side point for the overall disclaimer, which became important in the Colorado litigation because Dain made it so: Renata held assets at Vanguard in three accounts. Around 90% of the value was in mutual funds and brokerage accounts; the remaining 10% was in a Roth IRA. As executor, Bernard distributed these assets two-thirds to the SNT and one-third to the Issue Trust. Bernard allocated the Roth IRA to the Issue Trust, and distributed them in equal shares to his children, as a deemed distribution to the Issue Trust.[66] This was tax-advantageous for them and did not harm Joanne (who pays no income tax). It was permissible under Renata's will, as long as the SNT received two-thirds of *all* Estate assets – which it did.[67]

Bernard's conservatorship accounting did not list the Roth IRA, because it was not a conservatorship asset. Dain used this nonreporting to claim to the DPC that Bernard had "stolen" these assets.[68] This was simply false.

Bernard listed the Roth IRA as an estate asset in the Westchester Surrogate's Court in February 2013. The Roth IRA, once disclosed, could not be stolen. Instead, Bernard's estate accounting needed to, and did, show that the SNT had received two-thirds of the value of all assets, including the Roth IRA.[69] Bernard engaged Melinda Harper, CPA, an experienced forensic accountant and founding partner of HarperHofer & Associates in Colorado ("**Harper**"), to prepare his Estate accounting. Ms. Harper confirmed by affidavit ("**Harper Affidavit**") that:[70]

---

[66] PSUMF 57.

[67] PSUMF 58. On allocation of two-thirds of all Estate assets to the SNT, see discussion of Estate accounting in **§ III.B** *infra*.

[68] PSUMF 59, Schaalman Exh. SC-5 (transcript of DPC hearing, Sept. 8, 2015) at 119-120; 129-130 (Dain's argument supporting civil theft).

[69] PSUMF 60, Exh. BL-17 (Bernard's listing of Estate assets (Feb. 5, 2013). Schaalman Exh. SC-12 (Harper expert report), Schedule 3 (summarizing estate accounting).

[70] PSUMF 61, Schaalman Exh. SC-13 (Harper Affidavit (Feb. 20. 2020)) ¶ 20.

We noted that the Roth IRA account has been consistently listed by Mr. Black in his filings as Executor with the Westchester Surrogate's Court, in the federal and New York State Estate Income Tax Returns that he filed, and in the Estate accounting that we prepared on his behalf. As such, the Roth IRA value forms part of Renata Black's overall residual estate. Two-thirds of that overall value is allocated to the SNT, even though the Roth IRA as a specific asset was distributed to the Issue Trust.

Bernard also disclosed the Roth IRA to his Colorado counsel, Glatstein, and thus could not have stolen the Roth IRA assets without Glatstein's cooperation. Glatstein advised Bernard that the conservatorship filings should not include the Roth IRA.[71] Reliance on counsel's advice cannot be theft. Dain received Bernard's estate filings, and knew that Bernard had disclosed the Roth IRA to counsel. He thus knew or should have known that his claim of theft was false.[72]

## E. Dain's (In)action as Trustee in 2013 and 2014

During 2013 and the first eight months of 2014, Bernard was unable to reach Dain, even on urgent trust business. It took him months, and multiple requests, to get Dain to sign account opening forms for checking accounts at Chase Bank for the SNT, the Issue Trust, and a third trust that held Joanne's workers compensation payments – the Joanne Black 2013 Trust (the "**2013 Trust**").[73] Bernard also opened accounts at Chase Bank's securities affiliate, J.P. Morgan Securities, to hold the securities and mutual funds that Renata held at Vanguard, which he then transferred to the SNT and the Issue Trust.[74] For convenience, we refer below to Chase Bank and JPMorgan Securities together as "**Chase**."

In the spring of 2013, Defendants Wrigley and Pinto were making repeated urgent demands for money to pay Pinto for services to Joanne. Bernard urgently sought Dain's assent as SNT trustee to make these payments, multiple times. Dain was unreachable.[75] He did, however, agree

---

[71] PSUMF 62, Exh. BL-17 (Bernard email to Glatstein, RE: documents attached (May 25, 2013).

[72] PSUMF 63; Schaalman Exh. SC-5 (Transcript of DPC hearing (Sept 8, 2015), at 59 (Dain testifies that "Mr. Glatstein was aware – made aware there was a Roth IRA")).

[73] PSUMF 64, Exh. BL-10 (SNT and Issue Trust account opening statements).

[74] PSUMF 65.

[75] PSUMF 66. As Bernard explained to the DPC, "Dain knew about the two-thirds, one-third and said nothing, was uninvolved, was totally uninterested, left everything to [Wrigley] and me. I tried to get Mr. Dain to come and be the conservator in Colorado instead of me, he wasn't interested. I tried to get him to manage the money under Joanne's [SNT], he wasn't interested. I could not get Mr. Dain to lift a finger on Joanne's behalf until I had a fight with Cherie Wrigley, his sister [over Wrigley's expenses]" Transcript of DPC status conference (April 2, 2015), at 36-37, Schaalman Exh. SC-10.

to add Samuel Black as a third SNT trustee.[76]  Bernard was able to defer the need for Dain to participate in SNT decisions by distributing funds from Renata's estate and treating these as deemed distributions to the SNT.  Bernard followed a similar approach for the Issue Trust.

From June 2013 through October 2014, Joanne was committed to a psychiatric hospital, first in New Jersey and then in New York.[77]  During 2013 and the first half of 2014, Bernard worked cooperatively with Wrigley on Joanne's care and treatment.  In June 2014, however, Wrigley's emails took a hostile tone, and suggested that Wrigley wanted to replace Bernard as Joanne's conservator.  Bernard sought to defuse the situation by reaching out to Dain by telephone and email; Dain was again unreachable.[78]

One issue addressed in a June 2014 email exchange among Bernard, Wrigley, and Dain was the location of the SNT and Issue Trust accounts.  Wrigley asserted that Renata had wanted her trust accounts to be at Vanguard.  Bernard responded that Renata had established trust accounts at Chase.  As he explained to Wrigley, with copy to Dain (emphasis added):[79]

> Assets needed to be moved out of my mother's accounts at Vanguard into the trusts [note the reference to trusts *plural – thus to both the SNT and the Issue Trust*].  My mother created the trusts [plural] at Chase, and had her main banking at Chase. . . . *Tony [Dain] was aware that the trusts were at Chase.*

In July 2014, Wrigley took a three-day trip to New York to visit Joanne.  Bernard agreed to use SNT funds to pay Wrigley's expenses.  In late August, Wrigley sent her expenses to Bernard, which totaled almost $7,000**.**  Bernard offered to pay what he viewed as reasonable expenses of around $1,700:[80]

## F.  Dain Seeks to Reverse the Disclaimer In New York and Colorado

Wrigley was furious and demanded full payment.  Bernard reached out to Dain, seeking an amicable solution.  Dain refused to speak with Bernard and instead, by email, threatened litigation

---

[76]  PSUMF 64.

[77]  PSUMF 67.

[78]  PSUMF 68.

[79]  PSUMF 69, Exh. BL-19 (Bernard email to Wrigley and Dain, June 29, 2014).

[80]  PSUMF 70.

if Bernard did not accede to Wrigley's demands. The Dain-Wrigley effort to seize control of the Black family trusts was now on.[81]

One early step in the Dain-Wrigley war was for Wrigley to petition in New York to become Joanne's guardian.[82] A second was for Dain to hire Salzman as counsel for Joanne, to replace court-appointed counsel, and agree to pay Salzman.[83] He who pays the piper calls the tune. Salzman, although nominally Joanne's counsel, took instructions only from Dain.[84]

By early 2015, the two-part Dain-Wrigley strategy to seize control of the Black family trust assets had emerged. Wrigley would seek guardianship over Joanne, and thus control over her funds. And Dain would seek to reverse the disclaimer and defund the trusts so that their assets would go to Joanne, and be under Wrigley's control.

In February 2015, Dain sought to reverse the disclaimer in both Colorado and in the New York guardianship case. In New York, Dain made a surprise appearance at a status conference held on February 19, 2015, with no notice to his co-trustees, and made a lengthy speech.[85] Below, we excerpt Dain's speech, with commentary (emphasis added):

> MR. DAIN: . . . I am a trustee of the [SNT, the 2013 Trust, and the Issue Trust] . . . . I was never given notice by Mr. Black of any funding of the issue trust. I have no idea where the accounts are. . . .
>
>> **Truth:** Dain signed account opening statements at Chase. Bernard also informed him, in the June 2014 email quoted above, that the trust accounts were at Chase.
>
> We all agreed that Mr. Black should file for Conservatorship. The purpose was to take control of the [Vanguard] assets that otherwise would have gone unfettered outright to Miss Black . . . . [W]hat Mr. Black told the Colorado court . . . was: I want to disclaim those assets so that I can place them in the Renata Black Estate *where two-thirds of those funds* will go into [the SNT]. That's what he told the court.
>
>> **Comment:** This confirms that Dain received Bernard's conservatorship powers, quoted above.
>
> What he didn't state was that the other one-third he was going to have transferred to this issue trust which is solely-tor the benefit of him and his children. . . .

---

[81] PSUMF 71; Exh. BL-20.

[82] PSUMF 72.

[83] PSUMF 73; Exh. BL-21 (Salzman engagement letter).

[84] PSUMF 74.

[85] PSUMF 75; Schaalman Exh. SC-14.

> **Truth:** Bernard's proposed powers also stated that the disclaimed assets would pass under Article Fourth of Renata's will. Dain knew that under Article Fourth, one-third of the disclaimed assets would go to the Issue Trust.

What Mr. Black did is say two-thirds are going into the [SNT], implying the other third, *as we all thought*, would be maintained for the use of Miss Black's needs outside of the [SNT]. . . .

> **Truth:** This, and the similar statement above, is one of the most important statements in this case, because it contrasts with the different, false statements that Dain made to the DPC.
>
> Dain acknowledges here that he received Bernard's proposed powers, which stated that the SNT would receive two-thirds of the disclaimed assets. He claims that "as we all thought," the remaining third would go to Joanne "outside of the [SNT]."
>
> The reference to "we all" must include Dain plus at least two other persons. One of them is surely Wrigley. The other can only be Young, DiPonio, or both. They all knew, or should have known, that the remaining third would pass to the Issue Trust under Article Fourth of Renata's will. Disclaimers must also be unconditional. Once the assets were disclaimed, Renata's will controlled where they went.

I first found out about the issue trust approximately five weeks ago . . . . I -- my first reaction was, What are you talking about? What issue trust? . . .

> **Truth:** Dain signed account opening documents for the Issue Trust, and knew the Issue Trust was funded, with assets held at Chase.

[T]hat issue trust needs to be -- the money in it needs to be defunded.

> **Comment:** A clear, stark statement by a trustee that he wants to defund his own trust.

For the disclaimer, the New York guardianship court deferred to the DPC, where similar proceedings were underway.[86] In Colorado, Dain caused Joanne's counsel. DiPonio, to file a motion in the DPC on February 9, 2015, seeking reversal of the disclaimer.[87]

## G. Alternatives to Reversing the Disclaimer

For the wrong that Dain perceived – one-third of the disclaimed assets had gone to the Issue Trust – Dain chose the most extreme remedy imaginable: reversal of the disclaimer and thus complete defunding of both trusts.

A natural, far less extreme remedy was to transfer funds from the Issue Trust to the SNT. The SNT and Joanne as its primary beneficiary would be better off. Yet, if the Issue Trust and its

---

[86] PSUMF 75.

[87] PSUMF 75, Schaalman Exh. SC-15 (DiPonio motion to reverse disclaimer (Feb. 9, 2015)).

beneficiaries would be worse off, this would not be by much.  This attractive outcome – where the SNT wins and Issue Trust barely loses – was achievable because support for Joanne was unlikely to exhaust the SNT.  Since the Issue Trust was the remainder beneficiary of the SNT, assets moved from the Issue Trust to the SNT would, in all likelihood, revert to the Issue Trust when she died. We provide below an analysis of Joanne's financial position at year-end 2014, which Bernard prepared at that time:[88]

### Joanne Black Effective Net Worth at Year-end 2014

| Asset | Value |
|---|---|
| Value of SNT | $2,400,000 |
| Value of future workers' compensation payments | 2,000,000 |
| Value of future SSDI payments | 600,000 |
| Value of 2013 Trust (incl. worker's comp) | 300,000 |
| McKeel House (to be contributed to SNT) | 700,000 |
| **Total** | **$6,000,000** |

In terms of income, Joanne had tax-free income from workers' compensation plus SSDI of $65,000 per year, growing with inflation.  Her housing expenses were low because she was living in a deeply subsidized halfway home in Brooklyn; she still lives there today.  She had both Medicare and Medicaid health insurance.  A conservative, 4% rate of return on the SNT and 2013 Trust assets would add another $136,000 in income.  Thus, Joanne could expect income of $200,000 per year, a substantial amount tax-free and growing with inflation, without touching the SNT principal.[89]  It was likely that some or most of the trust principal would remain in the SNT at her death, and would revert to the Issue Trust.  If Issue Trust assets were transferred to the SNT, then unless the SNT principal would have been exhausted, these funds would return to the Issue Trust at her death, with appreciation.

*Remedy 2 (Claim by SNT against Issue Trust)*.  A similar remedy was available to the SNT through litigation, although litigation was unlikely to be needed, since Bernard had proposed a transfer of funds from the Issue Trust to the SNT, which Dain rejected.  The SNT could bring a

---

[88]  PSUMF 76.
[89]  PSUMF 77.

claim against the Issue Trust seeking transfer of funds to the SNT, based on the same allegations that underlay Dain's actual effort to defund both trusts.

*Remedy 3 (Claim by SNT for damages against Bernard).* A third potential remedy was a damages claim against Bernard, based on the allegations that underlay Dain's actual effort to defund both trusts. This is the remedy that the DPC awarded (though neither Joanne nor Dain sought it), so it was clearly available to Dain.[90] It would benefit the SNT and not harm the Issue Trust, since damages would be sought only against Bernard, not against the Issue Trust.

Any of these remedies would benefit the SNT, and harm the Issue Trust minimally if at all. All were unequivocally better for both trusts than defunding.

## H. Settlement Offers in 2015 and Thereafter

In early 2015, before any meaningful litigation had taken place, Bernard asked his guardianship counsel, Anthony Lamberti, Esq., to approach Dain through Joanne's counsel, Ira Salzman, with an initial offer to settle by transferring up to $500,000 (roughly half of the Issue Trust) to the SNT. Salzman replied to Lamberti, after speaking with Dain but not with Joanne. He made a ridiculous counteroffer – he demanded that the SNT receive $800,000 from the Issue Trust (achievable) plus $1 million from Renata's estate (impossible, because the estate then held only about $100,000 in assets). Salzman refused to accept Lamberti's representation as to the estate assets or his offer of proof.[91] Negotiations proceeded no further.

In early September 2015, Bernard again approached Dain through Salzman, and offered a complete transfer of the Issue Trust funds to the SNT. Bernard and Samuel would also resign in favor of an independent trustee, if Dain resigned as well. This offer *fully remedied* the asserted harm – that the SNT did not receive all of the disclaimed assets. Dain rejected this offer, and insisted on being sole SNT trustee.[92] It is standard trust law, however, that a trustee has a duty to act solely in the interests of the trust and its beneficiaries; this duty includes resigning to facilitate

---

[90] Schaalman Exh. SC-1 (DPC Order, Sept. 28, 2015).

[91] PSUMF 78; BBlack Exh. BL-22 (LLamberti letter summarizing settlement effort).

[92] PSUMF 79.

settlement if necessary. Bernard has continued since then to make settlement offers at least annually, involving transfer of all or a most of the Issue Trust assets to the SNT.[93]

These proposed settlements can be compared to the disaster that Dain has inflicted on the trusts. His defunding efforts have failed. Dain has incurred millions in legal fees, yet recovered nothing for either the SNT or Joanne.[94] Dain has refused to engage in mediation as well, which Bernard has attempted in Colorado in 2016 (with a mediation hearing in 2017), in Illinois in 2018, in Colorado in 2019, and in Oregon in 2020-2021.[95]

## I. Statements By Dain and Others about the Disclaimer to the DPC

In the DPC, Dain acted as *de facto* lead counsel for Joanne's effort to defund the trusts. He examined and cross-examined all witnesses. His control of the trial was so complete that when Dain testified, he did so in a monologue, instead of in question and answer format.[96]

Dain's testimony to the DPC about his understanding of the disclaimer contradicts, in important parts, what he previously told the New York guardianship court (quoted above). Dain's New York testimony shows that he and others (the "we all" he referred to) had received Bernard's proposed disclaimer authority. Before the DPC, Dain testified that he did not remember seeing the proposed powers or understanding that they involved a disclaimer, and believed the SNT would receive all of the Vanguard assets:[97]

> I don't ever recall seeing the proposed order [with conservatorship powers], . . . and in fact I have to say I didn't even focus on the words disclaimer in that order. My understanding on reading that order was all of the money . . . was going into a Supplemental Needs Trust . . . .

This testimony is clear, however, on the harm that Dain perceived: The SNT had received only two-thirds of the disclaimed assets, instead of all.

---

[93] PSUMF 80, Bernard's 2018 offer is discussed in **§ III.E** *infra* (section on the FINRA arbitration).

[94] PSUMF 81.

[95] PSUMF 80. Bernard's effort at informal mediation in 2018 is discussed in **§ III.E** infra

[96] PSUMF 97; Exhs. SC-2 through SC-5 (transcripts). At the Sept. 8 hearing Dain introduced himself as "Anthony Dain, appearing as the presence for the protected person and an interested person [as trustee]." Exh. SC-5 at 3.

[97] Exh. SC-4 (Dain testimony before DPC (Aug, 5, 2015), transcript at 194).

GAL Young also testified that she believed the SNT would receive all of the disclaimed assets: [98]

> Q  [Ms. Young, you] understood that if the disclaimer in this case was exercised the funds in the POD accounts would go to Renata Black's probate account?
>
> A  No . . . . I assumed that the disclaimer was to move all of her assets--you know, not two-thirds/one-third . . . but 100 percent of her assets into a Supplemental Needs Trust.

DiPonio's motion seeking to reverse the disclaimer is also clear that the harm that she sought rectify was that one-third of the disclaimed assets went to the Issue Trust, instead of all of these assets going to the SNT. [99]  No one claimed the assets in the SNT were not properly there.

Dain arranged for DiPonio to file a surprise motion seeking civil theft damages on June 15, 2015, the day before the DPC hearings were to start, thus denying Bernard an opportunity to respond. [100]  Dain's argument for civil theft turned entirely on nondisclosure of the Roth IRA. [101]

## J.  2015 Hearing:  DPC Statements and Decision

The DPC's own statements confirm that the core issue in 2015 was whether one-third of the disclaimed assets should have gone to the Issue Trust.  No one disputed the SNT's receipt of two-thirds of the disclaimed assets.  The DPC stated the "fundamental issue" as: [102]

> whether the disclaimer obtained by Mr. Black as to the accounts at Fidelity and Vanguard POD to Joanne Black should have acted to divest Ms. Black of 1/3 of these non-probate assets.

In its post-hearing order, the DPC found that "the disclaimer . . . should not have divested Ms. Black of one-third of the POD assets left to her," and stated its "understanding that once Mr. Black disclaimed the funds, all of the funds would be placed into the SNT." [103]

---

[98]  Exh. SC-2 at 101 (Young testimony) *See also id.* at 112 ("I thought that everything was going into a Supplemental Needs Trust for [Joanne]").

[99]  Exh. SC-15 (DiPonio motion to void disclaimers), ¶ 6 (The disclaimed "assets were allocated one-third to a trust for the benefit of Mr. Black and his issue, and two-thirds were allocated to [the SNT]; this transfer divested Ms. Black of one-third of the $3.5 million owned [and] was entitled to").

[100]  DiPonio motion seeking Civil Theft Damages (June 15, 2015), Schaalman Exh. SC-16.

[101]  Exh. SC-5 (DPC transcript (Sept. 8, 2015), at 119-120; 129-130 (Dain's argument for civil theft)).

[102]  Schaalman Exh. SC-17 (DPC Order (April 2, 2015)), ¶ 13.

[103]  Exh. SC-1 (DPC Order (Sept. 28, 2015)), at 5-7 (one of many similar statements in this order).

The DPC's post-hearing order awarded surcharge damages against Bernard for the amount that the Issue Trust had received (and therefore the SNT had not received).[104] It also found that Bernard had engaged in civil theft, and trebled the damages it awarded under the Colorado civil theft statute.

The DPC did not, however, reverse the disclaimer. The DPC's opinion did not explain why it instead awarded surcharge damages. But a likely explanation comes from a colloquy between Bernard's counsel, Bernie Poskus:[105]

> Mr. Poskus: [T]he probate code says once a disclaimer is exercised it's irrevocable.
> THE COURT: Okay. So then basically we're back to surcharge? . . .
> Mr. Poskus. [Y]ou're right that [surcharge] would be the only remedy.

The defense to defunding, that disclaimers are irrevocable, was not only reasonable, it had succeeded. Bernard appealed the damages award and Joanne appealed the DPC's decision not to reverse the disclaimer. The Colorado Court of Appeals affirmed both aspects of the DPC decision.[106]

### III. Overview of Period 3 (Sept. 2015 through July 2018)

### A. Remaining Plausible Claims Against the Issue Trust

After the DPC decision, Dain had no plausible basis for continuing to seek to reverse the disclaimer. He did, however, have other potential remedies. Dain could have sought transfer of the Issue Trust assets to the SNT, or perhaps to Joanne personally. This claim might not have succeeded. One defense was that the DPC had made an election of remedies and Joanne could not collect damages both from Bernard and from the Issue Trust. But it was not frivolous.

---

[104] *Id.* This amount was roughly $1 million. The DPC awarded damages of approximately $1.5 million. *Id.* at 12 ¶ 2. The DPC award treated all of the Roth IRA value as damages, even though the Roth IRA was included in Renata's estate, so that two-thirds of its value needed to (and did, see discussions of the Roth IRA in **§ II.D** *supra*) flow to the SNT under Renata's will. The awarded damages also included pre-judgment interest from the time of the disclaimer to the time of the damages award. PSUMF 82.

[105] Exh. SC-4 (transcript of DPC hearing (Aug. 5, 2015)), at 118-110. Under C.R.S. § 15-11-1205, disclaimers are irrevocable once carried out.

[106] *In the Interest of Joanne Black, Protected Person v. Bernard Black*, 422 P.3d 592, 613 (Colo. App. 2018).

Joanne brought such a claim, in Westchester County Surrogate's Court and as a cross claim in an interpleader action filed by Chase in New York concerning the Issue Trust. Both actions were dismissed because the New York courts lack subject matter jurisdiction over the Issue Trust.[107] Dain could have brought, or caused Joanne to bring, a similar claim in Illinois, which had jurisdiction over the Issue Trust. No such claim was brought and the Illinois statute of limitations for such a claim expired in July 2018.[108] Dain has instead sought, since early 2018, to persuade the DPC to reverse its 2015 decision and unwind the disclaimer, which would defund both trusts – his true original and continued goal.

## B. Estate Accounting

Bernard, as executor of Renata's estate, filed his estate accounting in 2016. The accounting was prepared by Ms. Harper.[109] Ms. Harper has since periodically updated the estate accounting, most recently to March 31, 2019. The Harper Affidavit summarizes Ms. Harper's updated accounting.[110] It confirms that the distribution of assets to the SNT and the Issue Trust is very close to the two-thirds to one-third provided for in Renata's will. The exact amount received by each trust will depend on allocation and valuation decisions by the Surrogate's Court. Ms. Harper's accounting shows that, before payment of executor expenses, the SNT was slightly *overpaid* and owes $20,000 to the Issue Trust. Any net overpayment to either trust can be remedied through a transfer from one trust to the trust. As Ms. Harper concluded:[111]

> [O]nce the court has made its findings regarding asset valuations, valuation dates, and regarding whether the payment of legal and other professional fees should be charged to

---

[107] Schaalman Exh. SC-18 (Court opinion in *JP Morgan Chase Bank v. Issue Trust*, Index No. 156343/16 (N.Y. Supreme Court, New York County) (May 8, 2017)), at 7-8. This decision also discusses the similar decision on jurisdiction by the Surrogate's Court. *Id.* at 10.

[108] See discussion of the Illinois statute of limitations in **§ V.**C *infra*.

[109] PSUMF 83.

[110] Exh. SC-13 (Harper Affidavit (2020)), at 18-19.

[111] *Id.* ¶ 32j.

the SNT, the Issue Trust, or the Estate as a whole, a relatively small amount will be owed either by the Issue Trust to the SNT, or by the SNT to the Issue Trust.

Ms. Harper's accounting confirms that the Roth IRA assets were not stolen, but instead distributed in accordance with Renata's will.

## C. 2016: Declaratory Judgment Action by Issue Trust Trustees in Illinois

In January 2016, Bernard and Samuel, as Issue Trust trustees, filed a declaratory judgment action in the Northern District of Illinois, with Joanne as nominal defendant, seeking a declaration that they were "free of restraint to . . . administer the Issue Trust," including paying expenses and making distributions to beneficiaries.[112]  This action was later dismissed for lack of personal jurisdiction over Joanne in Illinois.[113]

## D. 2016-2017: Dain Spends SNT Funds on Litigation

Dain was a minority trustee of the SNT.  The SNT instrument provides that trustee powers are governed New York Estate, Powers and Trusts Law,[114] under which the default rule is that trust decisions are made by a majority of trustees.[115]  Dain thus had no authority to spend SNT funds.  Dain, however, without discussion with his SNT co-trustees, petitioned the DPC to authorize him to spend SNT funds to hire counsel for Joanne to defend against the Issue Trust declaratory judgment action.  He did so in a filing on February 17, 2016, the day before a DPC hearing on other matters, thus denying his co-trustees notice and an opportunity to respond.[116]

The DPC authorized Dain's spending, without considering whether it had jurisdiction to do so, the trust rule requiring trustees to be impartial between beneficiaries, whether Dain had spending authority, or whether the SNT instrument permits spending on Joanne's legal fees.[117] Dain then spent $122,000 to pay Joanne's counsel in the declaratory judgment action.[118]

---

[112]  Schaalman Exh. SC-19 (declaratory judgment action, Case 16-cv-1763 (N.D. Ill.)) ¶ 26.

[113]  Schaalman Exh. SC-19 (court order in declaratory judgment action (July 13, 2016)).

[114]  Exh. BL-3 (SNT instrument), art. VI, § 3

[115]  NY EPTL § 10-10.7.  The SNT instrument does not change this default rule.  Exh. BL-3.

[116]  PSUMF 84; Schaalman Exh. SC-20 (Dain Motion for use of SNT funds (Feb. 17. 2016)).

[117]  Schaalman Exh. SC-21 (DPC Order authorizing legal expenses (Feb. 25, 2016)).

[118]  PSUMF 85; Exh. SC-12 (Harper expert report), Sch. 1 (listing fees)).

Dain's surprise attack, seeking authority to spend SNT funds, exemplifies Dain's interactions with his co-trustees and with courts. He launches litigation without prior discussion with his co-trustees, often by surprise, as he did here. Prior examples include Dain's surprise appearance at a status conference in the New York guardianship case, where he sought to reverse the disclaimer; and DiPonio's mid-trial motion seeking civil theft damages.[119]

Dain returned to the DPC three more times, seeking to spend more SNT funds on litigation.[120] The DPC approved each request.[121] Dain stopped only after a 2018 decision by the Financial Institutions Regulatory Authority ("**FINRA**"), discussed below, froze spending of trust assets on litigation. As Ms. Harper's expert report documents, SNT funds spent on litigation total $535,000; and Dain has DPC authority to spend another $242,000.[122]

## E. March 2018 FINRA Decision:  Trust Funds Cannot be Used for Litigation

Chase was honoring Dain's spending requests, yet had frozen the SNT and the Issue Trust against spending by Bernard and Samuel.[123] To stop this one-sided litigation spending, Bernard and Samuel sought arbitration before FINRA, and requested that a FINRA arbitration panel freeze litigation spending by both trusts, but allow SNT spending for Joanne's direct support. In March 2018, the FINRA arbitration panel granted this relief.[124]

During the FINRA hearing, Chase's counsel offered to informally mediate the dispute over the trusts and the overall litigation. Counsel agreed to end Dain's cross-examination early, if Dain would stay after the FINRA session ended and participate; Dain agreed. Bernard again offered to settle by transferring *all* Issue Trust assets to the SNT.[125]

---

[119] See discussion of New York status conference in **§ II.F** *supra* and civil theft motion in **§ II.I** *supra*.

[120] Schaalman Exhs. SC-22, SC-24, SC-26 (motions by Dain, or by DiPonio on Dain's behalf, for additional authority to spend SNT funds on litigation (Sept. 7, 2016; April 17, 2017; Dec. 5, 2017).

[121] Schaalman Exhs. SC-23, SC-25, SC-27 (DPC orders approving spending requests).

[122] Exh. SC-12 (Harper Report), Sch. 1.

[123] PSUMF 86.

[124] PSUMF 87; Schaalman Exh. SC-28 (FINRA arbitration award (March 23, 2018)). The discussion in text reflects the revised relief that Bernard and Samuel requested at the hearing, reflected in the award.

[125] PSUMF 88.

One obstacle to this offer: the trusts had borrowed funds to pay legal fees. The lenders, Olga Dal and Katherine Litvak, had obtained loan judgments; Dain was challenging those judgments.[126] The lenders agreed to defer collecting their loans until Joanne died.[127] This allowed full transfer of the Issue Trust funds to the SNT and meant that these loans would not affect Joanne. Dain insisted that the lenders should *never* recover their loans, even after Joanne's death; walked out of the informal settlement talks; and refused to reengage after that.[128]

Bernard and Samuel specifically asked the FINRA arbitration panel to allow SNT spending for Joanne's direct benefit. By 2018, Dain had never asked his co-trustees or the DPC to approve SNT spending for Joanne, only for litigation. Four more years have gone by, and Dain has still never sought to use SNT funds be used for any purpose other than litigation.[129]

## F. April 2018: Dain Seeks to Defund the Trusts, Again

In April 2018, Dain, acting in cooperation with Young and DiPonio, in a hearing before the DPC concerned solely with DPC jurisdiction over the SNT, caused them to request that the DPC reverse its prior 2015 decision unwinding the disclaimer. Dain once again used surprise as a tactic, seeking defunding in a reply brief, filed only two days before the DPC hearing.[130] The DPC reversed the disclaimer and ordered that the trust assets be deposited in its court registry.[131]

Bernard appealed. The Colorado Court of Appeals vacated the portion of the DPC order reversing the disclaimer, ruling that the DPC lacked subject matter jurisdiction, because at the time of this decision its 2015 decision not unwinding the disclaimer remained on appeal.[132]

---

[126] PSUMF 89; Schaalman Exhs. SC-29, SC-30. See discussion of these loans in **§ III.D** *infra*. Katherine Litvak is Bernard's wife; Olga Dal is her cousin.

[127] PSUMF 89.

[128] PSUMF 89, BBlack Exh. BL-23 (Letter from Brad Grayson, Esq., Illinois counsel to the trustees, to Chase counsel (May 3, 2018) (the trustees "appreciate the efforts that Chase/JPMS counsel made, during the FINRA hearing in February, to see if a settlement could be reached. We regret that [Dain and Goodwin] continues to be uninterested in serious settlement discussions.")).

[129] PSUMF 90.

[130] PSUMF 91, Schaalman Exh. SC-31 (DiPonio reply brief, including footnote seeking reversal). This footnote was written by Dain.

[131] Schaalman Exh. SC-32 (DPC Order (April 27, 2018)), at 12-13.

[132] *In the Matter of Joanne Black, Protected Person v. Bernard Black*, 482 P.3d 460, 480 ¶ 88 (2020).

## G. May 2018: Chase Files an Interpleader Case in Illinois for Both Trusts

After the FINRA decision had frozen the trust assets against litigation spending, and the DPC ordered that the same assets be deposited in its court registry, Chase filed an interpleader action in the Northern District of Illinois ("**NDIL Interpleader Action**") and asked the interpleader court to resolve the conflicting claims.[133] The Chase complaint states what Chase saw as the competing interests and whom Dain was allied with:[134]

| GROUP 1 | GROUP 2 | GROUP 3 |
|---|---|---|
| Joanne Black | Bernard Black | Kate Litvak |
| Anthony Dain | Samuel Black | Olga Dal |
| Jeanette Goodwin | | |

Chase saw Dain as allied with Joanne and her conservator; the other groups were Bernard and Samuel as trustees of the Issue Trust and majority SNT trustees; and Kate Litvak and Olga Dal as lenders to the trusts. This alignment matched the on-the-ground reality.[135]

Once the interpleader action was filed, the trust assets were thoroughly frozen: by the FINRA order, the interpleader filing, and "citations" that the lenders to the trusts had obtained against Chase in Illinois, freezing the trust assets until the loan judgments were paid.[136] The interpleader court later directed that "Plaintiffs shall not allow any withdrawals of the interpleader assets from the accounts or execute any instructions with respect to the interpleader assets, without prior approval from the Court."[137]

## IV. Dain's Actions in Period 4 (July 2018 to Present)

Period 4 begins in July 2018, when the Illinois statute of limitations for a direct claim against the Issue Trust expired. As discussed above, the DPC's unwinding of the disclaimer in 2018 was reversed on appeal for lack of subject matter jurisdiction. Dain plans to return to the DPC and try again to reverse the disclaimer; the only question is when.[138] In the meantime, he

---

[133] Schaalman Exh. SC-33 (Complaint in NDIL Interpleader Case (May 15, 2018)).

[134] Exh. SC-33 (Complaint in NDIL Interpleader Action) ¶¶ 3-4.

[135] PSUMF 92.

[136] PSUMF 93.

[137] Exh. SC-34 (Court order in NDIL Interpleader Case (May 15, 2019)).

[138] PSUMF 94.

continues to seek unwinding of the disclaimer in other courts. We provide here examples of Dain's ongoing effort to defund both the SNT and the Issue Trust, and refusal to entertain either mediation or settlement through transfer of funds from the Issue Trust to the SNT.

In 2018, Bernard and Samuel sought mediation in the NDIL Interpleader Case. They again proposed settlement through transfer of Issue Trust funds to the SNT. The lenders to the trusts, Olga Dal and Kate Litvak, were again willing to defer collection of their loans to the trusts for Joanne's lifetime.[139] Dain was again not interested. He demanded defunding of both trusts, with their assets to be deposited with the DPC, and that the lenders recover nothing, ever.[140]

Dain has continued to seek defunding, even after the DPC order was vacated on appeal in 2020. In the NDIL Interpleader Case, Dain argued in November 2021 for defunding both trusts. He referred to the DPC's vacated 2018 order, and stated:[141]

> [T]hat the SNT was once viewed as an "appropriate destination" for those assets, as Bernard describes it, does not meant that it remains an appropriate destination.

In December 2021, Dain amended his request for relief in the NDIL Interpleader Case to seek defunding of both trusts.[142]

Bernard and Samuel, as SNT trustees, have sought to protect the SNT against Dain's effort to reverse the disclaimer by seeking a declaratory judgment in Illinois that the disclaimer is irrevocable under Illinois law for the SNT.[143] (As Issue Trust trustees, they have already obtained a similar declaratory judgment for the Issue Trust.[144]) Dain's duty as SNT trustee

---

[139] Schaalman Exh. SC-35 (joint settlement proposal by trustees and lenders in the NDIL Interpleader Case (undated but submitted Feb. 19, 2019).

[140] Schaalman Exh. SC-36 Dain and Goodwin proposal in NDIL Interpleader Case (Feb. 21, 2019).

[141] Schaalman Exh. SC-37 (Dain and Goodwin Response in NDIL Interpleader Case Bernard's and Samuel's Motion to Clarify the Record (Nov. 29, 2021)).

[142] Schaalman Exh. SC-38 (Dain and Goodwin amended counterclaims and crossclaims, including an order that the \assets be removed from the trusts and delivered to the DPC court registry).

[143] Schaalman Exh. SC-39 (Complaint, *Bernard Black and Samuel Black, as SNT Trustees, v. Joanne Black and Anthony Dain*, Case 2021 CH 6049 (Circuit Court for Cook County Ill., Chancery Division (Dec. 6, 2021), citing 755 ILCS 5/2-7 which states that: "A disclaimer pursuant to this Section shall be irrevocable and shall be binding upon the disclaimant and all persons claiming by, through and under disclaimant.")

[144] Schaalman Exh. SC-40 (Court order in declaratory judgment action for the Issue Trust).

requires him to support this action, which defends the SNT against future attack. Dain has instead moved to dismiss the complaint, in favor of proceedings in the DPC.[145]

## V. Threshold Legal Questions

Plaintiffs believe that this court will need to resolve a number of threshold legal issues, set forth in this section.

### A. Which State's Fiduciary Law Applies?

One threshold question is which state's principles of trustee fiduciary duty govern Dain's conduct. There are two plausible candidates: Illinois and New York. Many core principles are similar in both states. However, to the extent that differences exist, the Court must determine which state's law to apply. The plaintiffs believe that Illinois law on fiduciary duty should apply to both trusts. The core reason is that Illinois has, and New York does not have, subject matter jurisdiction over the trusts.

The SNT and the Issue Trust are lifetime trusts, created and initially funded by Renata Black in 1997.[146] All of the SNT and Issue Trust assets are located in Illinois.[147] None of the trustees of either trust resides in New York.[148] Illinois has personal jurisdiction over each of Bernard Black, Samuel Black, and Dain in their capacities as SNT and Issue Trust trustees.[149]

Neither the SNT instrument nor the Issue Trust instrument specifies which state's fiduciary duty law applies to the trustees.[150] Thus, which state's law applies must be determined under general principles of choice of law. Since Illinois has both personal jurisdiction over all trustees and subject matter jurisdiction over the trusts, Illinois law is preferred.

The New York courts do not have subject matter jurisdiction over the Issue Trust or the SNT. For the New York courts to have subject matter jurisdiction over a *lifetime trust* (as opposed

---

[145]  Schaalman Exh. SC-41 (Dain motion to dismiss declaratory judgment complaint for the SNT).
[146]  PSUMF 10, Exhs. BL-2 (Issue Trust), BL-3 (SNT).
[147]  PSUMF 19.
[148]  PSUMF 9 (Bernard resides in Illinois; Samuel in Maryland; Dain in California).
[149]  PSUMF 20, 21, 22.
[150]  PSUMF 26; Exhs. BL-2 (Issue Trust), BL-3 (SNT).

to a testamentary trust), one of three conditions must exist. The New York Surrogate's Court can assert jurisdiction over a trust estate "of any lifetime trust which has assets in the state, or of which the grantor was a domiciliary of the state at the time of the commencement of a proceeding concerning the trust, or of which a trustee then acting resides in the state . . . ." Surr. Ct. Proc. Act 207(1). These rules also apply to the New York Supreme Court – the New York court of general jurisdiction.

A New York Supreme Court decision directly concludes that the New York courts lack jurisdiction over the Issue Trust. *JP Morgan Chase Bank v. [Issue Trust]*, 2017 WL 1807879 (NY Supr., New York County). As the court held:[151]

> New York Surrogate's Court can assert jurisdiction over the trust estate "of any lifetime trust which has assets in the state, or of which the granter was a domiciliary of the state at the time of the commencement of a proceeding concerning the trust, or of which a trustee then acting resides in the state . . . . (SPC 207 [1]). The New York Supreme Court's jurisdiction over lifetime trusts is the same as that of the Surrogate's Court [citations omitted].

> Here, neither the Surrogate's Court nor the Supreme Court has subject matter jurisdiction over the Issue Trust. The first basis for jurisdiction fails, as the Issue Trust has no assets in New York. The entirety of the Issue Trust assets are in Illinois bank and brokerage accounts (Bernard Black aff, ¶ 12).\

> The second basis for jurisdiction also fails. Although Renata Black, the grantor of the trust, was a New York resident, she died in 2012 *(id.,* ¶ 4). With respect to a lifetime trust, the grantor's domicile as a basis for jurisdiction "'evaporates with the death of the grantor as the grantor has no domicile after death'" *(Matter of Witherill,* 306 AD 2d at 675 [ citation omitted]). Therefore, Renata Black's domicile in 1997, when the trust was created, cannot serve as a basis for jurisdiction . . . .

> Finally, the third basis for jurisdiction also fails. Bernard and Samuel Black, the trustees of the Issue Trust, are natural persons, neither of whom resides in New York.

This decision is *res judicata* for the Issue Trust. The same logic applies to New York jurisdiction over the SNT. The SNT has no assets New York. The grantor of the SNT, Renata

---

[151] Exh. SC-18, at *4-5.

Black, is deceased and has no domicile.  And the SNT trustees are natural persons, none of whom resides in New York.[152]

## B.  Dain's Continuing Fiduciary Duty to the Issue Trust

A second threshold issue involves whether Dain continues to owe fiduciary duties to the Issue Trust, and thus to its beneficiaries, despite his purported resignation in December 2015. Plaintiffs believe that Dain continued to owe fiduciary duties for three separate reasons.

First, while the Issue Trust instrument is silent on which state's common law of fiduciary duty applies to the Issue Trust, it specifies that the NY Estate, Probate and Trust Law ("EPTL") governs trustees' powers.[153]  This court should therefore follow NY EPTL rules to determine whether Dain's resignation was legally effective.  Under NY EPTL § 7-2.6(a)(1), court approval of resignation is required.  This section gives the New York Supreme Court power "*On the application of a trustee*, to accept his resignation and to discharge him on such terms as it deems proper (emphasis added)."  The authoritative commentary to this section by Margaret Turano, *Practice Commentary to N.Y. Estate Powers and Trusts Law*, explains:

> Trustees are not automatically permitted to resign, but may do so only on court order (subparagraph (a)(1)).

See further *In re Luckenbach's Will*, 303 N.Y. 491, 104 N.E. 2d 870 (NY Ct. App. 1952). In this case, trustee Wente, one of three trustees, "attempted to resign, as a trustee of Lewis Luckenbach's trust, by sending Lewis Luckenbach a letter to that effect, but Wente has never accounted, or been formally discharged as trustee."  *Id.* at 495.  The Court of Appeals treated Wente as continuing to be a trustee, but invoked an emergency exception "to the rule that all trustees must, ordinarily unite in any action taken on behalf of the trust," to allow the majority trustees to pursue an appeal despite Wente's nonparticipation.  *Id.* at 497.

---

[152]  The Westchester County Surrogate's Court also concluded that it lacks subject matter jurisdiction over the Issue Trust and the SNT, by rejecting filings relating to each trust, without written decision.  PSUMF 95.  The Surrogate's Court action with respect to the Issue Trust is discussed in Exh SC-18 at *5.
    [153]  Exh. BL-2 (Issue Trust instrument), art V, § 3.

Dain's resignation would be ineffective even if this court were to apply Illinois rules. 760 ILCS 5/12 allows a trustee to resign "by written notice . . . to a co-trustee, if any, and to the beneficiaries." Dain did not provide notice to the Issue Trust beneficiaries.[154]

The second, independently sufficient reason why Dain continues to owe fiduciary duties to the Issue Trust and its beneficiaries is that the Issue Trust is the remainder beneficiary of the SNT. Dain, as SNT trustee, owes fiduciary duties to the Issue Trust, as an SNT beneficiary.

The third reason why Dain continues to owe fiduciary duties to the Issue Trust is that a trustee cannot resign and then take action against his trust, that draws on his prior position. For example, a trustee cannot use information obtained through the confidential trustee-beneficiary relationship against the beneficiary, nor use information obtained while a trustee to compete with the trust or its beneficiaries.[155] These bans must continue even after the trustee resigns. Similarly, Dain should not be able to attack and seek to defund his own trust, achieve a partially favorable court decision, and then avoid ongoing fiduciary duties by resigning with a view to continuing the attack. Any further attack that builds on the prior attack should remain subject to the fiduciary obligations that applied prior to the resignation.

## C. Proximate Cause for the Issue Trust

An issue that the court will need to reach if Dain is determined not to owe full fiduciary duties to the Issue Trust and its beneficiaries during periods 3 and 4 is proximate cause. Dain undoubtedly owed fiduciary duties to the Issue Trust and its beneficiaries for his conduct during periods 1 and 2 as an Issue Trust trustee. This includes damages suffered in periods 3 and 4, under usual concepts of proximate causation. Thus, this court will need to assess which damages to the Issue Trust were proximately caused by Dain's breaches of duty.

The measure of damages for breach is to restore the victim to the position where she would have been but for the breach. For example, if a trustee steals from a trust, and this theft causes the

---

[154] PSUMF 23; Exh. BL-5 (Dain resignation email (Dec. 2, 2015)).

[155] *See* Restatement (Third) of Trusts § 78 cmt. j "Incident to the duty of loyalty . . . is the trustee's duty to preserve the confidentiality and privacy of trust information from disclosure to third persons … [when] the effect of disclosure would be detrimental to . . . the interests of the beneficiaries."

trust to default on its obligations to a third party and pay damages, the thieving trustee is liable not only for the amount stolen, but for amounts paid to the third party. Here, Dain, prior to resigning, used his trustee powers to attack Issue Trust, seeking to defund it, and partially succeeded. The Issue Trust was not defunded, but thereafter faced legal risk based on the DPC decision that resulted from Dain's attack. The plaintiffs believe that this partial success is a but-for cause of all legal expenses incurred by the Issue Trust since then.

The sole limit on this catch-all-harm principle is foreseeability: could the misbehaving trustee, at the time he breached his fiduciary duties, reasonably foresee that his misbehavior would lead to more losses to the trust? Here, foreseeability plainly exists. Dain himself has been attacking the Issue Trust after his (real or purported) resignation. These attacks were not only foreseeable, they were *planned*. As Dain stated in an October 2015 email, while still a trustee:[156]

> I intend in any event to resign from the Issue and 2013 Trusts . . . . The Issue Trust, of course, still holds funds that rightly belong to Joanne Black, and unless Bernard agrees to arrange for the return of those funds with interest, this will have to be the subject of separate litigation.

### D. Statute of Limitations for a Claim Against the Issue Trust

Dain might hypothetically have brought a direct claim against the Issue Trust for the assets it received as a result of the disclaimer. Joanne brought such a claim in New York in 2016, which was dismissed because New York lacks subject matter jurisdiction over the Issue Trust.[157] This court needs to determine when the statute of limitations for such a claim expired in Illinois, where the claim could have properly been brought.[158]

The Illinois statute of limitations for a claim involving personal property is five years, measured from the later of when the transfer occurred, or when the plaintiff should have been on notice that it occurred (735 ILCS 5/13-205). The transfer of assets from Renata's estate to the

---

[156] PSUMF 101, BBlack Exh. BL-25.

[157] See discussion of New York subject matter jurisdiction over the trusts in **§ V.A** *supra*.

[158] Plaintiffs believe that Colorado has no jurisdiction over the Issue Trust, but even if it does, the Colorado statute of limitations is three years, versus five years in Illinois. C.R.S. § 13-80-108.

Issue Trust occurred on July 19, 2013.[159]  Bernard's inventory of conservatorship assets was filed on July 1, 2013, and disclosed that the SNT held $2,175,000 in assets – roughly two-thirds of the $3 million in disclaimed assets.  This put Dain and others on notice that the SNT had received only two-thirds of the $3 million in disclaimed assets.[160]  The statute of limitations thus expired five years later, in July 2018.  The exact date is not important.[161]  Dain was aware of the Illinois statute of limitations and allowed it to expire without bringing a claim.[162]

### E.  Burden of Proof, When a Trustee Attacks or Fails to Defend His Own Trust

As discussed below, the plaintiffs believe that a trustee can never affirmatively attack and seek to defund his own trust.[163]  If an exception exists, then, as is true more generally for a claim of an exception to a general rule, or claiming an affirmative defense, the burden of proof should be on the party claiming that the exception or affirmative defense applies.  The burden is thus on Dain to show why his conduct falls within whatever exception exists.  The burden should similarly be on Dain with regard to the duty to defend, to show that no reasonable trustee would have found a reasonable basis to defend the trusts against attack.

### F.  What Weight to Give to Statements by the DPC?

The DPC expressed opinions, often strong ones, on many topics.  Dain's defense will rest heavily on those opinions and decisions by the Colorado Court of Appeals based on the DPC opinions.  Those opinions, however, are not admissible evidence in this case.  The DPC is not a fact witness, nor is the Colorado Court of Appeals.  The DPC's statements about Dain are dicta, because Dain was not a defendant in the DPC hearings.  So are most of its statements about

---

[159]  PSUMF 96, Exh. BL-24 (Issue Trust statement for July 2013 at JPMorgan Securities).

[160]  See discussion of the disclaimed assets and reported conservatorship assets in **§ II.C** *supra*.

[161]  The DPC concluded that notice that the Issue Trust received disclaimed assets took place in September 2014, when Bernard filed his amended conservatorship report for 2013.  Exh. SC-1 (DPC Order (Sept. 28, 2015), at 9).  However, similar information about conservatorship assets was included in Bernard's July 2013 inventory, and his initial conservatorship report for 2013, filed in June 2014.  See Exhs. SC-9 and SC-11.  This court should reach determine for itself when notice occurred for purposes of the Illinois statute of limitations.  However, nothing of importance turns on whether the statute expired in 2018 or 2019.  Either way, the Illinois statute expired some time ago, without Dain making a direct claim against the Issue Trust.

[162]  Schaalman Exh. SC-42 (Dain testimony in FINRA arbitration, Feb. 14, 2018, at 166 ("In Illinois, and I've done that research, there's a five-year statute for suing for the return of personal property")).

[163]  See discussion of the ban on trustee attack in **§§ VI.B** and **VII.B** *infra*.

Bernard's actions as Joanne's conservator. The DPC hearings involved different parties, different substantive claims, a different mix of facts, and different burdens of proof, evidentiary rules, and trial procedure.

The evidence in this case can come only from documents and testimony relevant to the plaintiffs' claims about Dain's breach of fiduciary duty, and from witnesses who can be cross-examined. Still, this court will have to decide how much weight to give to those statements at this stage in the case. For the reasons explained in this section, plaintiffs believe that the DPC's statements should be given little or no weight.

The DPC relied on statements by Dain that were inconsistent with his statements to the NY guardianship court. It did not read Renata's will and denied understanding that under her will, two-thirds of the disclaimed assets would flow to the SNT, even though Bernard's proposed powers said this. The DPC made statements about Bernard's conduct that have no record basis and are provably false. Bernard engaged Melinda Harper, CPA, to conduct a complete forensic accounting review of Bernard's conduct as conservator, trustee, and executor.[164] Comparisons between statements made by the DPC and Ms. Harper's conclusions, include:

**DPC statement or conclusion:** Bernard concealed the existence of the Roth IRA, and committed civil theft with regard to the Roth IRA.[165]

**Harper Aff.** ¶ 17, 20. [We] did not find indicia of fraud, which would include such things as attempting to misrepresent or conceal information, or instances in which the transactions as recorded in Mr. Black's spreadsheets did not match the underlying substance. . . .

**DPC Statement:** Ms. Kerr's accounting shows that Mr. Black transferred funds into an excessive number of different accounts, which can only be likened to a shell game. . . . [An exhibit prepared by Ms. Kerr] shows 25 different accounts were created to hold funds related to this case, encompassing Renata Black's original accounts at Vanguard and Fidelity and accounts opened by Mr. Black as Executor, Trustee and conservator. The Court finds 15 of these accounts appear to be completely unnecessary.[166]

**Truth**: Bernard created only seven accounts, each with a clear purpose; checking accounts for the estate, the SNT, the Issue Trust, and the 2013 Trust; brokerage

[164] See Exh. SC-13 (Harper Affidavit).

[165] Exh. SC-1 (DPC order (Sept. 28, 2015)), at 8. As discussed in **§ II.D** *supra* (section on Roth IRA), at the DPC hearing, the claim of civil theft was focused on the Roth IRA.

[166] Exh. SC-1 (DPC Order (Sept. 28, 2015)), at 11.

accounts for the SNT and the Issue Trust, and a savings account for the 2013 Trust. The transfers between accounts were limited and did not harm Joanne.[167]

**Harper Aff.** ¶ 21a. [Finding that all of] the bank accounts had a purpose and that all inter-bank transfers were appropriate and accounted for appropriately.

**DPC Statement.** Mr. Black caused a new trust to be created for Joanne Black at a significant cost to Joanne Black's estate which also appears to be completely unnecessary.[168]

**Truth:** This refers to the 2013 Trust, which Bernard created with DPC approval, to hold Joanne's workers compensation payments.[169] There was no claim made to the DPC regarding the 2013 Trust, nor any evidence about was trust presented.[170]

**DPC Statement.** Mr. Black failed to account for tax consequences when he caused the [2013 Trust] to be created and manipulated funds and transactions between Joanne Black's conservatorship estate and her trust and Renata Black's estate, so that Joanne Black would bear the brunt of any tax ramifications.

**Truth:** Joanne pays no income tax, and there was no manipulation of accounts.[171]

**Harper Aff.** ¶ **21.** [T]he establishment of the 2013 Trust did not result in any adverse tax consequences to Joanne Black.

## VI. Legal Analysis of Dain's Actions for the SNT

### A. Duty of Loyalty; Duty to Defend the SNT When Dain Attacked in 2015

The parties agree on substantial aspects of the law on trustees' duty of loyalty, including the general principle that trustees have a duty of undivided loyalty to the trust and its beneficiaries.[172] As stated in Restatement (Third) of Trusts § 78, a trustee has a duty "to administer the trust solely in the interest of the beneficiaries." A trustee is "obligated to act with the highest degree of fidelity and with utmost good faith toward the beneficiaries." *Wallace v. Malooly*, 4 Ill. 2d 86, 94 (1954). See also *In re Will of Gleeson*, 5 Ill. App. 2d 61 (1955); *Campbell v. Alberts*, 313 Ill. App. 152 (1942). "[T]he trustee cannot do any act inconsistent with the beneficiaries' interests irrespective of the trustee's good or bad faith" and must act "with undivided loyalty to his trust." *Rennacker v. Rennacker*, 156 Ill. App. 3d 712, 715 (1987). In New York, as famously

---

[167] PSUMF 97.

[168] DPC Order (Sept. 28. 2015), at 12.

[169] Exh. SC-7 (DPC Order (March 5, 2013)), ¶ 9b ("the Conservator is specifically authorized . . . To secure such workers compensation benefits to which [Joanne] is entitled but is refusing to claim, and place these benefits in trust for [Joanne] (Joanne Black Trust II)". This refers to the Joanne Black 2013 Trust.

[170] PSUMF 98; Exhs. SC-2 through SC-5 (DPC hearing transcripts).

[171] PSUMF 97, 99; Exh. SC-13 (Harper Aff.), ¶ 19d.

[172] Schaalman Exhs . SC-48 (expert report by Jeffrey Zaluda for plaintiffs), SC-49 (expert report for Defendants by John Farinacci, at 12 (discussing general principles of trustee duty of loyalty).

stated by Justice Cardozo in *Meinhard v. Salmon*, 249 N.Y. 458, 464 (1928), "A trustee is held to something stricter than the morals of the marketplace. Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior."[173] A trustee owes an "unwavering duty of complete loyalty to the beneficiaries of the trust." *Boles v. Lanham*, 865 N.Y.S.2d 360, 361 (App.Div.2d Dep't 2008).

Dain's effort to defund the SNT violated this duty, because defunding could not possibly be in the beneficiaries' joint interests. (Favoring one beneficiary over another is also prohibited, as discussed below.[174]) Dain sought not to gather more assets for the SNT, but to strip all assets from it. This was strictly worse for the SNT than to continue to hold two-thirds of the disclaimed assets, especially because the SNT was offered additional assets from the Issue Trust in settlement. Even without that transfer from the Issue Trust, SNT assets were around $2.4 million in 2015 when Dain first attacked, exceed $4 million today, and would exceed $5 million today, but for Dain's spending of SNT assets on his defunding effort and other litigation.[175]

The parties agree that the duty of loyalty includes a duty to defend his trust against attacks by others, with a limited exception for instances where there is no reasonable basis for defense. They agree on the statement in Bogert's, *The Law of Trusts and Trustees* § 581, which is quoted by the Defendants' expert, John Farinacci.[176] Bogert's explains (emphasis added):

> Equity imposes upon the trustee the duty of defending the integrity of the trust, if he has reasonable ground for believing that the attack is unjustified or if he is reasonably in doubt on that subject. Where it *ought to be entirely clear to any person of ordinary intelligence*, after taking legal advice, that the attack is warranted and that the trust is defective and should be set aside in whole or in part, or that for other reason a defense would be futile or unnecessary, the trustee has no duty to incur expense to defend the suit.

---

[173] Illinois applies a similar standard. See *Sauvage v. Galloway*, 329 Ill. App. 38, 66 N.E.2d 740, 743 (1946) (trustee "must act honestly and with finest and undivided loyalty to his trust, not merely with the standard of honor of the workaday world, but with a punctilio of honor the most sensitive").

[174] See discussion of the duty of impartiality in **§ VI.E** *infra*.

[175] PSUMF 76, 100. Dain's spending of SNT funds is discussed in **§ III.D** *supra*.

[176] Exh. SC-44 (Farinacci Report), at 14 (quoting Bogert's § 581).

Dain will seek to justify not defending based on the DPC's ruling and statements made after of his attack. This, however, is the wrong time for assessing whether defense was reasonable. Whether there is a reasonable basis for defense, and thus a duty to defend, must be judged at the time of the attack. As defense expert Farinacci testified in deposition: "You have to judge a trustee's actions at the time that they're made."[177] Whether no reasonable trustee would defend the SNT is an objective question. It turns on what Dain knew about the available defenses, *before attacking*, or would have know if he had spoken to Bernard, his co-trustee.

Consider then whether a duty to defend would arise if *someone else* had attacked and sought to defund the SNT, claiming (as Dain did) that Bernard did not sufficiently disclose that only two-thirds (rather than all) of the disclaimed assets would go to the SNT. There was manifestly a reasonable basis to defend the SNT's right to hold the assets it held – which all agreed it should have held. What is unreasonable is the attack: A claim that the SNT received fewer assets than it should have cannot justify removing the assets that were properly there. All the more so since Dain never pursued, and rejected when offered, the less extreme remedy of transfer of Issue Trust funds to the SNT.

We discuss below three additional defenses that were available for an effort to defund the *Issue Trust*, and also apply to the SNT: (i) disclaimers are irrevocable under Colorado law; (ii) the time period under C.R.C.P. 60(b) for reversing the DPC's prior decision had expired; and (iii) Bernard provided reasonable disclosure of the effects of the disclaimer (judged at the time the attack was made, not in hindsight).[178] Each was individually reasonable. If at least one reasonable defense exists, the exception to the trustee's duty to defend fails.

Bernard's defense of the trusts against defunding succeeded in 2015. This negates any claim that no reasonable trustee would have pursued this defense. The plaintiffs believe that, as a matter of law, this success should be conclusive proof that defense was reasonable. Thus, Dain's

---

[177] Exh. SC-45 (Farinacci dep.) at 114; *see also id.* at 117 ([T]he trustees have to make a measured decision at the time . . . . [T]hey're judged based upon the decision made when it was made."); 132 (similar).

[178] See discussion of these defenses for the Issue Trust in **§ VII.A** *infra*.

duty of loyalty required him to defend, if someone else attacked.  It necessarily follows that his attack was a breach of that duty.

## B.  Duty Not to Attack the SNT

Dain did not merely fail to defend, he attacked his own trust and sought to completely defund it, by reversing the disclaimer.  Bogert's § 581 explains that this is *never permitted*.

> **Duty of Trustee Not to Attack the Trust**
> The trustee has a duty not to attack the trust or set up a claim that it is in whole or in part invalid, or to maintain that its creation was procured in an illegal manner or for an illegal purpose. . . .  When a trustee accepts a trust, he agrees to carry out its provisions and to secure the results which the settlor intended. . . .  The promise to execute the trust impliedly includes an agreement not to set up any claims which will impede or render impossible the carrying on of the trust.

This categorical ban follows directly from the trustee's basic duty of undivided loyalty to the trust. Any attack on the trust, even if meritorious, must come from someone else.  The parties agree that a narrow exception to the duty to defend exists, when there is no reasonable basis for defense. There is no similar exception that permits a trustee to attack his own trust.[179]  The plaintiffs have found no case where a trustee was permitted to attack and seek to completely defund his own trust. On the contrary, actions that endanger the trust are grounds for trustee removal.  *Laubner v. JP Morgan Chase Bank, N.A.*, 386 Ill. App. 3d 457, 467 (2008).

Dain's efforts to defund the SNT also breach his duty to obey the SNT instrument.  "The trustee has a duty to administer the trust, diligently and in good faith, in accordance with the terms of the trust and applicable law." Restatement (Third) of Trusts § 76. The "duty to act and to carry out the terms of the trust" is among the "fundamental duties" of a "trust relationship." Charles E. Rounds, Jr., *Loring: A Trustee's Handbook* § 6.1 (8th ed. 2006), "Simply stated, a trustee's duty is to obey the directions of the trust." Martyn Frost*, Trusts in Prime Jurisdictions* 13 (Alon Kaplan ed., 2000). "The terms of the trust take precedence over the wishes of the beneficiaries." Lynn D. Wardle & Laurence C. Nolan, *Family Law in the USA*, 361 (2011).  Under Illinois law, a trustee

---

[179] Consistent with the flat view that attacks by a trustee are never permitted, Bogert's § 581, under the heading "Duty to Defend Trust Against Attack," discusses the duty to defend against attacks by the settlor, beneficiaries, and creditors of the settlor or a beneficiary, but does not discuss the duty to defend against attacks by a trustee.

"is obligated to carry out the trust according to its terms and to act with the highest degrees of fidelity and utmost good faith." *Giagnorio v. Emmett C. Torkelson Trust*, 292 Ill. App. 3d 318, 325 (1997); *see also Grot v. First Bank of Schaumburg*, 292 Ill. App. 3d 88, 91-92 (1997).[180]

This duty bars Dain from seeking to defund the SNT. Defunding would harm the primary beneficiary, Joanne, by creating a substantial risk that if funds for her support are not held in trust, she will squander them.[181] This contradicts the trust instrument, which contemplates that assets for Joanne's support will be held in trust, and places those assets in a special "Supplemental Needs Trust," which includes restrictions on spending that ensure that Joanne will remain eligible for government benefits. These benefits include subsidized housing, Medicaid insurance, and freedom from claims for the cost of her past and possible future stays in psychiatric hospitals.[182] Defunding would also destroy the Issue Trust's remainder interest in the SNT. This contradicts the settlor's expectation that a remainder interest is likely to remain on Joanne Black's death.

## C. Period 3: Additional Bases for Defending the SNT in 2018

When Dain renewed his defunding effort before the DPC in 2018, five additional defenses to his attack were available, *in addition to* those available in 2015. Of these defenses, the only one that the Colorado Court of Appeals reached, in vacating the DPC's 2018 decision on the disclaimer, was lack of subject matter jurisdiction. This lack was so clear that, at oral argument, Joanne's appellate counsel simply conceded that the DPC lacked jurisdiction.[183]

A second defense was that the DPC had already decided in 2015 not to reverse the disclaimer. Reversing a prior decision is an extraordinary remedy in the first instance. Plaintiffs are unaware of precedent for a court to revisit a prior decision twice and reverse the second time, after not doing so the first time, let alone after the first refusal was affirmed on appeal.

---

[180] New York law is similar. See, e.g., *In re Chase Manhattan Bank*, 6 N.Y.3d 456, 460 (2006) (trustee must honor the settlor's intent, as conveyed by the language of the trust instrument).

[181] See discussion of Joanne's ability to handle substantial amounts of money in **§ II.A** *supra*.

[182] PSUMF 101.

[183] Schaalman Exh. SC-46 (transcript of appellate oral argument) at 6.

A third defense was that the DPC had awarded surcharge damages against Bernard and could not award duplicative relief against different parties (the trusts) for the same wrong.[184] A fourth defense was the lapse of time since approval of the disclaimer in 2013. This, in all likelihood, exceeded the "reasonable time" within which a motion to reverse the DPC's prior decision had to be brought under C.R.C.P. 60(b).[185] A final defense was the procedural impropriety of the attack, launched in a reply brief, with no notice to trust beneficiaries or opportunity for the trustees to respond.[186]

Thus multiple reasonable defenses existed. Dain's fiduciary duty therefore required him to defend the trusts against defunding if someone else attacked. Attacking himself was forbidden, let alone doing so in a procedurally improper manner.

## D. Period 4: Bases for Defending the SNT Today

During period 4, Dain has continued to seek to reverse the disclaimer and defund both trusts. Once again, there are many reasonable bases for defense. The DPC now has subject matter jurisdiction for a future motion to reverse the disclaimer. There may not be procedural irregularity. But the other defenses discussed above will still apply. Defense is therefore required, and attack forbidden.

The C.R.C.P. Rule 60(b) requirement that a motion to reverse a prior decision be brought within a "reasonable time" looms ever larger as time goes by. It is over nine years since the disclaimer was authorized. No Colorado case allows a Rule 60(b) challenge after such an extended period; several impose a much shorter time limit.[187] Moreover, Colorado has a three-year statute

---

[184] The DPC reversed the disclaimer without altering its prior award of surcharge damages. Exh. SC-32 (DPC Order (April 27, 2018), at 13.

[185] See discussion of Colorado precedent on what a reasonable time would be in **§ VII.A** *infra*.

[186] The trusts are Illinois trusts. See discussion of which state's law applies to the trusts in **§ V.A**, *supra*. Under Illinois law, beneficiaries of a trust are necessary parties to foreclose their interest." *Schlosser v. Schlosser,* 218 Ill. App. 3d 943, 947 (1991) (citing *Illinois National Bank v. Givin,* 390 Ill. 345 (1945)). Even if the DPC could proceed without beneficiaries as parties, they were entitled to notice and an opportunity be heard. This would include the Issue Trust as remainder beneficiary of the SNT and the Issue Trust beneficiaries.

[187] Colorado cases on what a reasonable time might be are discussed in **§ VII.A** *infra*. A new challenge cannot relate back to 2018, because in 2018, no Rule 60(b) motion was brought. See next note.

of limitations for bringing a damages claim against the Issue Trust. It is hard to imagine that a reasonable time under C.R.C.P. 60(b) can exceed the statute of limitations.

There is also an important new defense to any effort to reverse the disclaimer in Colorado. The asserted harm in 2015 was that one-third of the disclaimed assets went to the Issue Trust. Yet the disclaimer has been found to be irrevocable under Illinois law with respect to the Issue Trust.[188] This leaves no apparent road to recovering the Issue Trust assets, even if the Colorado courts rule that a disclaimer can be revoked.

## E. Duty of Impartiality Between SNT Beneficiaries

Dain has openly acted on behalf of Joanne, the primary beneficiary of the SNT, and against the interests of the Issue Trust, as remainder beneficiary. There are many examples of his partiality, we list some of them here. Dain's preferred remedy, defunding the trusts, would transfer the SNT assets to Joanne personally, leaving nothing for the Issue Trust. Dain represented Joanne in the DPC in 2015, where he sought this remedy.[189] He hired Joanne's New York counsel Salzman and used SNT funds to pay Salzman and DiPonio, including their work seeking to defund the SNT.[190] He used SNT funds to pay Joanne's legal fees in a dispute with the Issue Trust.[191] In Illinois, he and Joanne's conservator Goodwin use joint counsel.[192]

All of these actions violate Dain's duty of impartiality between beneficiaries. This duty includes a primary and remainder beneficiary. This court has confirmed this duty, holding:[193]

> [U]nder New York law, trustees owe fiduciary duties to remainder beneficiaries. See, e.g., *In re Heller*, 6 N.Y.3d 649 (2006) (trustees owed fiduciary obligations not only to the income beneficiary, but also to the other remainder beneficiaries); see also *Weingarten v. Warren*, 753 F. Supp. 491, 495-96 (S.D.N.Y. 1990) (holding that under New York law, remainder beneficiary of trust stated a cause of action against trustee for breach of fiduciary duty.).

---

[188] Exh. SC-40.

[189] See discussion of Dain's conduct in representing Joanne before the DPC in **§ II.I** *supra*.

[190] See discussion of Dain's efforts to obtain DPC authority to spend SNT funds, and the purposes for which those funds were spend in **§ III.D** *supra*.

[191] See discussion above of the declaratory judgment action in Illinois in **§ III.C** *supra*. This court recognized Dain's use of SNT funds to pay Joanne's legal fees in its Order on Motions to Dismiss (Doc. 119) at 6.

[192] PSUMF 102.

[193] Opinion on motions to dismiss [Doc. 119] (Aug. 16, 2017), at 37-38.

As one New York court put it: "The [New York] Court of Appeals has expressly held a trustee/beneficiary owes a fiduciary duty to all trust beneficiaries, and must administer the trust fairly for all of them." *Milea v. Hugunin*, 2009 WL 1916400, at *7 (Sup.Ct. Onondaga Cty.) (citing *In re Watson,* 213 N.Y. 177 (1914)).

The plaintiffs believe that Illinois law governs trustee duties.[194]  However Illinois and national law is similar to New York law.  Restatement (Third) of Trusts § 79(1) states the duty of impartiality; § 79(2) confirms that this duty includes a primary and a remainder beneficiary:

> If a trust is created for two or more beneficiaries or purposes in succession… the trustee's duty of impartiality includes a duty to so invest and administer the trust, or to so account for principal and income, that the trust estate will produce income that is reasonably appropriate to the purposes of the trust and to the diverse present and future interests of its beneficiaries.

Bogert, *The Law of Trusts and Trustees* § 541, is similar:

> A trustee who holds for successive beneficiaries owes a duty to them to administer the trust with impartial consideration for the interests of all the beneficiaries.

Illinois case law is consistent with the Restatement, Bogert's and the New York cases cited by this court.  A trustee must "deal impartially with all beneficiaries and to protect their interests." *Northern Trust Co. v. Heuer*, 202 Ill. App. 3d 1066, 1070 (1990).  This includes a remainder beneficiary:  "a trustee owes the same fiduciary duty to a contingent beneficiary as to one with a vested interest." *Scanlan v. Eisenberg*, 669 F.3d 838, 844 (7th Cir. 2012) (quoting *Burrows v. Palmer*, 5 Ill. 2d 434, 439-40 (1955)).

For one instance of partiality, Dain's spending SNT assets to support Joanne (primary beneficiary) in litigation against the Issue Trust (remainder beneficiary), Dain will assert that his spending was authorized by the DPC.  This defense does not address his other actions that favored Joanne over the Issue Trust, including his effort to defund the SNT.

Even for the narrow issue of Dain's spending SNT funds to support litigation against the Issue Trust, Plaintiffs believe that this defense is insufficient.  A trustee should not be allowed to spend trust funds to benefit one beneficiary over another, even if he persuades a court to permit

---

[194]  See discussion of which state's law of fiduciary duty applies in **§ V.A** *supra*.

this. The breach lies in asking for permission, compounded by Dain's doing so through a surprise attack.[195] In addition, even if a *minority* trustee can spend trust funds with court approval (plaintiffs have found no cases allowing this), the co-trustees and beneficiaries must have an opportunity to respond to the spending request, in a neutral forum with jurisdiction over them. Dain obtained spending authority through a surprise attack which lacked these protections. Moreover, Dain's receipt of spending authority built on his prior breach in attacking his own trusts. All subsequent DPC decisions build on that breach, and cannot protect Dain here because they are the fruit of an already poisoned tree.

## F. Duty to Cooperate with Co-Trustees

Dain actions must be judged against the background of the trustee duty to cooperate with co-trustees. See, e.g., Restatement (Third) of Trusts § 37 cmt. e (grounds for trustee removal include "unreasonable or corrupt failure to cooperate with a co-trustee."); Uniform Trust Code § 706(b)(2) (2000) (court may remove a trustee if "lack of cooperation among co-trustees substantially impairs the administration of the trust."); *Rennacker v. Rennacker*, 156 Ill. App. 3d 712, 715 (1987) (removal due to conflict between trustee and beneficiaries).

Cooperation includes treating litigation between trustees as a last resort, to be launched only if efforts at an out-of-court resolution have failed and the trustee launching litigation concludes, after cost-benefit analysis, that the expected benefit from litigation exceeds the expected cost. As plaintiffs' expert Jeffrey Zaluda explained:[196]

> In all cases, going to court is understood to be only a last resort following all reasonable efforts by the trustees to work together and come to a resolution. A cost-benefit analysis should be performed by the trustee who seeks a court resolution . . . . Litigation is expensive, and there must be a reasonable basis based on this cost-benefit analysis for believing that the benefit to the trust exceeds the expected litigation costs. . . . Especially for a smaller trust, if litigation is commenced, it is incumbent on the trustees to pursue all reasonable efforts to settle . . . .

---

[195] See discussion of Dain's actions in seeking spending authority from the DPC in **§ III.D** *supra*.
[196] Exh. SC-43 (Zaluda report) at 6-7.

Defendants' expert, John Farinacci, agreed at deposition that "co-trustees in New York do have an obligation to consult with one another,"[197] and that litigation should be avoided "if there is another alternative that is appropriate."[198] He agreed that a trustee should engage in a cost-benefit analysis before launching litigation, that this analysis must show expected benefit from the litigation, and that cost-benefit analysis is especially important for a smaller trust.[199]

This is not, however, how Dain behaved. In period 1, he was essentially unreachable on trust business.[200] From the onset of the dispute, in September 2014, Dain had been totally non-cooperative and hostile. He has refused to speak with his co-trustees;[201] threatened Samuel with litigation for actions he had not even taken;[202] refused since 2015 to discuss settlement or engage in mediation;[203] and much more. There is no evidence that Dain ever conducted a cost-benefit analysis for litigation.[204] And litigation to defund the SNT harms rather than benefits the SNT.

A comparison of legal spending to recovery speaks volumes. Dain could have achieved a full recovery for the alleged harm to the SNT in settlement in 2015, when legal expenses where still small, in 2016, 2017, or 2018.[205] A transfer of most of the Issue Trust funds to the SNT remains on offer today.[206] Instead, Dain has achieved no recovery for either Joanne or the SNT. Legal expenses on each side far exceed the $1 million initially in dispute.[207]

---

[197] Exh. SC-45 (Farinacci dep.) at 103.

[198] *Id.* at 87.

[199] *Id.* at 132-134.

[200] See discussion of Bernard's inability to reach Dain during this period in **§ II.E** *supra*.

[201] PSUMF 71.

[202] BBlack Exh. BL-25 (Dain email to Bernard's counsel, Bernie Poskus (Oct. 9, 2015) ("I do not believe there is any personal benefit to Samuel Black in continuing as Trustee of the [SNT], nor do I think he wants to engage in protracted litigation . . . over every decision or action we would need to take.").

[203] See discussion of Dain's refusal to settle or mediate in **§§ II.H** and **III.E** *supra*.

[204] PSUMF 103.

[205] See discussion of settlement offers in **§ II.H** and **III.E** supra.

[206] PSUMF 104.

[207] PSUMF 105; Exh. SC-12 (Harper expert report).

## G. Dain's Expected Reliance on Statements by the DPC

Dain is expected to rely on positive statements by the DPC about his conduct, and claim that these operate as collateral estoppel for the claims here. Those statements are obiter dicta, with regard to Dain's breach of fiduciary duty. Dain was not a defendant in the DPC and whether he breached his fiduciary duties was never addressed. Nor did the DPC address whether Dain, as a trustee, should be permitted to attack and seek to defund his own trusts.

The DPC not only did not recognize that Dain had a fiduciary duty to the Issue Trust as residual beneficiary of the SNT, it wrote that the SNT trustees owe duties "solely in the interest of the beneficiary Joanne Black, to observe a duty of loyalty only to her."[208] This is an incorrect statement of the law, as this court has recognized.

## VII. Legal Analysis of Dain's Actions for the Issue Trust

## A. Duty of Loyalty; Duty to Defend

The legal standard for the duty to defend a trust against attack is stated above; non-defense is justified only if there is no reasonable basis for the defense. This high standard is plainly not met here. For the Issue Trust, there were three separate bases for defending Bernard's actions in obtaining the disclaimer, which led to funding of the Issue Trust, against an attack which sought to reverse the disclaimer.

*Disclaimers are Irrevocable.* A first basis for defense against reversal of the disclaimer involves the legal rules governing disclaimers. Colorado has adopted the Uniform Disclaimer of Property Interests Act, as C.R.S. § 15-11-1201 et. seq. Under C.R.S. § 15-11-1205(5), "A disclaimer becomes irrevocable when it is delivered or filed." The defense, which apparently succeeded in the DPC,[209] was therefore that the disclaimer could not be revoked. This did not leave Dain or Joanne without a remedy. They could have pursued the remedies discussed above, including transfer of funds from the Issue Trust to the SNT.[210]

---

[208] Exh. SC-27 (DPC order (Jan. 4, 2018)), at 1.

[209] See discussion of the DPC decision not to unwind the disclaimer in **§ II.J** *supra*.

[210] See discussion of available remedies in **§ II.G** *supra*.

*Time for Challenge Under C.R.C.P. 60 Had Expired.*  A second basis for defense against reversal of the disclaimer involves the limited circumstances in which a court can revisit and reverse its own prior decision, set forth in C.R.C.P. 60(b) (similar to F.R.C.P. 60(b)):

> On motion and upon such terms as are just, the court may relieve a party or his legal representative from a final judgment, order, or proceeding for the following reasons: (1) Mistake, inadvertence, surprise, or excusable neglect; (2) fraud (whether heretofore denominated intrinsic or extrinsic), misrepresentation, or other misconduct of an adverse party; (3) the judgment is void; (4) the judgment has been satisfied, released, or discharged, or a prior judgment upon which it is based has been reversed or otherwise vacated, or it is no longer equitable that the judgment should have prospective application; or (5) any other reason justifying relief from the operation of the judgment. The motion shall be made within a reasonable time, and for reasons (1) and (2) not more than six months after the judgment, order, or proceeding was entered or taken.

For Dain's claim, of insufficient disclosure, the relevant subsection was (2).

The motion to reverse the disclaimer had two defects.  First, no explicit motion under C.R.C.P. 60(b) was brought.  Second, any motion would have been untimely.  The motion to void the disclaimer was filed almost two years after the DPC authorized the disclaimer on March 5, 2013.[211]  This far exceeded the 6-month time limit under subsection (2).  The catchall reason (5) was not available, because it "has been narrowed to include only extreme situations and extraordinary circumstances" that are "not covered by the enumerated provisions."  *Davidson v. McClellan*, 16 P.3d 233, 237-39 (Colo. 2001); *see also In re Adoption of P.H.A.*, 899 P.2d 345, 346 (Colo. App. 1995).  Moreover, a subsection (5) motion had to be filed within a reasonable time, yet Colorado cases had found periods shorter than two years to be unreasonable.[212]

*Bernard Provided Reasonable Disclosure of the Effects of the Disclaimer.*  A third basis, which we place third only because the DPC did not accept it, was that Bernard provided extensive disclosure of the effects of the disclaimer.  This defense did not succeed, but the question for Dain's duty to defend is whether there was a reasonable basis, viewed *ex ante*.

---

[211] Exh. SC-15 (DiPinio Motion to Void Disclaimer (Feb. 9, 2015)).

[212] See *Ehrlinger v. Parker*, 372 P.2d 267, 269 (1958) (three months unreasonable); *Salter v. Jefferson Cnty.*, 292 P.2d 345, 346 (Colo. 1956) (19 months "obviously" unreasonable); *Martinez v. Dixon*, 710 P.2d 498, 500 (Colo.App. 1985) (16 months unreasonable).

The defense would include asserting that any reasonable lawyer, who read Bernard's proposed conservatorship powers and Renata's will, should have understood that two-thirds of the disclaimed assets would flow to the SNT and one-third to the Issue Trust. Dain already knew what Renata's will provided. Young and DiPonio read her will, and Bernard's counsel walked them through the will's division of assets.[213] The DPC apparently did not read Renata's simple will.[214] However, Bernard could reasonably believe that the DPC would do so, given his statement that the disclaimed assets would "pass under Article Fourth of [Renata's will]."

Indeed, the plaintiffs believe that it was unreasonable for anyone who read Bernard's proposed powers to believe that the SNT would receive all of the disclaimed assets. His proposed powers expressly stated that under Article Fourth, "*two thirds* of the estate of Renata Black will be contributed to [the SNT]." Two-thirds cannot mean three-thirds. At most, Bernard's disclosure might lead someone to ask, "what about the other one-third of the disclaimed assets"? The answer to that question was found in Article Fourth of Renata's will.

Moreover, whether a reasonable basis for defense existed should be assessed assuming that Dain had defended instead of attacked the Issue Trust and would testify before the DPC consistent with his statements to the New York guardianship court. His statement to this court, quoted above, indicates that he received Bernard's proposed powers and understood that the SNT would receive two-thirds of the disclaimed assets.[215]

Whether no reasonable trustee would defend the disclosure for the disclaimer should also be judged assuming GAL Young would give testimony to the DPC consistent with her deposition testimony. Young read Renata's will and the two trusts.[216] At deposition, Young testified that she knew that the disclaimed assets would go into Renata's estate:[217]

---

[213] See Glatstein's testimony, quoted in **§ II.B** *supra*.

[214] Exh. SC-1 (DPC Opinion (Sept. 28, 2015)), at 7 ("Mr. Black's position essentially states the Court had the primary duty to discern Mr. Black's intentions by reading the Will").

[215] See discussion of Dain's statements to the New York guardianship court in **§ II.F** *supra*.

[216] PSUMF 48.

[217] Exh. SC-4 (DPC hearing transcript (Aug. 5, 2015) at 103 (excerpt from Young's deposition).

> Q. [I]t is your understanding under the law of disclaimers that if the POD accounts were disclaimed the money goes into the estate, am I correct?"
>
> Answer, "Yeah, yes, that's true. . . ."

In contrast, before the DPC, Young denied understanding that the disclaimed assets would pass under Renata's will:[218]

The defense of sufficient disclosure did not succeed, but the test for whether Dain had a duty to defend the Issue Trust is only whether the defense was *reasonable ex ante*.

## B. Duty Not to Attack the Issue Trust

Dain did not merely fail to defend the Issue Trust, he attacked his own trust and sought to completely defund it. As discussed above for the SNT, seeking to defund one's own trust is *per se* impermissible. Dain's defunding effort breaches his duty of loyalty to the Issue Trust, his duty to defend the trust against attack, and his duty to obey the Issue Trust instrument.

## C. Additional Defenses Against Defunding the Issue Trust in Periods 3 and 4

Additional defenses against defunding were available to the Issue Trust in period 3, including in 2018 when Dain renewed is effort to reverse the disclaimer. These defenses are discussed above for the SNT. They also apply to the Issue Trust, assuming that Dain has ongoing fiduciary duties to the Issue Trust, as plaintiffs believe he has.[219] The Issue Trust has further additional defenses against defunding today. These defenses are also discussed above. [220]

## VII. Relief Requested

## A. Relief Requested for the SNT

Plaintiffs request that this court rule that Dain, by seeking to defund the SNT, violated his duty of loyalty (Count 17), his duty to defend the SNT against attack (Count 28), his duty of impartiality between beneficiaries (Count 15), his duty to obey the trust instrument (Count 31), and his duty to cooperate with co-trustees (Count 36), in each of periods 2, 3, and 4. They further request that this court rule that Dain breached his duty of impartiality in each of

---

[218] *Id.* at 97 (Young testimony to DPC).

[219] See discussion of these additional defenses in **§ VI.C** *supra* and discussion of Dain's ongoing fiduciary duty to the Issue Trust in **§ V.B** *supra*.

[220] See discussion of these defenses in **§ VII.C** *supra*.

Periods 2, 3, and 4, by representing Joanne in litigation that was adverse to the interests of the Issue Trust and spending SNT funds to support Joanne in litigation against the Issue Trust (Count 16).

**B. Relief Requested for the Issue Trust**

Plaintiffs request that this court rule that Dain, by seeking to defund the Issue Trust violated his duty of loyalty to the Issue Trust (Count 1), his duty to defend the Issue Trust against attack (Count 9), and his duty to obey the Issue Trust instrument (Count 12), in each of periods 2, 3, and 4. They further request that this court rule that Dain breached his duty of loyalty in period 2 by representing a non-beneficiary (Joanne) in litigation against the Issue Trust seeking to defund it (Count 8). If this court determines that Dain did not owe full fiduciary duties during periods 3 and 4, they request that this court rule that legal expenses incurred by the Issue Trust during these periods were proximately caused by Dain's breach of duty in period 2.

Dated this 29th day of April, 2022.

GASS TUREK LLC
Attorneys for Plaintiffs

*Electronically signed by Michael H. Schaalman*
Michael H. Schaalman
schaalman@gassturek.com

241 North Broadway
Suite 300
Milwaukee, WI 53202
414-223-3300 T
414-224-6116 F